UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 09-50 (MJD/FLN)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | GOVERNMENT'S POSITION |
| v. | ) | WITH RESPECT TO SENTENCING |
| | ) | |
| SALAH OSMAN AHMED, | ) | |
| | ) | |
| Defendant. | ) | |

The United States of America, by and through its attorneys B. Todd Jones, United States Attorney for the District of Minnesota, Assistant United States Attorneys Charles J. Kovats, Jr., John Docherty, and Department of Justice Trial Attorney William M. Narus hereby submits its position with respect to sentencing of Defendant Salah Osman Ahmed ("Ahmed" or "defendant").  The government anticipates serving and filing a motion pursuant to U.S. Sentencing Guidelines (U.S.S.G.) § 5K1.1.  Absent such a motion, the government believes that a Guidelines sentence is appropriate in this case.

## I.    BACKGROUND ON SOMALIA.

At Common Appendix I, the government presents a factual background on Somalia that is relevant to the sentencing proceedings against the following defendants:

*United States v. Mahamud Said Omar*, 09-CR-242 (MJD/FLN)
*United States v. Kamal Said Hassan*, 09-CR-38 (MJD/FLN)
*United States v. Salah Osman Ahmed*, 09-CR-50 (MJD/FLN)
*United States v. Abdifatah Yusuf Isse*, 09-CR-50 (MJD/FLN)
*United States v. Adarus Abdulle Ali*, 09-CR-317 (MJD/FLN)
*United States v. Omer Abdi Mohamed*, 09-CR-352 (MJD/FLN)
*United States v. Ahmed Hussein Mahamud*, 11-CR-191 (MJD/FLN)

This background is provided at Common Appendix I to the sentencing position papers filed in each of the cases described above.

## II.    A MINNESOTA PIPELINE OF SUPPORT TO SOMALIA.

At Common Appendix II, the government submits an overview of the description of the offenses, defendants, and facts and circumstances describing the conduct at issue. Like Common Appendix I, Common Appendix II is an identical document submitted in each case described above.  The specific conduct of the defendant is set forth in more detail in Section III, B below.

## III.    THE CASE AGAINST THE DEFENDANT, SALAH OSMAN AHMED

### A.    The Charge of Conviction

On July 28, 2009, defendant Ahmed pleaded guilty to Count One of the Indictment, Providing Material Support and Resources, namely, personnel, Knowing and Intending that the Material Support or Resources would be used in Preparation for and Carrying Out a Conspiracy to Kill, Kidnap, Maim or Injury People in a Foreign Country, in violation of 18 U.S.C. § 2339A.  This offense carries a statutory maximum sentence of 15 years' imprisonment, a maximum term of supervised release of life, a $250,000 fine, and a $100 special assessment.

### B.    The Defendant's Offense Conduct

#### 1.    The Factual Basis in the Plea Agreement

The factual basis of the plea agreement was limited to the following:  On or about December 6, 2007, the defendant traveled from Minneapolis, Minnesota to fight against

2

Ethiopian troops present in Somalia and to cause the Ethiopian troops to withdraw from Somalia.

During the plea colloquy, the defendant elaborated. The defendant explained that in October 2007 he met some men from Minneapolis who were discussing going to Somalia to fight the Ethiopians. Plea Colloquy at 15. The group held secret meetings and purchased tickets for the men. *Id.* at 15-16. The defendant received basic training on AK-47s, Rocket Propelled Grenades, and machine guns at a safe-house in Marka and was issued an AK-47 at a second house before leaving for the training camp. The defendant assisted with building the training camp for approximately two weeks and then left before receiving any training. *Id.* at 18.

### 2.   *The Defendant's Statements*

During the course of the investigation, the defendant was interviewed by agents of the FBI and provided information about himself, his knowledge of the conspiracy, and his observations. On or about October 5 and 9, 2012, the defendant provided the following sworn testimony when called as a witness in the trial of *United States v. Mahamud Said Omar* about these same topics. From these statements of the defendant, the following additional information about the defendant and his relevant conduct is known beyond that recounted in Common Appendix II.

### a.   *Ramadan 2007 until Departure on December 6, 2007*

The defendant first learned about a trip to Somalia in Ramadan 2007 and agreed to join the trip after realizing that it would actually happen. Like his co-conspirators, the defendant was motivated by a desire to force the Ethiopians out of Somalia. The

defendant did not consult with his family and raised money by soliciting donations under false pretenses.  The defendant testified that he recalls Said Fidhin (*See* Attachment 2, Letter "A") stating that they would dress up like civilians and then throw something like a grenade at the Ethiopian military.  Once Dahir Gure (*See* Attachment 2, Number "1") arrived in Somalia, Gure informed the men that he was being received as a hero.  The defendant left with Kamal Hassan (See Attachment 2, Number "3").  At the time he left, the defendant understood that he had joined a plan to fight and kill the Ethiopian military in Somalia.  Before departing the United States, the defendant understood that he would be joining al Shabaab, but did not have an understanding of the group's operations and objectives.

### b.    *Departure until Return*

The defendant traveled through Dubai, Djibouti, Hargeisa and Mogadishu before arriving in Marka.  While there, the defendant learned that Shirwa had reservations about traveling to Somalia but was persuaded to come by Khalid Abshir (*See* Attachment 2, Number "7").  The defendant encountered "Amo" (*See* Attachment 1, Letter "D") in the safe-house and learned more about al Shabaab.  Amo explained that al Shabaab would fight against the Ethiopians, the government or anyone who opposed them.  This was different than defendant's expectation that it would be the Somali people taking up arms against the Ethiopian Army; instead, the defendant had to hide his identity because al Shabaab was at war with the TFG and the Ethiopian military.  Despite learning this, the defendant continued down the path toward the al Shabaab training camp.

It was in Marka that the defendant learned that he would have to raise money to purchase his weapon. The defendant and other men in the house placed calls to people in the United State requesting that they send money. In Baraawe, the defendant received his AK-47 and magazines. Having never fired a gun, the defendant discharged several rounds in the air while the group traveled to the training camp near Kamsuma. The defendant did not remain at the training camp, claiming that he had developed a skin condition that needed to be treated and leaving the camp with Abdifatah Yusuf Isse (*See* Attachment 2, Number "5"). Before leaving Somalia, the defendant acquired a fraudulent marriage certificate to corroborate the story that he had been married in Somalia if questioned by authorities.

### c. Post-Return Conduct

The defendant returned to the United States in April 2008 and moved to California to avoid attention from law enforcement. The FBI interviewed the defendant on July 30, 2008, and he lied to the FBI, denying his involvement. Following the suicide bombing by Shirwa Ahmed (*See* Attachment 2, Number "2"), the FBI interviewed the defendant a second time and he again lied, denying any involvement. During the first interview, the defendant presented the FBI with the fraudulent marriage certificate in an attempt to discourage further investigation. The defendant was arrested in July 2009 and agreed to cooperate within a week.

### C. The Pertinent Guideline Calculations Agreed to By the Parties

The parties agreed to the following Guideline calculations in the plea agreement:

Base Offense Level, §§ 2X2.1, 2A1.5:          33 (Plea Agreement, para. 6(a))

5

Acceptance of responsibility, § 3E1.1(a), (b):     -3  (*Id.* para. 6(d))

The government reserved the right to argue that a 12-level adjustment under § 3A1.4(a) applies because the defendant's conviction is a Felony Involving or Promoting a Crime of Terrorism.  The defendant reserved his right to argue that this section did not apply.  (*Id.* para. 6(c)).

Finally, the parties agreed that, if the adjustment under § 3A1.4(a) applies, the defendant's Criminal History Category would be VI.  Otherwise, the parties believed it to be I. (*Id.* para. 6(f)).

## IV.   THE PSR's CALCULATIONS AND RECOMMENDATIONS.

On or about March 25, 2013, the United States Probation Office disclosed the PSR in this case. The PSR calculates defendant's applicable guideline range at 180 months' imprisonment, based on a total offense level of 42, criminal history category of VI, and a statutory maximum sentence of 15 years' imprisonment.  (PSR ¶ 142).

The PSR guideline calculations are summarized as follows:

| | | |
|---|---|---|
| Base Offense Level, §§ 2X2.1, 2A1.5: | 33 | (PSR ¶ 98) |
| Victim Related Adjustments: | | |
| Felony involving/promoting crime of terrorism § 3A1.4(a): | +12 | (PSR ¶ 101) |
| Acceptance of responsibility, §§ 3E1.1(a), (b): | -3 | (PSR ¶ 104) |
| Total Offense Level: | 42 | (PSR ¶ 105) |
| Criminal History Category: | VI | (PSR ¶ 110) |
| Guideline Range: | 180 months | (PSR ¶ 142) |

6

Supervised Release:                          Any term up to life   (PSR ¶ 145)

Fine:                                        $25,000-$250,000   (PSR ¶ 151)

The PSR also indicates that the information provided does not constitute a recommendation by the USPO for a departure or a variance.

## V.   GOVERNMENT'S RESPONSE TO THE PSR.

### A.   Objections to the PSR

The government has no objections and one amendment to the PSR.  As to the description of defendant Ahmed Abdulkadir Warsame (charged in the Southern District of New York) located at paragraph 18 of the PSR, the government would like to add that on December 21, 2011, Ahmed Warsame pleaded guilty to all nine counts of the indictment.  The information relating to Ahmed Warsame's pleas of guilty was not available at the time the PSR was published.

### B.   The Government's Guideline Calculations

The government agrees with the guideline calculations in the PSR. The government does not believe any other Specific Offense Characteristics or Victim-Related Adjustments are appropriate.  The government also concurs that the appropriate guideline range is 180 months' imprisonment based on a Total Offense Level of 42 and a Criminal History Category of VI.

### C.   The Terrorism Adjustment Under U.S.S.G. § 3A1.4(a) Applies

The defendant disputes the PSR's correct application of U.S.S.G § 3A1.4(a), the terrorism adjustment, which increases his Offense Level by 12 levels and his Criminal

History Category to VI.  The government concurs with the USPO that the terrorism adjustment should apply to this defendant's case.

### 1.  Text of the Terrorism Enhancement

Section 3A1.4 is categorized under chapter three as a victim-related adjustment for terrorism.  Section 3A1.4 was amended in 1996 by the Antiterrorism and Effective Death Penalty Act.

Section 3A1.4 states, in pertinent part, that:

> (a) If the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, increase by 12 levels; but if the resulting offense level is less than level 32, increase to level 32.

> (b) In each such case, the defendant's criminal history category from Chapter Four (Criminal History and Criminal Livelihood) shall be Category VI.

There are four application notes to Section 3A1.4. Application Note 1 states that the term "federal crime of terrorism" has the meaning given that term in 18 U.S.C. § 2332b(g)(5).  Section 2332b states, in pertinent part:

> (5) the term "Federal crime of terrorism" means an offense that–

> > (A)    is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; and

> > (B)    is a violation of –

> > > (i)    . . . 956(a)(1) (relating to conspiracy to murder, kidnap, or maim persons abroad), . . . 2339A (relating to providing material support to terrorists), 2339B (relating to providing material support to terrorist organizations) . . . .

Application Note 2 concerns harboring, concealing and obstruction of justice offenses.  It states, "For purposes of this guideline, an offense that involved (A) harboring or concealing a terrorist who committed a federal crime of terrorism (such as an offense under 18 U.S.C. § 2339 or § 2339A); or (B) obstructing an investigation of a federal crime of terrorism, shall be considered to have involved, or to have been intended to promote, that federal crime of terrorism."

Application Note 3, which concerns "Computation of Criminal History Category," provides that, "[u]nder subsection (b), if the defendant's criminal history category as determined under Chapter Four (Criminal History and Criminal Livelihood) is less than Category VI, it shall be increased to Category VI." USSG § 3A1.4 cmt. n.3 (2012). Application Note 3 serves as an addendum to § 3A1.4's subsection (b) by clarifying that § 3A1.4 does not require a prerequisite criminal history category VI for its application. Application Note 3 provides for the automatic increase of criminal history to category VI. The increase applies to the § 3A1.4 application notes, except for Application Note 4.

Application Note 4 is a stand-alone provision for upward departure, rather than a Section 3A1.4 adjustment, in cases where the defendant's actions do not meet the definition of "federal crime of terrorism" as defined in 18 U.S.C. § 2332b(g)(5).  The predetermined increases of offense level and criminal history category that are applicable to § 3A1.4 are not applicable to Application Note 4.  The Commission noted that an upward departure rather than a specific guideline adjustment was used because of the infrequency of this type of case and so that the court could assess the harm caused by these offenses on a case-by-case basis.

Viewed in the aggregate, these amendments reflect an understanding by both the Congress and the Sentencing Commission that "an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus that terrorists and their supporters should be incapacitated for a longer period of time." *United States v. Meskini,* 319 F.3d 88, 92 (2d Cir.), *cert denied sub nom. Haouari v. United States*, 538 U.S. 1068 (2003). "We have recognized that 'the Sentencing Commission had a rational basis for creating a uniform criminal history category for all terrorists under [U.S.S.G.] § 3A1.4(b), because even terrorists with no prior criminal behavior are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation.'" *United States v. Stewart,* 590 F.3d 93, 143 (2nd Cir. 2009) (quoting *Meskini, supra,* 319 F.3d at 92).

### 2. *Two Theories of Application of the Section 3A1.4 Enhancement*

The disjunctive phrases in § 3A1.4 makes clear that the predicate offense must either (1) "involve" a federal crime of terrorism or (2) be "intended to promote" a federal crime of terrorism and that each clause has a separate meaning. The United States has not been able to locate any Eighth Circuit precedent on the application of § 3A1.4.

### a. *The "Involve" a Federal Crime of Terrorism Theory*

For § 3A1.4 to apply under this prong, the offense must have been "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct," *and* the offense must be one of those enumerated in § 2332b(g)(5). The government submits that the Court must determine by a

preponderance of the evidence that the defendant's offense was "calculated to influence or affect the conduct of government by intimidation or coercion or to retaliate against government conduct."  *United States v. Ashqar*, 582 F.3d 819, 824 (7th Cir. 2009) (preponderance of the evidence standard applies to consideration of the terrorism enhancement); *United States v. Awan*, 607 F.3d 306, 317 (2d Cir. 2010); *United States v. Jayyousi*, 657 F.3d 1085, 1115 (11th Cir. 2011).   The Court may draw reasonable inferences regarding the intent of defendant's crime based upon the evidence.  *See United States v. Mohammed*, 693 F.3d 192, 201-02 (D.C. Cir. 2012) (affirming district court's application of the terrorism enhancement where the court "pointed to specific statements in the record – which Mohammed does not dispute he made – from which it [the district court] drew plausible inferences); *United States v. Chandia*, 675 F.3d 329, 340-41 (4th Cir. 2012) (affirming application of terrorism enhancement where the court "reasonably inferred by a preponderance of the evidence" that the defendant intended to advance Lashkar's terrorist purpose in providing material support to a leader of Lashkar). Although the Eighth Circuit has not considered the issue of whether the district court must make specific factual findings in order to apply the terrorism enhancement, the government assumes for purposes of this sentencing memorandum that that the Eighth Circuit would follow the example of the Fourth Circuit.  *See Chandia*, 675 F.3d at 334 (citing *Chandia I*, 514 F.3d 365, 376 (4th Cir. 2008) (if the sentencing court concludes that the terrorism enhancement is applicable, it was to "identify the evidence in the records that supports its determination").

i.      *"Calculated to influence or affect" conduct of government, or to "retaliate against" government conduct*

In *United States v. Awan*, 607 F.3d 306 (2d Cir. 2010), the Second Circuit made clear that for the terrorism enhancement to apply, the law requires a showing only of a specific intent "to commit an offense that was 'calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct.'" *Awan*, 607 F.3d at 317 (quoting 18 U.S.C. § 2332b(g)(5)).  The Court has been clear, however, that the statute does *not* require "proof of the defendant's particular motive." *Id.*  The defendant's "motive is simply not relevant." *Id.*  "[A] person may intend and may commit an offense that is so calculated even if influencing or retaliating against government is not his personal motivation." *Id.*  By way of example, "a person who murders a head of state" commits an act of terrorism if he knows "that his crime will influence or affect the conduct of government . . .  even if his particular motivation in committing the murder is to impress a more established terrorist with his abilities." *Id.*  In a second example, the Court explained, "A hired assassin who kills a political leader at the behest of a terrorist organization can hardly disclaim that his crime was calculated to influence the conduct of government simply because he was motivated by greed rather than politics." *Id.* at 318.

Thus, the Second Circuit went on to focus on the defendant's knowledge:

> If the evidence showed that Awan engaged in criminal conduct *with knowledge that confederates solicited his actions* to effectuate politically motivated bombings in India, or homicidal attacks on that country's security forces or its political leaders, such proof could demonstrate that Awan's crimes were calculated to influence the

> conduct of government even if he was not personally motivated by
> that object.

*Id.* at 317-18 (emphasis added).

The Court noted that the "calculated to influence" language had been referred to by some courts as the "motivational element."  The Court explained that, in fact, "the section is better understood as imposing a requirement that the underlying felony [be] calculated to influence or affect the conduct of government by intimidation or coercion or to retaliate against government conduct."  *Id.* at 317 (citing *United States v. Stewart*, 590 F.3d 93, 138 (2d Cir. 2009)).

The Eleventh Circuit stated that the Court's analysis "focuses on the intended outcome" of the defendant's crimes – "i.e., what the activity was calculated to accomplish, not what the defendant's claimed motivation behind it was."  *Jayyousi*, 657 F.3d at 1115 (citations omitted); *cf. United States v. El-Mezain*, 664 F.3d 467, 571 (5th Cir. 2011) (applying the terrorism enhancement to defendant's conviction for supporting Hamas's fundraising arm because defendant knew Hamas had the goal of influencing government through violent jihad, and the evidence showed that defendant supported that goal).

### ii.   *"Conduct of Government" or retaliation for "Government Conduct"*

The "government" affected need not be the government of the United States. Courts have held that a Colombian terrorist group's attempt to influence the government of Colombia met the requirements of the statute.  *See United States v. Puerta*, 249 Fed.Appx. 359, 360 (5th Cir. 2007) (*per curiam*) (The court found that § 2332b(g)(5)

13

applied to "Puerta and his co-conspirators [who] sought to trade drugs and money for weapons to supply the United Self Defense Force[s] of Colombia, a designated foreign terrorist organization that opposes the Colombian government."); *United States v. DeAmaris*, 406 F. Supp. 2d 748 (S.D. Tex. 2005) (concluding "the word 'government' as used in § 2332b(g)(5)(A) includes foreign governments and is not limited to the government of the United States" and applying the enhancement to a group opposed to the government of Colombia).  Courts have also applied the enhancement with respect to Egypt and Pakistan.  *See Stewart*, 590 F.3d at 144 (quoting without disapproval the district court's application of the terrorism enhancement to a defendant whose conduct was "calculated to affect the conduct of the Egyptian government though intimidation and coercion"); *United States v. Aref,* No. 04-CR-402, 2007 WL 804814, at 2 (N.D.N.Y. Mar. 17, 2007) (finding enhancement applied to conduct calculated to influence or affect President of Pakistan).

The Sixth Circuit applied the enhancement to Hizballah's attempts to influence Israel, disregarding a defense argument that Israel no longer constituted a "government" because it was occupying Lebanon in contravention of international law.  *United States v. Assi*, 428 Fed. Appx. 570, 574-75 (6th Cir. 2011).  There, the defendant was accused of attempting to provide global positioning satellite modules, night vision goggles, and a thermal imaging camera to a terrorist organization, Hizballah.  The Court explained, "Surely Congress did not intend for a United States district court judge to determine whether a foreign state is complying in full with its international obligations before

determining whether a person who has pled guilty to providing support to a foreign terrorist organization is subject to § 3A1.4." *Id.* at 575.

### iii.    *The Offense Need Not Be Violent*

In *Assi,* the Sixth Circuit also responded to a defense argument that his crime was not violent.  The Court observed that, "Not all of the crimes listed in 18 U.S.C. § 2332b(g)(5)(B) are necessarily violent," citing as examples "1030(a)(1) (relating to protection of computers)," "1030(a)(5)(A) resulting in damage as defined in 1030(c)(4)(A)(i)(II) through (VI) (relating to protection of computers)," "1361 (relating to government property or contracts)," and "1362 (relating to destruction of communication lines, stations, or systems)." *Assi,* 428 Fed. Appx. At 574.  Thus, the Sixth Circuit adhered to the plain language of the statute and found "that a non-violent offense can be a federal crime of terrorism." *Id.*  The Sixth Circuit held that the terrorism enhancement was not limited to acts of violence; a nonviolent offense could qualify as a "federal crime of terrorism" as defined by 18 U.S.C. § 2332b(g)(5).  *Id.*

### b.    *The "Intended to Promote" Theory*

The Second Circuit has noted that by using the term "intended to promote" the terrorism enhancement casts a "broader net" than the statutory definition alone. *Stewart,* 590 F.3d at 137.  In order to satisfy the requirements of the terrorism enhancement, "[t]he criminal conduct at issue need not itself meet the statutory definition of a federal crime of terrorism if 'a goal or purpose [of the defendant's act] was to bring or help to bring into being a crime listed in'" the statutory definition.  *Id.* (quoting *United States v. Mandhai*, 374 F.3d 1243, 1247 (11th Cir. 2004).  Thus, the "intended to promote" theory applies

where the defendant's offense is intended to encourage, further, or bring about a federal crime of terrorism, even though the defendant's own crime of conviction or relevant conduct may not include a federal crime of terrorism."  Therefore, in order to apply under the "intend to promote" theory of applicability, "the defendant's offense need not itself be 'calculated' as described in Section 2332b(g)(5)(A)."  *Id.*

The Seventh Circuit has upheld the application of § 3A1.4 in a case under the "intended to promote" theory in *United States v. Ashqar.*  In that case, the defendant was called before a grand jury and advised the grand jury was investigating alleged terrorist acts of Hamas.  *Ashqar*, 582 F.3d at 821.  Once before the grand jury, the defendant refused to answer the questions posed to him by the Assistant United States Attorney.  *Id.* The defendant was subsequently convicted of obstruction of justice and criminal contempt.[1]  *Id.*  At sentencing, the district court applied § 3A1.4 and sentenced the defendant to 135 months' imprisonment.  *Id.*  In upholding the district court's application of § 3A1.4, the Seventh Circuit held the defendant's conduct before the grand jury, namely obstructing an investigation "can be one way of promoting" a federal crime of terrorism.  *Id.* at 826.  The Court continued,

> Promoting a crime includes helping and encouraging that crime, and one way of furthering a crime is to try to prevent the government from finding out about it.  So long as the sentencing court finds that the defendant intended to obstruct an investigation into a federal crime of terrorism, as opposed to an investigation into more ordinary violations of the law, the court has found the intent required to apply § 3A1.4.
>
> *Id.*

---

[1] The defendant was also charged with a racketeering conspiracy, in violation of 18 U.S.C. § 1962(d) based on his refusals to testify but was acquitted of these offenses.  *Ashqar* at 822.

### 3.      Applicability of Section 3A1.4 to the Defendant

In the present case, the defendant's crime involved a federal crime of terrorism and satisfies the first theory of applicability of § 3A1.4.   First, the defendant was convicted of 18 U.S.C. § 2339A, which is among those enumerated offenses listed in § 2332b(g)(5)(A).   Second, the defendant's crime was calculated to influence or affect the conduct of the government, specifically, the government of Ethiopia.

### a.      The Defendant's conduct involved an enumerated "Federal Crime of Terrorism" found at § 2332b(g)(5)(B)(i)

On July 28, 2009, defendant Ahmed entered a guilty plea to Providing Material Support to a Conspiracy to Kill Overseas, in violation of 18 U.S.C. § 2339A.   According to 18 U.S.C. § 2332b(g)(5)(B), the offense to which the defendant pleaded guilty is a "Federal Crime of Terrorism" and plainly satisfies the first element of § 3A1.4.

### b.      The Defendant's offense was calculated to influence or affect the conduct of government by intimidation and coercion and to retaliate against government conduct

The defendant's commission of the offenses was also "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct" and, therefore, satisfies the second and final element of § 3A1.4.

### i.      Plea Agreement and Plea Colloquy

As demonstrated by the facts stipulated to by the parties in the plea agreement and the defendant's underlying conduct, his actions were certainly calculated to have such influence or effect.   Before leaving the United States, the defendant knew that the group he was joining would commit acts against the Ethiopian military that included fighting

17

and killing.  In other words, the defendant understood that the objective of his offense was to discourage the Ethiopian government from occupying Somalia with its military. Once he arrived in Somalia, the defendant learned that the group he had joined, al Shabaab, while not a designated terrorist organization yet, was intent on killing members of the Somali government. The defendant may not have shared this objective, but he certainly understood that the offense he committed, supplying himself to a conspiracy to kill overseas now included not only Ethiopian soldiers but the TFG that had invited them into Somalia.

In sum, "element one" is satisfied because the offense for which the defendant was convicted, a violation of 18 U.S.C. § 2339A, is a "federal crime of terrorism."  "Element two" is satisfied because the defendant's admitted role in the offense, his knowledge and support of al Shabaab, and his statements and actions leave no ambiguity regarding his intent to support al Shabaab and al Shabaab's goals, and therefore were intended and calculated "to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."  As such, the "terrorism adjustment" under § 3A1.4 must apply.

## VI.   ABSENT ANY ADDITIONAL MOTIONS, THE COURT SHOULD SENTENCE THE DEFENDANT TO A GUIDELINE SENTENCE.

In *Gall v. United States*, 552 U.S. 38 (2007), the Supreme Court set forth the appropriate sentencing methodology: the district court calculates the advisory Guidelines range and, after hearing from the parties, considers the 18 U.S.C. § 3553(a) factors to determine a sentence sufficient, but no greater than necessary, to achieve the goals of 18

U.S.C. § 3553.  552 U.S. at 49-50; *United States v. Ruvalcava-Perez*, 561 F.3d 883, 886 (8th Cir. 2009) ("In sentencing a defendant, the district court should first determine the appropriate Guidelines range, then evaluate whether a traditional departure is warranted, and finally decide whether or not to impose a guideline sentence after considering all the § 3553(a) sentencing factors").

The district court may not assume that the Guidelines range is reasonable, but instead "must make an individualized assessment based on the facts presented." *Id.* at 50. If the court determines that a sentence outside of the Guidelines is called for, it "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Id.* Section 3553(a) requires the Court to analyze a number of factors, including, "the nature and circumstances of the offense," "the history and characteristics of the defendant," "the need for the sentence to reflect the seriousness of the offense," "the need for deterrence," "the need to protect the public from further crimes of the defendant," and "the need to avoid unwarranted disparities." 18 U.S.C. § 3553(a).

### A.      Nature and Circumstances of the Offense.

These acts of the defendant must not be considered in a vacuum.  The defendant and his co-conspirators engaged in an elaborate conspiracy to send men to Somalia to join forces with those fighting against the Ethiopian military.  The preparations for the offense allowed time for reflection and required fundraising and operational security. Upon arriving in Somalia, the defendant learned that he would be trained by al Shabaab and that the organization opposed the TFG as well as the Ethiopians.  The defendant

19

continued on the course toward the training camp for approximately three months, receiving weapons training and being visited by senior members of al Shabaab. The defendant and his co-conspirators placed calls back to the United States to young men and women in the Twin Cities, seeking money to use to purchase their weapons. Once the money was raised, the defendant received an AK-47 and began his journey to the training camp.

To be sure, the defendant was not a leader or organizer in the United States and did not complete al Shabaab's training camp. He was secreted in safe-houses in Somalia, eventually armed, and sent for training. He sought to kill members of a foreign country's military which he believed was acting improperly. Moreover, became affiliated with a terrorist group that had its own agenda and began the process of training the defendant to accomplish its goals.

Simply put, the nature and seriousness of the defendant's crimes, including providing support to a conspiracy to kill overseas, weigh strongly in favor of a Guidelines sentence in this case. *See* 18 U.S.C. § 3553(a)(1) and (a)(2)(A).

**B.     History and Characteristics of Defendant.**

The defendant and his family fled Somalia in 1995 and settled in Kenya. They settled in Minneapolis in 1999. The defendant graduated from Harding Senior High School in St. Paul, Minnesota and attended North Hennepin Community College in Brooklyn Park, Minnesota, where he studied radiology. The defendant is married and expecting a child in April 2013. The defendant does not have a criminal record.

The defendant lied to the FBI on two occasions about his involvement in the instant offense.  To his credit, the defendant had broken with those involved in the conspiracy upon returning the United States.  Moreover, he entered his guilty plea almost immediately after his arrest and agreed to cooperate with the government's investigation. Since then, he has not had any issues of omitting information or misleading investigators.

**C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense.**

The defendant committed extremely serious crimes when he knowingly conspired to provide material support to a conspiracy to kill overseas.   Considering the seriousness of this crime, promoting respect for the law and providing just punishment are important factors in this case.  As the Supreme Court has recognized, "combating terrorism is an urgent objective of the highest order." *Holder v. Humanitarian Law Project*, 130 S.Ct. 2705, 2724 (2010).

Sophisticated terrorist plots, such as those used by al Shabaab to both sustain itself and commit acts of terror, require multiple participants performing different roles. The defendant is precisely the recruit targeted by members of a terrorist cell.  He is fluent in more than one language, possesses a U.S. passport, and was willing to uproot and travel overseas. Once in Somalia, the defendant was under the direction of the leaders of a terrorist organization and received weapons training.  Although the defendant has no criminal history and this offense represents his first criminal conviction, his participation in this criminal conspiracy cannot be viewed as a discrete event occurring at a singular place and time.  Far from doing a favor for a friend on a single instance, the defendant

21

repeatedly moved forward with the plan from Ramadan 2007 until finally leaving the training camp in approximately March 2008.  The defendant participated in fundraising events, attended meetings, made three trips to the travel agency, and accompanied Kamal Hassan to his house the night before they departed.  The defendant learned about the objectives of al Shabaab, the group that he had joined, and continued to receiving weapons training and move forward toward the training camp.

The government respectfully submits that the Court consider the seriousness of defendant's support to the conspiracy to kill overseas and the defendant's affiliation with al Shabaab, which has committed numerous acts of terrorism against the government of Somalia, its citizens, and those who have sought to provide relief and comfort to its citizens, including the United Nations and the African Union.  A substantial term of imprisonment, therefore, is necessary to reflect the seriousness of defendant's violation of § 2339A and to promote respect for the law.

### D.   The Need for the Sentence to Afford Adequate Deterrence to Criminal Conduct, and the Need for the Sentence Imposed to Protect the Public from Future Crimes of This Defendant.

In this case, there is a need for both individualized and general deterrence. Individualized deterrence is that which discourages a defendant from ever committing such a crime again.  General deterrence is the public response necessary to deter other people from committing similar crimes.  "Congress specifically made general deterrence an appropriate consideration  . . ., and we have described it as 'one of the key purposes of sentencing.'" *Ferguson v. United States*, 623 F.3d 627, 632 (8th Cir. 2010) (quoting *United States v. Medearis*, 451 F.3d 918, 920 (8th Cir. 2006)).

Terrorists and terrorist organizations rely upon support from individuals for their success in carrying out specific attacks, as well as their continued existence.  In the District and State of Minnesota, which has seen a proliferation of cases involving young men traveling to join al Shabaab, this is no small interest.  To date, neither the designation of al Shabaab as a foreign terrorist organization nor prosecution of the men who joined al Shabaab and those who have supported them, have completely stemmed the flow of support to the foreign terrorist organization from Minnesota.  The government respectfully requests the Court strongly consider the impact on both this defendant and the broader community when imposing an appropriate sentence.

Further, the harm that material support to international terrorism causes is of grave concern. *Humanitarian Law Project,* 130 S.Ct. at 2724 (upholding the constitutionality of §2339B: "the Government's interest in combating terrorism is an urgent objective of the highest order."). As the Supreme Court has recognized:

> 'Material support' is a valuable resource by definition. Such support frees up other resources within the organization that may be put to violent ends. It also importantly helps lend legitimacy to foreign terrorist groups – legitimacy that makes it easier for those groups to persist, to recruit members, and to raise funds – all of which facilitate more terrorist attacks.

*Id.* at 2725.

Given the compelling need to deter the continued threat that home-grown terrorists and those that support them pose to the United States and our allies, a Guidelines sentence would send a clear message to any would-be jihadists that the abhorrent criminal conduct seen in this case is not tolerated by the U.S. government.  A Guidelines

sentence also sends a strong but fair message of deterrence by signaling that those who provide themselves to a conspiracy to kill overseas can and will be prosecuted.

**E.    The Kinds of Sentences Available, the Need to Avoid Disparities and the Sentencing Guidelines and Related Policy Statements.**

Within the last three years, numerous defendants have been sentenced in federal district court for providing, or attempting to provide, material support to al Shabaab, or related offenses.  At Common Appendix III, the Court will find a short description of each case, the offense(s) of conviction, and the sentence handed down by the respective district courts.

Within the current cases pending sentencing before this Court, the government believes the Court should note the following facts that could serve to distinguish this defendant from some of the other defendants, (1) the defendant did not have a leadership role in the offense; (2) the defendant pleaded guilty almost immediately after arrest; and (3) the defendant has been a good performer while on supervised release.

The Guideline sentencing range for the offense to which the defendant pleaded guilty would be 360-Life but for the limitation provided by the 180-month statutory maximum.  Absent any motion from the government related to the defendant's sentence, the government believes that a sentence within the Guideline range is appropriate and necessary to satisfy the factors described in 18 U.S.C. § 3553(a).

Dated: April 19, 2013                          Respectfully Submitted,

                                               B. TODD JONES
                                               United States Attorney

                                               *s/ John Docherty*
                                               _____
                                               CHARLES J. KOVATS, JR.
                                               JOHN DOCHERTY
                                               Assistant United States Attorneys

                                               *s/ William M. Narus*
                                               _____
                                               WILLIAM M. NARUS
                                               Trial Attorney
                                               U.S. Department of Justice