UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Cr. No. 09-50 (02) MJD/FLN

UNITED STATES OF AMERICA,       )
                                )
                 Plaintiff,     )       POSITION OF DEFENDANT
                                )       WITH RESPECT TO SENTENCING
v.                              )
                                )
SALAH OSMAN AHMED,              )
                                )
                 Defendant.     )


I.   **INTRODUCTION**

Salah Ahmed is not a terrorist.

Undersigned counsel does not know whether that declaration is trite or provocative, likely to greeted by a yawn or by outrage and condemnation. In conversations with other defense lawyers involved in these cases, he is assured that he is not alone in being unable to gauge the perspective of others towards the individual defendants in these cases. A great source of disorientation is the advice given by the Sentencing Guidelines, which, to undersigned counsel, seems meaningless and completely out of proportion to the real offense conduct for many of the defendants. But these cases also possess, to an unusual degree, disquieting ambiguities. Our system of government draws lines between the policy making functions of the political branches and the justice functions of the courts. Yet in the law of terrorism, there certainly seems a risk, more substantial than any existing in the rest of criminal justice, of letting justice be toned a little by interests having more to do with policy than with reason and cool objectivity. We seem at a frontier in which justice and policy intersect. In these cases for sentencing, does one's sense of the gravity of certain offense conduct depend to a degree on how one views the merits of

Ethiopia's justifications for intervening in Somalia, or the legitimacy of the Transitional Federal Government? Is justice different depending on whose side we take in foreign conflicts? And what of the curious duality of several defendants falling into the 'traveler' category? They broke laws involving terrorism, but they were also accurately described as "cannon fodder" by the prosecution in closing argument. One motivation for the original investigation was to save the young men of the Minnesota Somali community who were being spirited off to fight in Somalia, a concern that they were victims. Some of the young men who could have been defendants here died in *al Shabaab* violence in Somalia. The pre-sentence report observes that though people have died in offense related conduct, it is difficult to know whether to characterize them as victims.

Salah Ahmed did not become a terrorist, never intended to become a terrorist, and never intended to support terrorism. He opposes terrorism. His most important motivation for going to Somalia in December, 2007, was to fight terrorism, a form of which he believed, with good reason, was being inflicted upon his former fellow countrymen by a foreign army.

These statements are true and do not contravene Salah Ahmed's plea agreement, his guilty plea, or any fair interpretation of his testimony. He is guilty of the offense charged in Count 1 of his indictment, "Providing Material Support to Terrorists", and his conduct satisfies every element of that offense. Nevertheless, he never willfully supported terrorists.

The participants in the events charged in the various indictments in these cases tend to be divided into two categories. In terms used by the Pre-Sentence Report, there are the "facilitators", and there are the "travelers". While that division by function is accurate, it

oversimplifies and fails to account for one of the most important dimensions of the case, which is *time*. As former lead counsel for the Government in this case, Anders Folk, put it in testimony before Congress, the people who traveled to Somalia fall into at least three classes: the Class of 2007, the Class of 2008, and the Class of 2009.[1] Mr. Folk's public testimony did draw attention to a consideration which we think is critical to sentencing fairness: the dynamics of the charged conspiracy were changing over time as the various players, including the Ethiopian Army, the transitional government, and *al Shabaab*, arrived, evolved, and sometimes departed. *Al Shabaab* was not a static, monolithic entity which arrived on the scene fully formed, with an international reputation for terrorism, an alliance with al Qaeda, control of southern Somalia, and plans for dominating the Horn of Africa. When Salah Ahmed first contemplated joining fellow Somalis to try to drive Ethiopian forces out of the homeland, he and most American Somalis still thought of 'the Courts' as the main resistance to the Ethiopian army. In 2007, *al Shabaab* was a nascent power in southern Somalia, a secretive organization whose name Salah Ahmed and the others did not hear mentioned until the last days before they boarded their planes for Africa.

The defense respectfully urges the Court to further divide the Pre-Sentence Report's "travelers" into Mr. Folk's classes of 2007, 2008, and 2009. The "2007 travelers" (an expression this memorandum will adopt to identify Salah Ahmed, Kamal Hassan, and Abdifatah Isse), journeyed to Somalia motivated to fight the Ethiopian army in support of 'the Courts', to fight as soldiers against soldiers. It is not coincidence that these three who left for Somalia so early in the enterprise are the travelers who broke away from *al Shabaab* and returned to the United States.

---

[1] Testimony of W. Anders Folk (written remarks), U.S. House of Representatives Committee on Homeland Security, July 27, 2011.

The '2008 travelers', particularly those leaving in the summer and later, are those who were likely to know the ICU was gone and that *al Shabaab* would be waiting for them at the other end of the pipeline.  They most probably left with intentions to fight both the Ethiopian army and the Transitional Federal Government, knowing they would be joining *al Shabaab* and participating in the methods it was, by then, known to use.  The greater Somali community in Minnesota and throughout the United States was, by this time, less riled by the Ethiopian occupation and  more concerned with the disappearances of their sons into the hands of *al Shabaab*.

By the time the '2009 travelers' came along, the Ethiopian army had withdrawn from Somalia and no longer constituted any justification for fighting.  Many young men were known to be dying in *al Shabaab* suicide bombings.  Osama bin Laden had just made the "Fight on You Lions of Somalia" statement and a philosophical alignment between *al Qaeda* and *al Shabaab*, though not yet an alliance, had become patent.

The materiality of the subdivision of the travelers by time will be shown by analysis of the charging statute, which, though captioned as an anti-terrorism provision, really reaches a much, much broader range of behavior than that which is commonly understood as terrorism, and therefore justifies a much broader range of punishment than suggested by the sentencing guidelines.  Specifically, it is the position of defendant Salah Ahmed:

- First, that the statute by which he was convicted includes offense conduct ranging from "terrorism" at the most serious end, through what we will call "soldiering" which we suggest should fall in the middle or toward the less serious end of the statute's range; and

- Second, that timing of offense conduct is a relevant and critical consideration in

4

addition to role or function in distinguishing whether, for sentencing purposes, a given defendant should be identified more closely with terrorism or with illegal soldiering.  Those recruits who traveled to Somalia in 2007 were motivated by the Ethiopian occupation, not by *al Shabaab*, something that may not be said necessarily of later travelers as *al Shabaab* emerged and changed, and Ethiopia withdrew from Somalia.

The available evidence establishes that the specific intent, motivations, and essential conduct of the 2007 travelers, or at least of defendant Salah Ahmed, are more like illegal soldiering than terrorism, and therefore punishment should be based on considerations other than the so-called "terrorism" adjustments in U.S.S.G. § 3A1.4(a).

## II.   THE STATUTE AND "TERRORISM": WHAT IS SALAH AHMED GUILTY OF?

The case involves "terrorism" statutes, one of which uses the term "terrorists" in the caption, and it involves a "terrorist" organization, *al Shabaab*.  The shorthand expression for the crime of conviction is "providing material support to terrorists."  Salah Ahmed and other defendants have been said to have "joined" a terrorist organization.  The terms convey notions of volitional conduct that is severe and very dangerous, even psychotic.  The defendants have become identified with terrorism.  The sentencing guidelines treat them all virtually identically, as if every one of them was the most dangerous of psychopaths.

Because the caption of the statute labels the defendants as providers of material support to terrorists, there seems to be a tendency for many observers to subconsciously transform the established facts to circle back and satisfy the common understanding of what terrorism is.  It seems, at least to undersigned counsel, that many tend to interpret a phrase like "intending to

5

fight the Ethiopians" from the factual basis to mean instead 'intending to kill innocent civilians, engage in suicide bombings, overthrow a government, and force fundamentalist religious practices on other peoples.'

Salah Ahmed did indeed violate the statute, and has not said otherwise. He did not, however, travel to Somalia to train as a terrorist or to support terrorism, to kill civilians, or to overthrow a government, even a bad one. He began rejecting the ideology and methods of *al Shabaab* as soon as he began to encounter them in Marka in December, 2007. Ultimately he escaped from *al Shabaab* – and that is the accurate term for what he did – and has been trying to put it, and everyone associated with it, behind him ever since.

Salah Ahmed did not have to intend or be motivated to support terrorism in order to violate the statutes of conviction. It is a mistake to identify him with the goals and motivations of *al Shabaab*. He was on a much different errand to Somalia. He did not resign from *al Shabaab*, he escaped.

**A.  The words of the statute, the plea agreement, and the change of plea.**

The statutory offense of conviction is 18 U.S.C. § 2339A, which reads:

§ 2339A. Providing material support to terrorists

(a) Offense.— Whoever provides material support or resources or conceals or disguises the nature, location, source, or ownership of material support or resources, knowing or intending that they are to be used in preparation for, or in carrying out, a violation of section 32, 37, 81, 175, 229, 351, 831, 842 (m) or (n), 844 (f) or (i), 930 (c), 956, 1091, 1114, 1116, 1203, 1361, 1362, 1363, 1366, 1751, 1992, 2155, 2156, 2280, 2281, 2332, 2332a, 2332b, 2332f, 2340A, or 2442 of this title, section 236 of the Atomic Energy Act of 1954 (42 U.S.C. 2284), section 46502 or 60123 (b) of title 49, or any offense listed in section 2332b (g)(5)(B) (except for sections 2339A and 2339B) or in preparation for, or in carrying out, the concealment of an escape from the commission of any such violation, or attempts or conspires to do such an act, shall be fined under this title,

6

imprisoned not more than 15 years, or both, and, if the death of any person results, shall be imprisoned for any term of years or for life. A violation of this section may be prosecuted in any Federal judicial district in which the underlying offense was committed, or in any other Federal judicial district as provided by law.

The entire subsection is quoted because it is important to see all that is in the body of the statute when considering how it compares to its own caption.

In his plea agreement, drafted by the prosecution, Salah Ahmed admitted violating this statute by providing material support to activity which violated 18 U.S.C. § 956(a), a conspiracy to kill, kidnap, or maim, persons in a foreign country. He stipulated to the following factual basis establishing his guilty conduct: ". . . On or about December 6, 2007, the defendant traveled from Minneapolis, Minnesota to Somalia to fight against Ethiopian troops present in Somalia and to cause the Ethiopian troops to withdraw from Somalia."

In his appearance before Judge Rosenbaum, Salah Ahmed admitted the factual basis using a few additional details, but without any material differences from the stipulation in the plea agreement. He did admit that he was with *al Shabaab* while in Somalia for purposes of fighting the Ethiopian Army, but the record shows he did not know *al Shabaab* was considered a terrorist group.[2] He admitted that he knew he "couldn't go off and fight and make wars," to borrow Judge Rosenbaum's words. He did not admit committing or intending to commit acts of terrorism, or intending to support terrorism in the ordinary meaning of that term. He did not admit intending to support *al Shabaab*, except to the extent of participating with them in the fight against the Ethiopian army. He did not admit intending to overthrow the Transitional Federal

---

[2] In addition, it is believed by the parties that Salah Ahmed left the jungle camp and ended his association with *al Shabaab* before the United States designated it a terrorist organization.

Government.  He did not admit intending to kill or maim any civilians.

**B.  The lack of admission of involvement with terrorism and the sufficiency of the plea.**

In the shorthand phrasing of the statute's caption and therefore in the common parlance of the courthouse and the media, Salah Ahmed was convicted of 'providing material support *to terrorists*.'

The statute's pronouncement of the kinds of conduct which constitute the crime, however, is a little different.  The body of 18 U.S.C. § 2339A omits the object of the verb in the title and says instead that we will punish: "[w]hoever provides material support or resources or conceals or disguises the nature, location, source, or ownership of material support or resources, knowing or intending that they are to be used in preparation for, or in carrying out, a violation of . . ." a long list of other criminal statutes.  Nowhere in the body of the statute are found the words "terrorist" or "terrorism".  These loaded terms are conspicuously *not* defined in § 2339A(b).

Rather than prohibiting 'support to terrorists', the statute prohibits support to an effort to commit the other crimes it references by section number.

Salah Ahmed stands convicted of providing material support knowing or intending that it be used in preparation for, or in carrying out, a violation of § 956, which is entitled "Conspiracy to kill, kidnap, maim, or injure persons or damage property in a foreign country".[3]  Subdivision (a) states as follows:

(a) (1) Whoever, within the jurisdiction of the United States, conspires with one or

_____

[3]  As recently as 1996, this statute dealt only with conspiracies to damage property.

more other persons, regardless of where such other person or persons are located, to commit at any place outside the United States an act that would constitute the offense of murder, kidnaping, or maiming if committed in the special maritime and territorial jurisdiction of the United States shall, if any of the conspirators commits an act within the jurisdiction of the United States to effect any object of the conspiracy, be punished as provided in subsection (a)(2).

Like the body of § 2339A, this statute makes no reference to terrorism or support of terrorism. Subdivision (a) can apply to a disgruntled employee in Los Angeles plotting to kill a supervisor in Mexico City, or a non-custodial parent in Milwaukee paying someone to kidnap her child who is living with the custodial parent in Tokyo.

Key to its application is this statute's use of both the term "killing" and the term "murder" – prohibiting "killings" in foreign countries that would be "murder" if committed within the jurisdiction of the United States. The significance, we suggest, is that this statute encompasses "killings" in a foreign country which would not constitute murder there.

This characteristic of the statute was at the heart of the Government's motion *in limine* in the trial of Mr. Omar, in which it argued the defense should not be permitted to argue a claim of self defense, defense of others, or other claim of necessity in a conspiracy to kill Ethiopian soldiers, since those defenses all require a 'necessity' which is very narrowly defined by American law as an inability to 'retreat' or otherwise avoid the danger. Since Mr. Omar and the other defendants in these cases were engaged in conduct occurring in Somalia, to which they had to travel first, none of them could legally assert a defense of necessity in an American court, and thus were committing or conspiring to kill in violation of § 956(a). Salah Ahmed's willingness to volunteer as a soldier in active combat against Ethiopian troops in Somalia, which obviously contemplates the possibility of "killing" Ethiopian soldiers, constitutes the providing of material

9

support to a conspiracy to kill.

The statute 'criminalizes' (makes subject to the criminal jurisdiction of federal courts) regular old murders planned in the United States that are to be carried out overseas.  It criminalizes acts of terrorism planned in the United States that are to be carried out overseas.  It criminalizes foreign combat activity by American civilians which is planned or agreed to in the United States.

## C.  'Soldiering' as Crime.

For a very long time, it has been illegal for American citizens to fight in a foreign military under certain circumstances.  Statutes proscribing the participation of American citizens in foreign conflicts were enacted at least as early as 1794.  In *Wiborg v. United States*, 163 U.S. 632 (1896), the Supreme Court addressed questions raised by the conviction of a Danish sea captain who, while anchored 3 miles out to sea, picked up a score or more of men who originated in Philadelphia and transported them near the coast of Cuba, where he assisted them in debarking and heading for the shores in the middle of the night.  These men were intending to join a Cuban insurrection against Spain, with whom the United States was at peace at the time.  The captain was convicted of aiding and abetting a "military expedition or enterprise" originating in the United States, in violation of one of a series of statutes known as the "Neutrality" laws, cited as Chapter LXVII, Sections 5281 through 5291.  Another section, 5282, prohibited persons from enlisting within the United States as soldiers in service to "any foreign power" or from "hiring or retaining" any other person to enlist or go abroad for purposes of so enlisting.  While, as the Court observed, it was not illegal to travel overseas to enlist in a foreign military, it was illegal to do so within the territory of the United States.  The goal of these statutes was to protect the

10

neutral status of the United States under international laws and the laws of war, and to preserve the conduct of foreign affairs to the federal government.  Modern equivalents of these statutes are found at 18 U.S.C. §§ 958 - 960.

These statutes have a checkered history of enforcement, or at least a colorful history of official enforcement avoidance.

One of the most well known examples that come to mind is that of the Eagle Squadron of the Royal Air Force, formed approximately 1940.  The Eagles consisted of United States civilians who found their way into the RAF, flying combat missions against the Axis powers at a time when America was still officially neutral.  American businessmen in London, as well as a Canadian group organized as the Clayton Knight Committee recruited and approved applications of some 6700 Americans who volunteered to fly combat against Germany on behalf of Britain prior to December, 1941.  The recruiters spent in excess of $100,000 to bring these Americans to the United Kingdom for training, though some of the American recruits trained with the Royal Canadian Air Force first, and many others had actually traveled to Europe earlier to train and fly on behalf of the Finnish "White Guard" during the so-called "Winter War" with the Soviet Union, between November 30, 1939, and March 13, 1940.

Formation of the Eagle Squadron echoed the methods used for the French "Lafayette Escadrille", a squadron made up of American civilians who were motivated to fly and fight on behalf of France in World War I while America herself was still  "neutral".

Perhaps the historical example of American civilians in foreign conflict with the greatest parallels to Salah Ahmed's case is that of the Abraham Lincoln Brigade, approximately 3,000 Americans, many of them naturalized citizens, who traveled illegally to Spain in 1937 and joined

11

the cause of the Spanish Republic against General Franco's insurgency, which was supported by fascist Germany and Italy.  America was officially neutral, and there was an international embargo (ignored by the Axis powers).  Americans could not legally enter Spain at all.  The Roosevelt Administration refused to support the elected government of Spain because it was Leftist and secular, and American religious leaders, Catholics in particular, were supportive of Franco because of his friendly relations with the Vatican.  In 1940, as the Republic collapsed and the surviving members of the American brigade came home, Roosevelt's Attorney General, Frank Murphy, had 11 of the participants in the movement arrested, including two combat veterans and two doctors active in the American Medical Bureau to Aid Spanish Democracy. They were indicted for violation of neutrality statutes prohibiting recruitment for foreign armies. After Murphy was appointed to the Supreme Court, his successor, Robert Jackson, abruptly ordered the dismissal of all charges.  The story of these illegal American soldiers is told in  "The Odyssey of the Abraham Lincoln Brigade", Peter N. Carroll, Stanford University Press, 1994. The "Lincolns" were all recruited in the United States by fellow Americans, and their organizing activity surely violated the neutrality laws.  No other indictments were sought, and no one was ever convicted for these offenses.

Assuming not one of the 6700 American recruits to the Eagle Squadron, or to the Finnish White Guards, or to the Lafayette Escadrille, had been approached in any fashion on American soil – by speaking to a recruiter by telephone, or talking with friends who were already involved, or receiving money, or a ride to the Canadian border, or plane tickets, or in any other of the myriad ways they could have been, and almost certainly were, recruited within the jurisdiction of the United States, no violation of law occurred.

12

Assuming any of the American flyers for the RAF were recruited in some fashion while on American soil, and if § 956(a) and § 2339A had been in effect in 1940, those American heroes and all involved in recruiting them would have been guilty of providing material support to terrorists.

Salah Ahmed was motivated to fight Ethiopian soldiers, and to be a soldier, albeit an irregular. Like the volunteers of the Abraham Lincoln Brigade, and the Eagle Squadron, he looked overseas from American soil and thought he saw terrible injustice. It appears beyond question that Ethiopia was guilty of atrocities in its occupation of Somalia as early as 2007. It is true that the historical Americans in this comparison went to fight for legitimate foreign governments, not one of which was engaged in what we know as terrorism, and Salah Ahmed, in contrast, found himself in association with such a group in Somalia. But that had not been his intention. His intentions were comparable to those earlier American volunteers.

Civil war in Somalia with a revolving cast of antagonists had been continuous over at least 20 years. This terrible but routine activity wouldn't motivate American Somalis to go back and take sides. Such activity was, after all, what turned them into refugees in the first place. But Ethiopian soldiers brutalizing Somalis on Somali soil – that is literally the crossing of a boundary, and it defines a clear purpose. It's the sort of behavior that has always provoked warfare.

We ask the Court to please keep in mind we are not justifying the conduct. That would be a complete defense and we have conceded Salah Ahmed does not have one. The current laws and their overlap with the law of war, the legal dancing between "killing" and "murder", the criminalization of certain kinds of soldiering and warfare bring to mind a couple of literary

references to killing and war and crime.

Samuel Fuller, a celebrated chronicler of the soldier's experience, a veteran of battle

himself, wrote and directed this pithy exchange about the vague morality of warfare:

PRIVATE GRIFF:     I can't murder anybody.
THE SERGEANT:     We don't murder.  We kill.

"The Big Red One", United Artists, 1980 (Mark Hamill, Lee Marvin).

Or, as Ernest Hemingway, who saw his share of war as participant and as journalist, said

about crime and warfare:

An aggressive war is the great crime against everything good in the world.  A
defensive war, which must necessarily turn to aggressive at the earliest moment, is
the necessary great counter-crime.  But never think that war, no matter how
necessary, nor how justified, is not a crime.  Ask the infantry and ask the dead.

Introduction to "Treasury of the Free World", Ben Raeburn,  Ed., Arco Publishing, 1946.

This sentencing memorandum opened with a reference to the ambiguities that at least

some of the participants in these cases sense.  The moral, ethical, and legal questions of killing in

the course of warfare are a part of it too.  We might have ordered Salah Ahmed to do in Iraq or

Afghanistan precisely what he could not legally do of his own volition in Somalia or anywhere

else.  That is the law and we don't doubt the reasons for it.  But should his attempt to act as a

private soldier – to fight armed and trained soldiers, not civilians – be punished as the equivalent

of terrorism, the cowardly killing of innocent and helpless civilians?  How can it be?  That is the

sentencing issue.

It does not matter who Salah Ahmed intended to join in Somalia for purposes of fighting

the Ethiopian army.  Under the statute, whether he went there to join *al Shabaab*, or to join any

outfit that would take him, or even if he specifically intended to join a militia which eschewed

14

terrorism, he is guilty of the charged offense.  Terrorism, at least as normally defined and understood, is not required by the offense of conviction.  We understand that one of the reasons these indictments were brought was because al Shabaab was involved, and Salah Ahmed acted in concert with it for a time.  His activity was serious and carried the risk that he would be caught up in the terrorist activity of that group even though he never intended to.  But he got away from them before he even got very far with the training.  It should matter for sentencing purposes.

This memorandum speaks of ambiguity in the case, but, assuredly, there is no claim of any ambiguity at all about the evil of terrorism.  The defense does seek to focus the Court on the essence of Salah Ahmed's conduct.  He is guilty of providing himself as material support for warfare against Ethiopian soldiers.  We think that is a far cry from terrorism, even though it is still a crime, as the statutes define it, or as Hemingway put it.

Having mentioned Hemingway, we can't resist noting that he himself provided material support to terrorists.  By the Spring of 1937, when he went to Spain as a journalist to cover the war, he'd already paid the passage of two American military volunteers, arranged for the purchases of ambulances, and worked on a documentary propaganda film, "Spain in Flames".  *Odyssey of the Lincoln Brigade*, *supra*, p. 77; later, he established an unofficial headquarters for the American fighters at the Hotel Florida in Madrid, where he served them quality Scotch, cigarettes, gifts of good food, and a place to lay down.

III.    *AL SHABAAB*, THE ETHIOPIAN ARMY, THE TFG, AND THEIR RELEVANCE TO SALAH AHMED'S PUNISHMENT.

As Salah Ahmed, Kamal Hassan, and Abdifatah Isse were being recruited in Minneapolis,

15

they were not being told specifically that *al Shabaab* was the group they would be joining. Somalis in general in Minnesota were aware of "the Courts", or ICU, and that when Ethiopia invaded in December, 2006, it was the Courts and allied militias which were fighting back.  As Bryden testified, the reality was there were a large number of different and even antagonistic groups, various clans and militias, more or less allied in the fight against Ethiopia.

Somalis reacted with outrage over the Ethiopian action (whether it is called an "intervention" or an "invasion").  Bryden testified that in the fall of 2007, as Salah Ahmed was becoming acquainted with those who were organizing the travel to Somalia, there were a series of conferences by Somalis all over the world, including in Minnesota, which attempted to organize opposition to the Ethiopian invasion.  Protests and marches to the state capitol took place beginning in early 2007, seeking to draw attention to what Somalis here saw as Ethiopian aggression and atrocities.

So it is credible and not surprising that these young men, the "2007 travelers", would know there was armed opposition to the Ethiopian army in Somalia without knowing much if anything about *al Shabaab* and its role.

**A.  Al Shabaab**

Bryden's testimony did not dwell long on *al Shabaab*'s beginnings or its evolution, though some of his testimony touched on its relationship with the ICU.  The Center for Strategic and International Studies (CSIS) publishes reports related to foreign affairs and policy, and has published some of Mr. Bryden's writings on Somalia.  As part of its "Al Qaeda and Associated Movements (AQAM) Futures Project", CSIS published a case study entitled "*al Shabaab*", by Rob Wise, in July, 2011.  This study, which will be included as a supplementary exhibit to this

16

position pleading, provides important additional background on the rise and evolution of *al Shabaab* which was not covered by testimony.

Like Bryden, the CSIS study points to the rise of local Islamic courts in the late 1990s which began to bring order out of chaos.  The courts, though fundamentalist, were welcomed by the religiously moderate Somalis because of the stability they were bringing.  Some of the courts were religiously moderate as well, as with the example of those lead by Sheikh Sharif Ahmed. Other courts were religiously hardline, lead by the likes of Sheikh Hassan Dahir Aweys.

The ICU was a merger of 11 of the regional courts in mid-2004, and it was lead by the moderate Sheikh Ahmed.  It was this alliance of the courts which permitted them to defeat the warlords around Mogadishu by June, 2006.  In that area of Somalia, the constant warfare of the past decade stopped, crime plummeted, and businesses reopened.  In some neighborhoods, however, the more fundamentalist elements of the ICU brutally imposed very harsh interpretations of Shari'a.  *Al Shabaab* was a unit of the Courts that was particularly fundamentalist.

*Al Shabaab* was incorporated into the ICU as a sort of radical youth militia, and it was this unit, about 400 strong and lead by Aden Hashi Ayro, that was a significant factor in the defeat of the Mogadishu warlords.  Like Bryden, the CSIS study points to the "stunning success" of the ICU for causing the alarm rising in Ethiopia in 2006.

With the Ethiopian army crossing into Somalia on December 24, 2006, the leadership of the ICU began to fall back and eventually flee to other parts of East Africa and the Horn.  The fundamentalists of *al Shabaab*, however, regrouped in the difficult, swampy terrain of the south and began a guerilla campaign against the Ethiopians which, throughout 2007, enjoyed

17

considerable success in stalemating the Ethiopian advance.

The CSIS study describes the period between December, 2006, and early 2008, as one in which *al Shabaab* truly came into its own, no longer the "bit player" merely enforcing the judgments of the larger courts union.  Prior to the conflict with Ethiopia, *al Shabaab* never had more than a few hundred members and was "kept in check by the courts."  Then, in the first of its two transformative periods, " . . . *al Shabaab* would emerge from the ICU's shadow to become the most powerful resistance group operating in Somalia, flush with thousands of fighters, millions of dollars, and the strong support of the local populace."  *al Shabaab*, Wise, CSIS Case Study 2, p. 4.

In addition to the spectacular rise in power and profile through 2007 and early 2008, *al Shabaab* underwent an ideological transformation as a direct result of the Ethiopian invasion.  While having always been composed of violent fundamentalists, *al Shabaab*'s subservience to the ICU restrained its ideology.  The ICU's popularity had not been based on its religious appeal but on its ability to bring stability.  Once the Ethiopian's destroyed the ICU, the moderate leadership fled, and the dangerous hard core of *al Shabaab* flared up and took power.

Nevertheless, the immediacy of the Ethiopian action required *al Shabaab* to define itself initially as a nationalist movement, "as the majority of Somalis were fixated not on religious struggle but on driving the Ethiopians from their country."  CSIS Case Study 2, p. 5.  As the Ethiopian army continued to pour into Somalia in January, 2007, the ICU, with remaining dominion over *al Shabaab*, had called for what Bryden labeled a "defensive jihad" - a "legitimate defense of a Muslim land against foreign, non-Muslim occupiers".  (Bryden, Omar T. 59,

10/2/12).[4]   It was only much later, after *al Shabaab* grew powerful enough to supplant the ICU, that it called for the establishment of a "caliphate" and the export of a very militant, fundamentalist form of shari'a law to neighboring lands.

Thus in mid-October, 2007, as Salah Ahmed, Kamal Hassan, and Abdifatah Isse began listening to the "facilitators" who were recruiting them to the cause, the shift in the balance of authority between The Courts and *al Shabaab* was still in progress, and the fighting in Somalia was still motivated primarily by nationalistic goals.

One purpose of the CSIS case study of July, 2011, was to be fairly specific about the evolution of *al Shabaab* during that period.  The CSIS case study observed that early 2008, either at or after the point when Salah Ahmed got away from the jungle camp, was the second transformative period for the terrorist group.  It was only then, when it could brag that it had stymied the Ethiopians, that *al Shabaab* began to metamorphose from a primarily nationalist organization focused on driving out Ethiopia through conventional, if asymmetrical, military means, to a hybrid movement that increasingly embraced transnational terrorism and the portrayal of itself as part of the al Qaeda-led global war against the West.

Testimony by Matthew Bryden and others at the two trials in these cases provided a general understanding of how *al Shabaab* developed and evolved between approximately 2000 through 2012, but oftentimes Mr. Bryden was asked to comment about general characteristics of the group "in the years 2007 and 2008", or even more broadly, without a reference to specific date, and sometimes imprecisely.  For instance, in the trial of Mr. Omar, Mr. Bryden testified

---

[4] References to the various rough transcripts of Bryden's testimony will be indicated by the name of the lead defendant followed by the page number of the transcript for the cited date.

about links between *al Shabaab* and al Qaeda, and mentioned the so-called "Fight On You Lions of Somalia" speech recorded by Osama bin Laden. The subject came up because the Government asked Mr. Bryden about things that international terrorist groups were saying about *al Shabaab* " . . . in 2007 and 2008." But, as Bryden stated more specifically in the 2011 trial, the "Lions" speech was made shortly after the Ethiopian Army withdrew from Somalia, and its purpose was to urge *al Shabaab* fighters to continue the battles even though the original cause for the fighting, the Ethiopian occupation, was over. That happened at the end of January, 2009; and bin Laden's recording was made, according to Bryden, sometime in March, 2009. (Bryden, Ali T. 30, 10/6/11). Even then, bin Laden had "stopped short", as Bryden put it, of a formal alliance with the Somali terrorists. It was following that statement that *al Shabaab* embarked on a six month campaign to obtain bin Laden's blessing, which it entitled "Labaik Ya Osama", or "At Your Service, Osama." (Bryden, Ali T. 30, 10/6/11). It wasn't until January 29, 2010, (according to one of Mr. Bryden's timelines), two years after Salah Ahmed abandoned the training camp, that *al Shabaab* officially confirmed it had joined al Qaeda's international jihad.

The evolution of *al Shabaab* from 400 fighters, under the thumb of the ICU, to international terrorists in league with al Qaeda did not happen overnight. It was a progression first through a period in which it used appeals to nationalism to gain recruits (when Salah Ahmed was persuaded to travel to Somalia). It was after this period that it was able to turn back to its primary reason for existence, radical Islam.

The appeal the 'facilitators' were making in October and November, 2007, was to Salah Ahmed's homeland pride, to his sense of the history of Ethiopia as the mortal enemy of Somalia, and to his sense that Somalia was defenseless and may cease to exist. In particular, they were

provoking him with stories of the atrocities being committed against Somali women and children, and civilians generally, by Ethiopian soldiers.

Part of the reason we associate the 'travelers' in the Pre-Sentence Report with real terrorism is that we are considering them in connection with the idea of *al Shabaab* we have which comes from its mature identity from 2008 onwards.  But the 2007 Travelers, including of course Salah Ahmed, were associating with an earlier version of that group, one that was less well known, less powerful, and still more focused on driving away the Ethiopian army.  When the 2007 Travelers were making their decisions and leaving for Somalia, they were in a position similar to that of the United States government at the time.  The Amnesty International report, cited earlier, references the American bombing of what our government called specific "terrorist suspects" in southwestern Somalia twice in January, 2007, a year before Salah Ahmed's arrival. Despite its intense interest in terrorism, activity in the Horn of Africa, and the described bombings based on intelligence sources, it would not be until late February, 2008, after Salah Ahmed abandoned the camp and turned his back on *al Shabaab*, that the Secretary of State herself would be able to determine that group was a terrorist organization and designate it as such.  It seems these particular defendants and the United States government were getting their information and reaching their conclusions at precisely the same times.

**B.  The Ethiopians.**

The behavior of the Ethiopian soldiers in Somalia in 2007 was a subject matter which was avoided at trial.  It is a significant factor in sentencing for its bearing on the mind-set and motivations of Salah Ahmed.  Though convicted of a "terrorism"-related crime, Salah Ahmed did not go to Somalia in order to kill innocent civilians and overthrow or coerce the government.

21

He went to Somalia to defend civilians.  He went to fight soldiers.

Bryden was permitted to testify about some of the Ethiopian behavior towards Somali civilians.  During cross examination by Mr. Hopeman, Bryden acknowledged the Ethiopian army was guilty of violating the law of war through the use of "disproportionate force", which is one of four general categories of violation constituting war crimes under the Geneva Conventions.  In other words, the Ethiopian army would often respond to relatively low scale mortar or mobile rocket launcher attacks by *al Shabaab* units in the center of a civilian enclave, for instance, by commencing heavy artillery barrages which would flatten the entire neighborhood, killing scores of innocent civilians and rendering hundreds homeless.

Bryden mentioned other conduct by Ethiopia that was outside international law.  The timing of the Ethiopian invasion itself was a surprise, even if not unexpected, according to Bryden's testimony, and on one of his timelines he noted the intervention was without United Nations authorization and probably constituted a breach of the international arms embargo.

But the atrocities were much broader than these sorts of violations.  In its report entitled "Routinely Targeted Attacks on Civilians in Somalia", published in June, 2008[5], Amnesty International examined human rights abuses committed by all belligerents in the Somali conflict. In the introduction to the report, a representative of a non-governmental organization working in Somalia in late 2007 is quoted as saying, "The level of human suffering now is unbelievable. This is an unprecedented level of fighting and raw brutality."

Part of the report focused on Ethiopian atrocities:

> There was a marked increase in reports of extrajudicial executions

---

[5] To be submitted with supplemental exhibits to this position pleading.

of civilians by Ethiopian soldiers in November and December, 2007.  The damage and destruction described by witnesses to Amnesty International suggest that many Ethiopian military attacks carried out in response to attacks by armed groups were disproportionate.

. . .

Many witnesses reported a type of killing they referred to as "slaughtering like goats", which they would describe by physically running a finger across their neck.  When asked to elaborate, they described Ethiopian troops slitting mens throats, then leaving them to bleed where family and friends would later find their bodies.  Most interpreted these killings as warnings to themselves, and left with their children soon after witnessing such incidents.

*Routinely Targeted*, p. 12.

The report also included anecdotes by survivors as illustrations of the evidence:

Ceebla'a, aged 63, from Wardhiigley, said she fled mogadishu on 15 November 2007 with her children after some shooting in the area.  One day she saw three men leaving their shops being picked up by Ethiopian soldiers for investigation.  The next morning she saw the bodies of the three men on the street.  One was strangled with electrical wire.  The second had his throat cut.  The third had been chained ankle to wrist, and his testicles had been smashed.

Canbaro, aged 35, . . . lost her eldest son (aged 15), who was killed when he left their house to watch some fighting and was caught in the cross-fire in late 2007.  On the same day, two male neighbours were killed by Ethiopian troops when they entered their house.  Their wives were "caught by force" (one of many euphemisms for being raped).

Fatima, 28, . . . fled in late 2007 because she and her sisters were "mishandled" (another euphemism for being raped) by Ethiopian troops, she said, and she was afraid for her children.

Guled, aged 32, . . . said he saw his neighbours "slaughtered".  He saw many men whose throats were slit and whose bodies were left in the street.  Some had their testicles cut off.  He also saw women being raped.  One incident took place next door to him where a

23

newly wed woman whose husband was not home was raped by over 20 Ethiopians in a queue. . . ."

. . .

Ebyan, aged 35, . . . arrived in a settlement two days before Amnesty International interviewed her.  She said,

> "They killed my husband and my father on the same day on 25 November, 2007.  They were riding together in a car. When they were stopped, my husband started speaking in Somali, but the soldiers didn't understand.  They shot my husband in the forehead.  When my father intervened they shot him too.  After they killed my husband I hid two of my four children under the bed, and took two with me.  I broke the bed over the two beneath so that no one would find them there.  Later I came back and found them.  I fled and left everything behind."

*Routinely Targeted*, pp. 12 - 14.

Bryden testified that he himself was an eyewitness to the disproportionate bombing of civilian neighborhoods in Mogadishu in 2007.  (Bryden, Omar T. 150, 10/2/12).[6]

The Amnesty International report includes a number of other anecdotes its investigators recorded about the Ethiopian army behavior towards non-combatants in 2007.  Similar stories, and attendant outrage, were spreading throughout the Somali diaspora in Minnesota and elsewhere.  Salah Ahmed, Kamal Hassan, and Abdifatah Isse were not hearing of these terrible things only from the 'faciliator'/recruiters.  It was knowledge and sorrow spread wide through the community.

The evidence shows that the 2007 travelers had received information from various sources, though primarily from the recruiters in Minnesota and Somalia, about the same or

---

[6] Bryden told the Court about being jailed by the TFG for reporting such atrocities.

similar Ethiopian atrocities which are documented by Bryden and others.  The fact that the information is essentially true and correct supports the conclusion that the 2007 travelers' reliance on it was reasonable.  Conduct by other parties which provokes the defendant's criminal acts may serve as a ground for departure or mitigation of punishment under the Sentencing Guidelines and statutory sentencing considerations.

**C.  The Transitional Federal Government**.

The adjustment in the Sentencing Guidelines responsible for all the distortion in the sentencing conversation is based upon the critical conclusion that the conduct of each of the defendants was specifically "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."  *See*, U.S.S.G., § 3A1.4; 18 U.S.C. § 2332b(g)(5).  *See also*, *United States v. Chandia*, 514 F.3d 365 (4th Cir. 2008).  Salah Ahmed's motives and intentions are examined later.  The characteristics of government in Somalia in 2007, are worth examining separately.

There seems to be no dispute that during the period between 1991 and perhaps 2010, at least, Somalia had no effective government, legitimate or otherwise, internationally recognized or not.  This is indisputable - it was the core concern of Ethiopia and all the other nations in the Horn of Africa, the United Nations, the world in general.

When Salah Ahmed traveled to Somalia in December, 2007, something called the "Transitional Federal Government" (herein, "TFG") was located in Mogadishu, and it had dominion and control over literally a few blocks of that city.  Its authority over every other square inch of Somalia was militarily disputed by not just one rebel group, but by probably dozens of groups of various sizes and strength.  *Al Shabaab* was one of the strongest opposition groups at

that time, and growing stronger.  But allied with *al Shabaab* to varying degrees were numerous other militia groups, clans, even criminal gangs.  The TFG , three years after its formation, had the support of only a minority of the civilian population, for some very good reasons.

 To begin with, the TFG was not elected or chosen by the people of Somalia.  It was a government formed in exile at an international conference, and for many Somalis it had no legitimacy from the beginning.  (Bryden, Omar T. 118, 10/02/12).

The TFG was what Bryden termed a "predatory" government in the sense that it preyed on its own citizens, though even as a predator the TFG was ineffective.  It controlled so little territory that it had few citizens within its grasp to exploit.  (Bryden, Omar T. 118, 10/2/12).  Mainly it had to prey on its own people indirectly, by embezzling or wasting international funds meant for government services and security.  Bryden testified that a World Bank investigation concluded that 7 of 10 dollars in international aid to Somalia was misappropriated or unaccounted for after getting into the hands of the TFG.  Bryden's own group estimated the loss was closer to 8 of 10 dollars in the period 2009 - 2010.  (Bryden, Omar T. 160, 10/2/12).

It was an "open secret" that the TFG had been "extremely corrupt."  (Bryden, Ali T. 116, 10/6/11).

Again, evidence about TFG corruption and the atrocities it committed against its own people was not relevant to questions of guilt at trial.  One who provides material support to a foreign conspiracy to kill is guilty of violating § 2339A no matter how justified his motive.  But the facts are still relevant to sentencing, and again, there is evidence to consider in the report by Amnesty International from July, 2008:

Journalists, human rights defenders and aid workers interviewed attribute the dire

human rights situation in Somalia to the weak transitional Somali government. No one is being held accountable for human rights and international humanitarian law violations committed by TFG forces. Forces of the TFG often act as if they believe they are immune from accountability, investigation or prosecution, including for crimes under international law.

Reports of looting have generally singled out TFG forces, although incidents involving Ethiopian troops were increasingly reported. . . .

*Routinely Targeted*, p. 10. Again, Amnesty International investigators collected testimony from

sufferers and included a few in the report, as this one:

> "I cannot say in one story why I wasn't safe, there are too many stories. My worst experience was one day when the TFG soldiers raided my village. These are the authority troops of Mohamed Dheere (the mayor of Mogadishu). [At about 5:00 a.m.], I was watching from upstairs in my house. They were in a line and everyone had their hands against the wall. Then the soldiers fired on them, in bursts from their AK47s. They were six or seven metres away from me. I didn't hear the soldiers say anything. I heard the people screaming, others were reciting the Koran, others were crying. After one hour, when the troops left, we came out to see the bodies. They also looted the village. They were Somali TFG forces. Everyone was killed because they were accused of being al-Qa'ida. On another day [in early November, 2007], a Tuesday morning, I went to Bakara market at 7:30 a.m. and I saw 21 bodies. I counted them. The bodies were lying alongside the road, all together in a row. They were all shot dead, with bullet holes all over their bodies. I saw two of them had their hands tied. I think they were killed because their clan was supporting the ICU. . . .".

*Routinely Targeted*, p. 11.

The process for establishing the TFG in 2004 "was driven by the Ethiopians." (Bryden, Ali T. 71, 10/6/11). The general view from the outside was that the Ethiopian interest was in discouraging the emergence of a strong, united Somalia, particularly one which might align itself with Ethiopia's geopolitical rivals, such as Egypt. (Bryden, Ali T. 68, 10/6/11). The formation

of the TFG and the installation of Yusef as its first president represented, in essence, Ethiopia getting its way. (Bryden, Ali T. 71, 10/6/11).

The TFG satisfied no classic formulation of "political legitimacy". According to John Locke, for instance, the legitimacy of political authority depends on whether the transfer of authority (from each individual, where it originates in nature) has happened in the right way. Specifically, it depends upon individuals' consent. This represents the philosophical underpinning of the American Revolution, and its explains why we drafted a constitution by convention rather than by legislation of the Continental Congress. A different concept of political legitimacy comes from Thomas Hobbes, who believed that political authority did not exist in nature but came from the social contract, entered into to assure self-preservation from the threatening forces of nature. Legitimate authority in this view depends upon the ability of a state to protect its citizens. The subject matter is extremely complex and digressive; the point of going this far with it here is to demonstrate how the TFG failed to satisfy any of the accepted theories of political legitimacy. It did not govern by the consent of its people, and it failed to protect its citizens; indeed, it was one of the chief threats to its citizens.

Bryden observed that President Yusef and his TFG were widely seen as simply being in league with Ethiopia. Bryden also testified that soon after his installation as President of the first TFG in 2004, Yusef made a speech about needing 20,000 foreign troops to help him move his Somali government into Somalia, and that he made this speech in Addis Ababa. (Bryden, Ali T. 72, 10/6/11). At this point in that trial, the Court interjected to point out that Free France was outside France during World War II, but it was recognized as the government of France by the United States and Britain, and thus an example of a government in exile which was nevertheless

28

a legitimate government. Bryden acknowledged the point. Reasonable minds could disagree, though, over whether the TFG was comparable to Free France, or more like Vichy, a government installed by a traditional enemy of France in order to secure a border on that enemy's vulnerable flank. Vichy was an example of a 'de facto' government, one that exists but whose legitimacy is questionable. Under Locke's formula, Vichy was not legitimate; under Hobbes, it would have been because it at least was protecting its citizens. The latter regard is a characteristic which, again, distinguishes the TFG as a failure.

According to Bryden, most Somalis ended up viewing the TFG "as one small group with a handful of clans imposing their will on the rest of the country . . ." (Bryden, Omar T. 131, 10/2/12).

On top of all of this is yet another layer for consideration. Just what concept, exactly, would a young Somali-American have of a Somali government? As the CSIS Case Study Number 2, previously referenced, notes, in the 19 years between the start of the civil war in 1991, and the date of its report in July, 2011, there had been 14 different attempts at a peace process and government through either the United Nations or regional actors, with little to show. The TFG, 3 years old when Salah Ahmed and the others traveled to Somalia, held the record for longevity, if not effectiveness, and it had barely been able to move into the geographical boundaries of the country it purportedly governed. On the other hand, the institution most Somalis, including members of the diaspora, would have probably recognized as the most effective government at the time was the ICU, and this is the body which was at war with Ethiopia. So, yes, Salah Ahmed and Kamal Hassan intended to go join the opposition to Ethiopia, not only because they believed Ethiopia was an invading, traditional enemy of Somalia,

29

and not only because they believed Ethiopian soldiers were committing atrocities and acts of terrorism against Somali civilians, and not only because they believed Somalia was defenseless because it had no real government and no real army, but also because they believed they would be joining forces with "the Courts", the ICU, as they testified, and arguably the only politically legitimate authority in Somalia at the time.

**D.  Motivation to 'Kill'.**

The Court posed questions to Mr. Hassan during the Omar trial which probed his motivations for going to Somalia, or sought an understanding of what persuaded him to undertake killing.  The efforts of Mr. Hassan, and of Mr. Isse and Salah Ahmed, to explain themselves were compromised by prior evidentiary rulings by the Court and by the tactical goals of the adversary lawyers.  The chief motives of the 2007 travelers involved information deemed irrelevant and prejudicial.  For Mr. Omar's attorneys, the Court's prior rulings on relevance proscribed the ability to elicit details of what the witness knew or had believed about the Ethiopian atrocities; for the Government, the interest was in minimizing the jury's exposure to that sort of prejudicial information.  The impact of these evidentiary limits was to mute the power of the horror stories coming out of Somalia that the 2007 travelers relied upon, and leave each witness's attempts to explain himself falling flat and unpersuasive.  But now the stories these young men heard and relied upon must be considered as they are certainly relevant for sentencing.  We can only fail to see these stories as valid motives for enlistment in warfare if we fail to empathize with these young men as human beings, for the human reaction to such information is naturally to defend by all means necessary.  We would recognize the call to arms if personally faced with a comparable situation.  We might fail to understand Salah Ahmed's

30

response if we saw him only as 'the other', because he is Somali, or because he is Muslim. Undersigned counsel only knows these stories would be enough for him. At least, they would have been when he was in his 20s.

The nature and characteristics of the TFG have some relevance to sentencing that is similar to those of the Ethiopian army conduct, in terms of provocation or imperfect justification for the defendant's criminal conduct, except that Salah Ahmed was not provoked by TFG activity, but solely by Ethiopian activity. In addition however, the character and legitimacy of the TFG as a government of Somalia during the period of the offense conduct is relevant to decisions concerning the application of the terrorism enhancement of § 3A1.4(a), because a federal crime of terrorism, as a prerequisite for the section's application, requires a specific intent by the defendant, to commit acts calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct. The evidence raises fair question of whether the TFG functioned as a "government" for purposes of the statute and the sentencing guidelines. Further, the evidence suggests defendant Salah Ahmed's specific intent had nothing to do with a calculation or purpose to influence or affect the conduct of this government, for two reasons. First, the TFG had no more power in Somalia than many other clans and militias, and there was therefore nothing to influence or affect. Second, the conduct of the TFG was irrelevant to Salah Ahmed, who intended to defend his countrymen against Ethiopia but did not adopt the additional purpose of *al Shabaab* of affecting the TFG.


IV.    "IMPERFECT NECESSITY"

Even when the Sentencing Guidelines were mandatory, several recognized grounds for

31

downward departure addressed motivations of defendants which were not sufficient to justify the conduct but nevertheless struck a chord which resonates with us somehow or mitigates the harm. Thus a victim's own conduct could be wrongful in some sense such as to contribute significantly to "provoking" the offense behavior.  U.S.S.G. § 5K2.10.  Sometimes, the conduct engaged in, while still violating the statute, doesn't really "cause or threaten the harm or evil sought to be prevented by the law proscribing the offense at issue."  U.S.S.G. § 5K2.11 (Lesser Harms). Sometimes the conduct results from pressure that has been put on the defendant by others, sufficient that the defendant experiences some level of duress or coercion, though he could have taken some step to avoid the unlawful conduct.  U.S.S.G. § 5K2.12.  These grounds for departure are sometimes called the "imperfect defenses" because they do not acquit the defendant even though they mitigate his illegal conduct and justify lenity.  Under current law, where the Guidelines are no longer mandatory, the courts are free to consider a wider range of circumstances that are within or analogous to these earlier categories in order to judge the appropriateness of non-Guidelines sentences so as to satisfy the goals of sentencing under 18 U.S.C. § 3553(a).

Thus while the United States correctly argued in Mr. Omar's trial that the defendant's possible good motives, or some justification provided by the conduct of the Ethiopian army or the Transitional Federal Government, were not relevant to the question of violation of the statutes charged, sentencing requires asking different questions, perhaps the biggest one being, 'Why did they go?'

The answer almost certainly is different for each defendant.

During the trial of Mr. Omar, one of the Government's witnesses was cooperating

32

defendant Kamal Hassan.  At one point during direct examination, the Court interjected a series

of questions of its own.  The Court first established that Mr. Hassan, his parents and siblings,

lived in a nice home in Minnesota with several bedrooms, etc., and that they had moved here

from a refugee camp in Kenya, where they all lived in a tent without running water, and slept on

the ground.  Shortly after this exchange, the Court sought to understand Mr. Hassan's reasons for

deciding to join the plan to travel to Somalia:

> Q (THE COURT):      This is not like going down to Valleyfair.  How did you get
> convinced to join?
>
> A:    Well the first guy that approached me on this plan was a guy named Salah . .
> . and he told me about the plan and the situation.  He said there are people that are
> trying to go to Somalia to fight against the Ethiopians and he said he was one of
> them and he was going there and he was asking me if I wanted to go with him.
> And he told me there were numbers of people dying in Somalia under the
> Ethiopian troops.  They were raping women and burning mosques and houses and
> he said it was our duty as Somalians to go to Somalia and fight against the
> Ethiopian troops and after he told me that, I agreed to go with him to Somalia, and
> then he introduced me to –
>
> Q:    After one meeting?
>
> A:    Not that night, but I thought about it, Your Honor, and eventually I agreed to
> –
>
> Q:    Was the Quran used to convince you to do this?
>
> A:    No, not right away, Your Honor.  What convinced me to go was when he
> started talking about the Ethiopians killing our people, Your Honor, in Somalia.
>
> Q:    Well, let's back up.  Tell me about why you were in a refugee camp in
> Kenya.  Who was killing who?
>
> A:    In '91 there was a civil war in Somalia, Your Honor.
>
> Q:    And who was killing who?
>
> A:    It was Somalis against Somalis, Your Honor.

Q:    Now, have you ever picked up a gun before?

A:    Never, Your Honor.

Q:    Tell me how you could make a leap from talking to somebody to be going over and picking up a gun and killing someone with just – with a conversation.

A:    Your Honor, I can't explain what made me decide to go there at that time, but – . . . at the time, Your Honor, there was a lot of protests going on around the city of Minneapolis about the Ethiopian troops and when he told me the situation, Your Honor, I decided to go.

Q:    And kill?

A:    Your Honor, when we prepared to go there and fight against the Ethiopians and we knew there was going to be fights and battles involved, Your Honor.

Q:    And kill?

A:    Yes, Your Honor.

Q:    So one conversation convinced you to be a killer?

A:    I wouldn't say that one, Your Honor, but there was a bunch of other stuff that was going other than at that time, Your Honor, that made me go.

Mr. Hassan subsequently explained that his fiancé was in Mogadishu at the time and one of his other concerns was to bring her back to America and safety.  He stated he had not done any research into the politics of the situation, the relationship between the Transitional Federal Government and the Ethiopian troops in Somalia.  Turning again to questions from the prosecution, Mr. Hassan talked about the idea of returning to where he was born to see the country, and how, "it was just . . . I thought it was going to be an adventure or something, traveling around, going to Somalia."  And, finally again, ". . . and the other thing was the group

34

that I went with talking about what the Ethiopians were doing in Somalia at the time."[7]

Salah Ahmed, who testified before Mr. Hassan, was not similarly questioned about his motives or what persuaded him to go to Somalia, but Mr. Hassan, in large part, accurately summarized Salah's beliefs at the time. Mr. Hassan was not as successful as he might have been in conveying the process by which he and Salah Ahmed were convinced to volunteer, but what he was undergoing was not a typical guided direct examination on the topic. The Court's questioning, which had a flavor of cross examination, appears to have consciously refrained from getting into the issue of Ethiopian atrocities, given its own ruling on the government's motion. And of course Mr. Hassan's own attorney was not at counsel table to conduct the direct examination on this topic she would have liked to, no doubt to her great frustration (a frustration shared by undersigned counsel while watching his own client's testimony).

Testimony in the Omar trial established that the subject of going to Somalia to fight the Ethiopians was first presented to Salah Ahmed and the other 2007 travelers near the end of Ramadan, 2007, as the young men gathered to sleep at the mosque, a traditional practice unrelated to any conspiracy. While undersigned counsel has not been privy to investigative reports relating to statements by any other defendants, he has reviewed the reports of interviews of Salah Ahmed provided by the Government, and they shed additional light on the nature of these meetings.

When interviewed soon after his arrest in July of 2009, Salah Ahmed described the summer of 2007 as the first time he began to regularly attend Abu Bakar mosque. It appears this

---

[7] As reported in the rough draft transcript, testimony of Hassan on October 10, 2012, pp. 4 - 10.

was about the time Kamal Hassan also began attending, and the mosque became their regular hangout.  By the time Ramadan approached, that autumn, he was acquainted with a number of other men at the mosque.  During the last 15 days of Ramadan, he and Kamal decided to join other men in the tradition of sleeping at the mosque, and it was probably on the first such evening that he was invited to share space in one of the rooms at the mosque with Ahmed Ali Omar ("Ahmed"), and Khalid Mohamud Abshir ("Khalid").  It may be that Kamal Hassan was not there this first night.  It was during this night that Salah[8] first heard Kahlid declare that he wanted to return to Somalia to fight the Ethiopian soldiers there.  Khalid also related stories and examples of atrocities against Somali women and children, including stories of Ethiopian troops "killing babies".  (Interview, 7-17-09, p. 2).[9]  Both Ahmed and Khalid advocated returning to Somali to fight the Ethiopians and they wanted others to join them.

On the second night, Salah recalls that Kamal Hassan joined him and the other men from the prior night at the mosque.  Another man, Dahir Mohamud Gure ("Abdiwahab") joined Ahmed and Khalid in promoting the notion of joining the fight in Somalia against the Ethiopian army. Khalid and Ahmed spoke of already knowing people back there in the fight, and assured Salah and Kamal that if they went but didn't like it they could return to Minnesota.  (Interview, 7-17-09, p. 2).

Over the following nights remaining in Ramadan, the stories and the attempts to persuade

---

[8]  Begging the Court's indulgence, to limit confusion between Ahmed Ali Omar and Salah Ahmed, in summarizing the reports of these events counsel intends to refer to the defendant as Salah.

[9]  References here are to FBI Form 302s summarizing interview sessions with Salah Ahmed, which have been provided to counsel.

the recruits continued.  At first, Salah was not sure these men were serious.  Soon he learned that Abdiwahab had concrete plans to leave for Somalia at the end of October, and that these men had real connections with people in Somalia involved in the fighting, including a relative of one of the men, called "Adair".  (Interview, 7/17/09, p. 2).

It was Salah's recollection that during the first month of these discussions, which would have been through mid-November, 2007, he and Kamal Hassan remained unconvinced that they should go, and that they debated with each other on the question.  Listening to Khalid, Ahmed, and Abdiwahab, Salah came to believe these men were knowledgeable about the politics and conditions in Somalia.  These men were also insisting that those who joined the fight against the Ethiopians were engaging in a good, valid jihad, and that to die was shaheed.  As Ramadan ended, Khalid in particular was pressing Salah and Kamal Hassan to join in the fight.  (Interviews, 7/16/09, p. 15;  7/17/09, p. 3).

As Salah Ahmed and others testified at the trial of Mr. Omar, during some of these meetings calls would be placed to Adair and others in Somalia, including Abdiwahab, who had indeed made the trip on October 30.  Salah and Mr. Hassan were hearing stories from these men about the combat against the Ethiopian troops, and Adair was assuring the young men that they were being offered an excellent chance to defend their country.  (Interview, 7/17/09, pp. 4 - 5).  Adair also insisted they had a duty to defend their country until the Ethiopians were driven out, and that after the invaders were gone, Salah and Kamal Hassan could return to Minnesota if they wished.   (Interview, 7/17/09, p. 6).

In addition to expressing his doubts with Mr. Hassan, Salah told his friend Adarus that he wasn't sure he wanted to go.  Salah told the interviewing agents of a conversation he had with

Omer Abdi Mohammed during this time, after Omer had heard that Salah was on the fence about going. Omer told Salah that if he wasn't sure, he shouldn't go. (Interview, 7/17/09, p. 7). At one point, Omer temporarily opposed letting Salah and Kamal Hassan go to Somalia because he did not think they were ready, or that they had the necessary commitment. (Interview, 7/17/09, p. 5). In other conversations before they left, Omer told Salah and Kamal Hassan that they should learn the religion more first, to be better prepared (Interview, 7/18/09, p. 26). It was also Omer who told them to load the lecture by Awlaki onto Salah Ahmed's ipod and listen to it as preparation. They did listen to the lecture, bits at a time, but did not finish listening to the entire thing.

In one of his expressions of regret over his decision, Salah Ahmed told the agents during one interview that if he'd had more than six or eight weeks to consider the decision, certainly if he'd had five or six months to think, he would not have gone. (Interview, 7/17/09, p. 6). In another interview, Salah Ahmed acknowledged that his going to Somalia was a mistake, and that he should not have gone because he hadn't been 100 percent committed to begin with. (Interview, 7/22/09, p. 16).

Salah Ahmed, Kamal Hassan, and Abdifatah Isse, were not persuaded to risk their lives in Somalia by a single conversation or over just a few days, though for certain the men were not given much time to think about their decision either. Anyone present during the FBI interviews with the 2007 travelers, listening to the men describe the pitches made to them at the various meetings in the Fall of 2007, might well recognize the employment of the kind of universal con game played by every military recruiter: the hard sell, the 'time is short' pitch, the appeal to patriotism, the duty to protect motherhood and the folks back home, the use of peer pressure

("your friends are already over there"), the appeal to the sense of adventure, the lies minimizing the dangers and suggesting it is all 'a day at the beach', and, yes, an appeal based on religion, which is certainly not unique to Islam ("there are no atheists in foxholes", the saying goes; and "For God and Country", as the Navy Seal said before killing Osama bin Laden).

## V.   THE ARC OF SALAH AHMED'S EXPERIENCE WITH *AL SHABAAB*.

What distinguishes Salah Ahmed from every other defendant in these cases is the degree to which, after confronting reality, he rejected and abandoned *al Shabaab* and affirmatively cut-off remaining links to the people he was involved with in Somalia.  He and Abdifatah Isse were the only two counsel is aware of who succeeded in leaving the training camp, and Salah Ahmed was the first to make his way home, employing his resources and his network of family to return as expeditiously as possible.  Upon arriving back in the United States, with the advice and assistance of his family in Minnesota, he went to stay with relatives in California for a period of months in order to avoid the people in Minneapolis who were still involved with activity in Somalia and *al Shabaab*.  His only voluntary contact was with Mr. Isse, who he spoke with by telephone on only a few occasions.  Mr. Isse was told not to give Salah Ahmed's telephone number to any of the others, and when Salah did receive calls, once from "Little Mustafa", and once from Mr. Omer, he made excuses to cut short the conversations, promised to call them back later, and then never did.  When he finally returned to Minnesota, because he missed his family, he continued to avoid anyone connected with the conspiracy, and they began to avoid him as well.

A better understanding of his experience in Somalia with *al Shabaab* than is possible

from the trial testimony alone is needed.  The following chronology attempts an adequate

description, beginning with his departure from Minnesota on December 6, 2007.

<u>Dubai</u>

As he had been while still in Minneapolis, Salah Ahmed continued to experience mixed

feelings about his decision to go to Somalia throughout the experience.  Initially, after finding

themselves alone on the flight from Minnesota, he and Kamal Hassan tried to think of themselves

as merely on a vacation.  They argued over who would get the window seat.  In Dubai while

waiting for Mr. Isse and Mr. Ahmed to arrive a couple of days later, he and Mr. Hassan behaved

as vacationers, dressing in western fashion and allowing people in the city to believe they were

"rich Americans", perhaps famous.  They went to nice restaurants, enjoyed the entertainment.

Salah Ahmed recalls cautiously suggesting they simply stay in Dubai awhile and then return to

Minnesota.  The idea could not get much traction because the plan was to meet Mr. Isse and Mr.

Ahmed when they arrived a couple of days later and fly to Somalia together.  Salah, and

apparently Kamal Hassan also, felt peer pressure, and did not want to lose face with their friends

after coming that far.

<u>Hargeisa</u>

The experience began to change drastically as soon as they arrived in Hargeisa, Somalia.

From the bright, modern, cosmopolitan atmosphere of Dubai, they found themselves in dusty,

dirty accommodations with no hot water, and eating at restaurants in which they didn't trust the

food.  Upon de-planing, they found it necessary to give an official a $50 bribe to get into the

country.  Because the person they expected to pick them up didn't show, they began to feel

anxiety and feared for their safety.  After finally making contact with those who were supposed

40

to guide them, the men settled down.  Over a couple of days they met a few people who seemed

to be connected to the group they would be joining in the south.  Salah Ahmed remembered one

man in particular who was vehement about the fight against the Ethiopians and rigid about the

duty of Muslims to drive the nonbelievers away.  He and Kamal Hassan mocked the man's

seriousness afterwards, but they were admonished for doing so by the others.  A few days after

the four arrived in Hargeisa, Mr. Hassan and Mr. Isse were taken to Mogadishu, but Salah and

Mr. Ahmed were left behind.  The two spent two more weeks waiting to continue their journey,

and adjusted to life in Hargeisa.  One evening they rented an entire restaurant for $15, to show

off.  They were treated as celebrities.  One proprietor provided the men with female escorts,

though Salah did not engage with the women sexually.  Mr. Ahmed did disappear with the two

women one evening and did not return for a long time, which worried Salah.


<u>Mogadishu</u>

The time came that they were directed to Mogadishu, flying there from Hargeisa in an old

Russian cargo plane outfitted for passenger service using folding chairs.  Upon arrival at the

Mogadishu airport, they were once again confronted by officials looking for bribes.  Their

American accents were recognized, and they were threatened with arrest until they paid another

$50.  Salah Ahmed immediately felt anxiety in the city, and told his interviewers he and Mr.

Ahmed both were afraid they were going to be killed.  A third man who traveled with them from

Hargeisa was accused by the airport officials of being against the government and was arrested.

Salah and Mr. Ahmed denied knowing the man when questioned and moved away from the

scene.  Salah returned, thinking he should talk to the officials on the man's behalf, but found the

41

man had already been released.  (Interview, 7/16/09, p. 7).  When they arrived at the building in the city where they were to meet their main contact, Adair, the cab driver warned them to run into the building quickly so people would not see their luggage.  That night, as they tried to sleep, they heard regular gunfire from the streets.

They only stayed overnight in Mogadishu, but while there Adair demanded their passports, wallets, and social security cards.  He also directed them to adopt fake names and never tell anyone they met their true names or where they were from.  He kept their luggage as well, promising to have it delivered to their next stop, the safe house in Marka.  That did not happen.

Before leaving Mogadishu, the pair was shown a video of two men who were in custody of Adair's group, *al Shabaab*.  The video showed the men being shot, and one of the men had his throat slit as well.  Salah Ahmed understood that the men were deserters, and their fate was a consequence of betraying *al Shabaab*.  After that, he and Mr. Ahmed were taken to a bus going to Marka.

This bus was packed with passengers, including men riding on the roof, on the hood, and on the front bumper.  Instead of taking the highway, it followed the shore of the ocean, driving on the sand, in this way avoiding the robbers and various militias that controlled and harassed travelers on the main routes.  During the trip, the bus broke down from time to time, and a bush mechanic made repairs.  On other occasions, the bus would get stuck in the beach sand and the passengers would have to get out and push.  Occasionally, for a break, Salah and other passengers would get out and simply walk behind the vehicle as it plodded along.

<u>Marka</u>

As is noted in the Presentence Report, it was in Marka that it was finally made explicit to the 2007 travelers that the group they were joining was *al Shabaab*.

Back during Ramadan in Minnesota, and in the few weeks before their departure, the discussions had not specifically identified *al Shabaab* by name.  This has always been Salah Ahmed's recollection, and that is consistent with the trial testimony of Kamal Hassan.  In Minnesota the men had always used the term 'the Courts', and Salah Ahmed recalled hearing Omer on the telephone with Adair asking questions about "the Courts".  Salah also remembers being told the group he would join was a part of the Courts that was willing to keep fighting against the Ethiopians, that they were very religious, and that they would accept fighters from the United States.  Salah Ahmed recalls that he might have heard the name *al Shabaab* during the last week in Minneapolis before leaving, but it had no special meaning to him, other than 'the youth'.  This is all consistent as well with Bryden's testimony and reports about the rise of *al Shabaab* by CSIS and other historians of the conflict.  In the autumn of 2007, the terrorist group was still emerging.  Even the American State Department had not yet reached conclusions about it.

The safehouse in Marka was run by a woman the men called Hooyo, and also "Mother of Shabaab".  Salah Ahmed described her to the FBI as a very religious extremist.  (Interview, 7/16/09, p. 3).  Hooyo told the recruits that the Courts had broken into two groups, and that her group was called *al Shabaab*, and they were fighting against both the Ethiopians and the government.  She told them the goal of *al Shabaab* was to get Ethiopia out of Somalia and establish shari'a law.  She said the government had to be fought because it was working with

43

Ethiopia.  (Interview, 4/22/10, p. 1).

In several of his interviews with the FBI, Salah Ahmed commented on the differences between what the recruits were told in Minneapolis, and what they were told in Marka.  In Minneapolis, they were always told they were going to train and fight against the Ethiopian Army because the Ethiopians had invaded their country, and were raping and killing civilians and destroying homes and towns.  In Marka, they were told the fight was also against the government because it was allied with the Ethiopians.  (Interviews, 7/16/09, p. 12, 4/22/10, p. 2).  It seemed to Salah, in fact, that most of the talk here was about fighting the government.  *Al Shabaab* fighters would visit the house and talk about battles with government soldiers; another visitor Salah Ahmed described as "a bad guy" told about ambushing and robbing government vehicles along roads.  (Interview 7/16/09, p. 16).

Some of the visiting *al Shabaab* veterans would describe deliberately provoking Ethiopian attacks on civilians by throwing grenades at them from civilian centers, knowing the Ethiopians would respond by firing artillery.  (Interview, 4/22/10, p. 2).  As these stories began to accumulate during his days in Marka, Salah privately concluded that the Ethiopians were not to blame for the death of Somali civilians, as he'd been lead to believe in Minnesota.

Salah's observations about these stories from the visitors in Marka are consistent with the testimony of Bryden about the known tactics and counter-measures employed by *al Shabaab* and the Ethiopians respectively.  Bryden also pointed out how both sides were culpable for human rights violations for precisely these sorts of tactics.  Salah Ahmed, however, tends to see things with less nuance, which may be one of the reasons he failed to think critically about what he was being told in Minnesota and was persuaded to travel to fight the Ethiopians.

There was a problem presented for Salah Ahmed when he understood that the group he had joined was fighting the government as well as the Ethiopians. His clan and his extended families in Somalia were associated with the TFG. He had cousins and other blood relatives who worked for the government. (Interviews, 7/16/09, p. 12; 4/22/10, p. 2). He therefore had another reason to regret his decision to come to Somalia, and he felt, privately of course, that this was business he had not signed up for.

It was in Marka that Salah Ahmed had his first conversations with people who doubted the religious validity of *al Shabaab*'s mission. One of the men in Minneapolis who was supposed to have traveled to Somalia was named Farhan. When he did not show up, the men spoke with him by telephone and he told them he'd been talking with true scholars about the jihad in Somalia and was told it was bad, that it was not religiously correct. (Interviews 7/17/09, p. 11, 7/19/09, p. 6). There was also Shirwa, who was supposed to join the trainees in Somalia but was still in Saudi Arabia at the time. By telephone he told the group in Marka he did not want to come as planned because he too had learned from scholars that the *al Shabaab* jihad was not religiously correct. It was bad jihad. (Interview 7/16/09, p. 14). For Salah Ahmed, news of this controversy provided further reason to doubt his decision to come.

Beyond these revelations, nothing much was happening. There was no training as yet. Most days they stayed in the safehouse until midday. They often walked into downtown Marka in the afternoon to buy minutes for their phones or charge batteries or stand in line to use the internet. They sometimes went to the beach and swam, or played football. There was no running water at the safehouse, so showers were taken outdoors with buckets of water. Salah Ahmed did not like the conditions in most of the restaurants in the town so he ate most of his meals at the

house.  Smoking was forbidden by the strict religion enforced at the house, so Salah would sneak into nearby hills every day to light up.

Hooyo controlled much of the activity.  She restricted their visits to town.  When she discovered they were talking to American girls on their cellphones she initially ordered them to stop, partly because of security, but also because of strict religious rules she enforced.  She relented only when she learned these girls could send money to the men.  (Of course, while they rationalized the calls for Hooyo, it was the main purpose of the men making these calls to socialize and flirt with these women).  At one point when there was a lot of concern at the safehouse over the complaints Kamal Hassan's family were making to American authorities, Hooyo temporarily confiscated all the cellphones to prevent any calls back to the United States.

When the concern over what Mr. Hassan's family in the United States was doing was at a peak in Marka, Mr. Hassan sought permission to return to the United States and calm his family down, after which he promised to return to Marka.  Hooyo and the other leaders would not allow him to leave.

At another point, Kamal Hassan had wanted permission to see his wife and her family in a nearby town.  Salah Ahmed recalled that Hooyo refused permission to do this, explaining to the men that she knew the woman's family and they were "bad people".  She and other leaders at the house lead the Americans to believe that if Kamal Hassan had contact with his wife's family he would be kidnaped by them and returned to the United States.  Hooyo did not want to risk that. (Interview, 7/22/09, p. 14).

While the time in Marka was slow and often boring, there was also an undercurrent of tension and intimidation.  Salah Ahmed continued to have the impression left by the video he'd

been shown in Mogadishu on his mind.  He also recalled one of the last bits of advice given to him by Omer before he left Minneapolis, which was that he must obey the leaders in Somalia because there would be bad people who would kill the Americans if they did not listen. (Interview, 7/22/09, p. 11).  There were warnings about being among the local people of Marka as well.  Hooyo told them not to spend too much time in the town or reveal they were Americans, or they would be robbed.  (Interview, 7/17/09, p. 14).

As of all this went on, Salah Ahmed and Mr. Hassan were speaking privately about finding a way to get their passports and leave Somalia for home.  Salah thought about leaving sometimes during his visits into town – there was at least one travel agency there.  He managed a private telephone call with his mother, in which she told him to get out of there and come back to the United States or she would come and get him herself.  (Interview 7/17/09, p. 12).  His mother did send him money in Marka, in his own name (which violated the safehouse rules), intending it for escape.  But Salah worried that in Marka he would never know whether he was talking to someone who would help him or someone connected with *al Shabaab* who would report him to Hooyo.  There was no police department, and Marka operated under its own rules – the government's power did not reach there.  (Interview 7/16/09, p. 10).

At one point, Ahmed learned of Salah's and Kamal Hassan's conversations, and warned them that *al Shabaab* would probably kill them if they tried to leave.  (Interview 7/16/09, p. 20).

On several occasions while in Marka, the men were told they would soon be taken to the training camp.  However, the transfer kept being delayed, and Hooyo told Salah Ahmed it was because *al Shabaab* did not have enough money to build the camp.  (Interview 4/22/10, p. 4).  At other times they were admonished to get themselves into shape by running and doing pushups

and other exercises.  Salah Ahmed later learned that a number of trainees who were at safehouses in the nearby town of Baraawe did keep themselves in shape this way.  He and the other men in Marka did not.

As the 2007 travelers testified at trial, they did eventually receive some training in the handling of weapons while still in Marka.  This consisted of learning to setup, load, and aim the weapons, operate the safety and automatic features, and carry the ammunition.  All such training took place inside the safehouse as the trainers did not want to be seen outside with weapons.  None of this training involved real ammunition or firing live rounds.  The American trainees also learned they would have to buy their own rifles, but they would not receive the weapons until later.  Hooyo told the men they weren't permitted to have guns in Marka for security reasons.  (Interview, 7/28/09 p. 6).

The waiting with nothing to do, and the denial of access to weapons, are consistent with *al Shabaab*'s need for security and its lack of money in early 2008, but these things are also consistent with Bryden's testimony about the terrorist group's practice of observing and testing the new recruits.  He testified *al Shabaab* would not take recruits directly to core training facilities; they would be left at safe houses or training camps that were segregated from more experienced fighters.  During these periods, leaders would learn more about the identity of the recruit by clan identification and other sources, they would observe the trainees, test them with tasks and rules to see how they behave and react.  Bryden identified the house in Marka as well known.  (Bryden, Omar T. 95 - 97, 10/2/12).

<u>Baraawe</u>

The 2007 travelers spent December and at least most of January, 2008, in Marka before

48

being transferred, in stages, to one of the safehouses in Baraawe.  Here there were more strict

rules about leaving the house in small groups, and avoiding interaction with townspeople.  In

Baraawe, armed guards were posted at the house at night.  Generally the Americans were not

trusted with guard duty.  (Interview 7/16/09, p. 17).

The days in Baraawe were also dull, and because there were more men there and more *al*

*Shabaab*, it was harder to avoid the strict religious rules that were supposed to be followed.

Salah Ahmed had to keep his ipod hidden because it had contraband music on it.

Baraawe, like Marka, was on the ocean but the seas there were very dangerous, with large

waves and undertow.  There was one area where swimming was relatively safe, and there were

many local people there that the *al Shabaab* recruits were supposed to avoid.  One day, Salah

Ahmed and two other men from the house decided to sneak over to the dangerous beach to go

swimming.  Kamal U.K., Hooyo's older son, came along and decided to swim as well.  He

became tired struggling to swim in the waves and current and began to be drawn out to sea.

Salah's group, along with a local man who was also swimming, tried to catch him and pull him

back to shore but they were having difficulty themselves.  Salah and one of the others ran back to

the safehouse and reported that Kamal U.K. was drowning.  Seven men from the house ran to the

shore to try to help, including Mucaad, Kamal U.K.'s little brother, and a Kenyan who was sick

in bed with malaria.  Almost immediately, four of the men had to return to shore because of the

dangerous waters.  The other three were in too much trouble to get back.  A group of local men,

seeing the disaster unfolding, jumped into the water and helped with the rescues.  Mucaad was

carried from the water unconscious.  It was Salah Ahmed who tried to resuscitate the boy, but the

corpse regurgitated into his mouth.  The men sat singly or in pairs inside and outside the

safehouse and wept.  For most of the recruits and travelers, this was their first intimate encounter

with violent death – the Americans there in the impoverished African frontier, away from family,

convenience foods, cars, and all that was normal.  The next morning they found the body of the

Kenyan who'd had malaria.  He'd been battered and mutilated by the surf against the rocks.  The

would-be soldiers who'd never fired guns wept again.  They'd been warned not to go, but like so

many young men, they swam anyway.

Hooyo was called about the death of her son, and the leaders of the house were very

angry.  Local residents were now noticing all these strangers.  Because the drownings drew

attention to the house, the leaders announced that everyone would be transported to the jungle

camp in a few days.

In less than two weeks time, Salah Ahmed would be running and hiding from *al Shabaab*,

making his way home.

The Jungle Camp

Just a couple of days after the drownings, two vehicles arrived at the house in Baraawe

filled with AK47s and ammunition.  The rifles were distributed along with ammunition.  Salah

Ahmed thought the guns looked like they had been buried somewhere, they appeared dirty and

weathered.  The trainees then boarded several vehicles headed for the jungle.  At least part of the

reason the guns were distributed at this time was because the caravan would travel through some

very dangerous wilderness which hostile militias and gangs of outlaws controlled.  At certain

times while motoring, the men were instructed to make sure the barrels of their weapons were

sticking out of the windows to be visible.  When the caravan stopped for lunch and fuel in a

frontier town, the men were instructed to carry their rifles and display them prominently.  Salah

Ahmed remembers being stared at by other armed men at a 'check point' at the edge of town, and wondering if someone would start shooting.

After some hours the vehicles stopped and the men began a long hike deeper into the jungle. It was during this time that Salah began thinking about having a gun for the first time and wondering what it sounded like, and what it felt like to fire it. Ahmed had talked to Salah about shooting his gun once. There were strict orders from the leaders to not fire the weapons, but Salah decided to disobey. He dropped back from the column, and when he thought he was isolated enough, adjusted the safety to fire one round. Instead the gun fired twice. He'd adjusted it to fully automatic by mistake. The leader, Qasim, demanded to know who fired the shots, but Salah Ahmed denied it was him. Salah remembers Kamal Hassan and Abdifatah Isse being very angry with him for pulling such a stunt.

The men reached a point in the jungle where the leaders announced this would be the site of the training camp. The trainees were surprised, having expected to see a camp, but seeing only jungle. They learned now that they would be building a camp from scratch at that location, clearing jungle and putting up tents. In the meantime, they were told to choose shelter under one of the trees within a radius of the camp center. The men were divided into groups. They slept on bare ground under these trees. Salah Ahmed remembers hearing lions in the wild at the perimeters of the camp at night, and other unidentifiable animal sounds. Large black insects which had many legs dropped down from the trees onto the men as they slept, sometimes hard enough to wake them.

For a few days, absolutely nothing was happening because the men had no tools. Finally, axes and other equipment for clearing the jungle arrived and the men were put to work cutting

51

and burning, digging and grading the future camp.

Most of Salah Ahmed's contact at this point was with Abdifatah Isse.  The two of them began talking about the lives they left behind in Minnesota, and the comparing the reasons they'd come to Somalia.  They both wanted to go home.  (Interview 7/16/09, p. 20).

Qasim sometimes beat the trainees with a stick if they were not clearing the jungle fast enough.  There were also men Salah Ahmed described as managers, but during this clearing and building phase the men who were trainers, lecturers, and teachers, who had come by the safehouses in Marka and Baraawe from time to time, were not around.  Qasim and the managers told the trainees from time to time that the teachers would come when the camp was finished.  In the meantime, the trainees were confined to the camp area.  Water was obtained from a nearby well, but the men were instructed not to talk with any local people they may encounter while filling containers.  The men were fed just once a day, a plate of rice usually, though Salah remembered one meal with goat.

Though they still had their rifles and ammunition, no training or practice was taking place while the camp was being built.  At night the men slept with their guns.

<u>Plans for Escape</u>

Mr. Isse told Salah about an idea he had for getting out of the camp.  He had relatives in the north.  He would tell Qasim that his grandmother was dying and that it was his duty to help take over the house and administer the property.  That would be his excuse to leave the camp and get away into the hands of his family.  Salah Ahmed heard the plan and saw Mr. Isse's departure as his own only chance to leave the camp.  He'd been developing a genuine skin rash, either from the harsh sunlight or from the ground.  If Mr. Isse succeeded in getting permission to leave the

camp, Salah Ahmed could tell Qasim that he needed medical attention and that he would like to leave with Mr. Isse in order to see a doctor. (Interview, 7/16/09, p. 20).

As a great piece of luck, in camp at that time was a local man from the same town Isse's relatives were in, and this man was greatly trusted by Qasim. This man offered to guide Isse to Kismayo where Isse could catch a plane. Qasim was persuaded to agree to let Isse go for this purpose as long as he returned to camp as soon as possible when the grandmother's house was settled. Qasim also agreed to let Salah Ahmed go with Isse and the local man to seek medical attention in Kismayo.

Salah Ahmed, Isse, and the local man left camp on foot. To support the impression they would be returning, they left behind most of their personal belongings. Salah Ahmed left his AK47, backpack, ipod, and boots. (Interview, 7/19/09, p. 24). All he had with him when he left the camp were Air Jordan shoes on his feet, sweat pants, a small bag with an extra pair of pants, his cell phone, battery charger, and some money. (Interview, 7/16/09, p. 20).

Soon after leaving camp they found they could not keep up with the pace of the local man, so in the nearest small town they found a vehicle they could hire, and the three drove to Kismayo, the southern port city.

<u>Kismayo</u>

In Kismayo, Salah Ahmed and Isse were able to separate from the local man for a while. Salah was supposed to be finding a doctor. He called his sister in Minnesota to let her know he'd escaped the camp and needed money to get away. He had Isse by him a ticket on the flight Isse was taking to Galcayo, and because he did not have permission to go north like Isse, he hid his ticket so the local man and anyone else they ran into would not suspect he was planning to leave.

(Interview, 7/17/09, p. 12).

Unfortunately, their flight did not leave Kismayo for a few days, and Salah had to make excuses to the local man about why he was not ready to go back to camp. At one point he bought some over-the-counter pain pills and told the guide that this was medicine that would start helping his skin condition. (Interview, 7/18/09, p. 14).

Then they ran into Qasim, who was in Kismayo for supplies. They explained to him that Isse's flight for the north would be leaving in a few days, but they had to lie about Salah still waiting to see a doctor. Salah assured Qasim that he would return to camp as soon as he got treatment. Because the men were still accompanied by the local guide who was trusted by Qasim, their stories were accepted. Qasim expected the local man to make sure the two got back to the camp. (Interview, 7/18/09, p. 14).

At some point while the pair was still in Kismayo, Kamal Hassan and Ahmed called Salah and told him the camp was in an uproar because Shirwa left without permission, and that a local man, who was a member of *al Shabaab*, had helped him leave. The camp leaders were more angry with the local man than with Shirwa, but they had decided to ban Shirwa from returning anyway. Kamal and Ahmed warned Salah that they thought *al Shabaab* may be going to kill Shirwa, and that he and Isse should probably hide as well. (Interview, 7/18/09, p. 18).

Within a day or so, Salah ran into Shirwa in a mosque in the city. It appeared that because Salah and Isse succeeded in leaving camp, Shirwa decided to try as well. Apparently while Qasim had been traveling to Kismayo for supplies, Shirwa attempted to persuade the camp managers to let him return to the United States to help a friend in trouble there. The managers refused to let him go, so Shirwa left camp without permission. Shirwa told Salah Ahmed that he

54

was on his way to Mogadishu to get his passport back from Hooyo so he could return to the United States to help the friend. Salah Ahmed decided to confide in him that he was planning to leave Somalia as well and not return to camp. They agreed to meet again the next day. At that meeting, Mr. Isse was along as well. They asked Shirwa to get their passports back from Hooyo as well, and Shirwa promised he would try. Shirwa did not have a cell phone, but he was still with the local man, and Salah obtained that man's phone number so they could all stay in touch. (Interview, 7/18/09, p. 13).

From Kismayo, Salah also called Sharif, who had provided the men money as recently as Baraawe, and asked him to help get his passport back from *al Shabaab*. Sharif told Salah that he would try to go to Marka soon and do as Salah asked. (Interviews, 7/18/09, p. 6; 4/22/10, p. 8).

Salah Ahmed also called Kamal Hassan and encouraged him to escape to his family, but Mr. Hassan told him he could not get away. Because of the number of men who had requested permission to leave, and because Shirwa left without permission, Kamal believed the camp leaders were about to confiscate the phones belonging to the trainees. (Interview, 7/18/09, p. 15).

As the time for their flight neared, Salah Ahmed knew he had to persuade their own guide to let him go north with Isse instead of returning to the camp as he was supposed to. When approached on the subject, the guide insisted that Salah return to camp if his skin had been treated, and that he could tour the north if he wanted once his training was finished. The man, however, accepted a bribe of $50 to keep quiet about Salah flying north with Isse, as long as Salah promised to return to the camp with Isse. (Interview, 7/18/09, p. 15).

Nevertheless, the attempts at maintaining the ruse failed somehow. Before catching the plane, Salah Ahmed received a call from Hooyo, who warned him not to disobey Qasim or fly

55

north.  She read verses of the Koran to him and quoted other references.  He cut her short by

insisting that he planned to return to the camp with Isse, and promising her he would do so.

(Interview, 7/18/09, p. 15).  He resolved to change his telephone number in Galcayo.

At the airport in Kismayo,there were  more near disasters.  The city of Kismayo, in early

2008, was run by a local militia (the city an its port would not fall under the control of *al*

*Shabaab* until 2009) and these men also controlled the airport, carrying around loaded automatic

weapons, with the safety off.

While he waited for his flight, Salah Ahmed's telephone battery charger was stolen.  Then

he discovered his airplane ticket, which had been in one of his pockets, had been stolen as well.

(Interview, July 22, 2009, p. 1).  Pickpockets in Somali airport cities frequently seek passenger

tickets, which are easy to sell on the black market.

Running to a ticket counter, Salah Ahmed reported the loss.  The agent could do nothing,

but he did say he'd seen the ticket – in the hands of one of the so-called security men from the

local militia.  Salah approached the man and argued about his ticket and was lucky to persuade

the man to return it.  It was not certain this was the man who'd stolen it.  (Interview, July 22,

2009, p. 2).

<u>Galcayo</u>

The plane was another old Russian model that frightened the passengers by shaking a

great deal in flight.  They did, however, arrive in Galcayo, where Salah Ahmed and Mr. Isse were

greeted by members of Salah's family who had been contacted by Salah's sister and mother in

Minnesota.

Most of Salah's family members in Somalia are never told of the real reason he came

back to the country.   Some of them are told he was there to get married.  (Interview, 7/22/09, p.

3).  While in Galcayo, Salah Ahmed stayed for a time in a hotel owned by an uncle, and then

moved to another hotel where he could have a separate room.

Salah followed up on the efforts he was making to get his passport back from *al Shabaab*.

He contacted Sharif, and learned that Sharif had been unable to get to Marka or Mogadishu and

get the documents back.  He also learned from Sharif that Shirwa had arrived in Mogadishu

where he was confronted at Hooyo's house by Hooyo, Khalid, and other leaders and told that he

could not return to the United States because it would be too dangerous for him there.

Apparently he'd been convinced by them to return to the camp.  The local man he'd traveled to

Mogadishu with had apparently resigned from *al Shabaab*.  (Interview, 7/18/09, p. 16).

With this news, Salah had to call Hooyo directly and find a way to persuade her to return

his travel documents and other belongings.  He called her and told her there was some sort of

emergency and he needed his family to take possession of the documents to allay their suspicions

so they would permit him to return to the camp.  He suggested that one of his cousins who

worked at the Mogadishu airport could come to her house for the documents, and she became

angry.  Then he wanted her to take the documents to the airport in Mogadishu, but she refused

that as well.  He believes she was afraid to go there.  Salah Ahmed had considerable difficulty

persuading her and they argued.  Eventually, she agreed to send a representative of her own to

meet a representative of Salah's family near the airport at Mogadishu.

Mr. Isse, learning Salah was making arrangements, asked Salah to get his documents as

well.  When approached about this, Hooyo refused, telling Salah that Isse would have to deal

with her directly.  (Interviews, 7/22/09, p. 3).  Salah believes one of Hooyo's concerns, and the

reason she did not want to go to the airport in Mogadishu, was that she was aware that Salah's clan was connected with the government. She may have been willing to turn over his documents in order to limit the risk of government involvement. Mr. Isse would not have the same advantage.

Bryden addressed one of *al Shabaab*'s strategies relating to recruits that is revealing in this regard. He testified that a problem for *al Shabaab* in recruiting or abducting young men in Somalia was that there would be pressure for their return from their families. In contrast, young Somali recruits from the diaspora could be more easily isolated and oriented to certain tasks. Someone coming from abroad might find themselves in a part of Somalia where they didn't have relatives, where there was no familial pressure to get them released, so they could be kept safely by *al Shabaab*. Bryden's investigations had revealed many cases where such recruits were non-Somali speaking youth, disoriented, alienated, and suggestible to specific tasks, including suicide bombing. (Bryden, Omar T. 93 - 94, 10/2/12).

Salah Ahmed thus had certain identifiable advantages that helped him escape. He was fluent in Somali. He had his cell phone. He had the ability to get money from his family in Minnesota and their help in networking with family in distant parts of Somalia. And, perhaps as important as any other advantage, he had relatives and clan members in good standing with the government, though this also meant that he could not tell all his family members in Somalia about why he'd come there.

Because he'd not told his family in Somalia the real reason he was there, Salah Ahmed had some difficulty explaining to his cousins why his passport was in another person's hands. He ultimately simply explained that a lady had his documents and he had to have someone go to

Mogadishu to pick them up.  In the end, one of his cousins flew to Mogadishu, and then hired a local man to go to the location specified by Hooyo, where the local man picked up the documents and property, returned to the airport, and gave them to the cousin, who then flew back to Galcayo.  Salah's family in Minnesota sent the money for the cousin's round trip flight. (Interview, 7/22/09, p. 4).  Salah was so thrilled with getting his things back that he hugged his cousin.  When he later spoke with Salah by telephone and learned of the success in getting the documents back, Mr. Isse became angry that Hooyo had not returned his things as well, and then he began to cry.  (Interview, 7/22/09, p. 4).

<u>Exit</u>

Salah Ahmed got a new telephone and gave the number to Mr. Isse with the understanding that no one else would be given it.  He was taking steps to cut off any contact from members of *al Shabaab*.  (Interview, 7/18/09, p. 15).  Salah Ahmed then took a bus to the city of Bossaso, where he and his family in Minnesota arranged the flights that would bring him home. After about a week, he flew first to Yemen, and from there back to Dubai.  He remembers being the only American on these flights.

As he put distance between himself and the the training camp, Salah Ahmed was careful to avoid being seen by someone who might be connected with al Shabaab, including people he knew from Minnesota.  He changed his telephone.  He limited his calls to people he thought could help him, like Sharif, and when it became clear they could not, he cut them off.  He concealed his intentions from others, even members of his own family in Somalia, all in an effort to safely leave the country, to survive.

It is important to remember this abandonment of *al Shabaab* required much more than

59

disenchantment with the program and an expression of regret.  Even back in Minnesota, late in the preparations, he'd been warned about the possibility of being killed for disobedience.  In Mogadishu he was warned of this again through the display of the 'snuff' video by Adair.  In Marka he received another warning from Ahmed about being killed for trying to quit, and even when in Kismayo, with permission to be absent from the camp, he received warnings from Ahmed and Kamal that *al Shabaab* was angry about defections from the camp and may be planning to kill people.

Bryden confirmed the seriousness and legitimacy of concern about being killed for quitting or disobedience.  He testified that *al Shabaab* was ". . . known fairly routinely to kill members of their own ranks, especially young men who want to escape.  And, again, this is believed to have an exemplary value so that other militia don't try to escape, because they see what the consequences would be."  (Bryden, Ali T. 48, 10/5/11).

<u>Dubai, London, and Home</u>

In Dubai, his mother had arranged a hotel and a local relative to look after him.  (7/22/09, p. 5).  He was supposed to stay there a week while waiting for an American Airlines flight to New York.  He did not have the patience to wait that long, and went to the airport after a couple of days seeking a standby flight.  After waiting overnight, he caught a British Airways flight to London, and from there, another overnight at the airport before catching a standby flight to New York on American Airlines.

His family in Minnesota had decided to send him to live with relatives in California so that he would be away from the people still in Minnesota who had arranged for him to fight in Somalia.  He spent several weeks there, working as a valet, but became homesick.  He returned

to Minnesota in July, 2008.

He had maintained some contact with Mr. Isse by telephone, but no one else was supposed to have his number.  He received a call while he was still in Sacramento from "Little Mustafa", one of the members of the group in Minneapolis who'd been too young to go to Somalia in December, 2007.  They talked a little about his experience in Somalia, and Salah Ahmed told Little Mustafa that he was no longer "down with that stuff" - in other words, that he did not agree with what the group was trying to do in Somalia.  He agreed to have further conversations, but he never called Little Mustafa back.  (Interview, 7/16/09, p. 8).  After he returned to Minnesota, he heard through others that Mustafa and Mohamed Misk were making preparations to leave for Somalia, and that they'd been told not to listen to anything Salah Ahmed said to them.  (Interview, 7/16/09, p. 8).  He also heard people in the community were saying bad things about him and his travel to Somalia.  (Interview, 7/22/09, p. 9).

Salah Ahmed maintained as low a profile as possible.  He did not attend mosque at Abu Bakar any more.  He did not want people to see him.  On one occasion he did see Faarax, the veteran who spoken to the recruits at meetings in 2007, at a Somali mall.  Faarax ignored him, and avoided contact.  Sharif obtained his phone number and called him once, reminding him that his friends were still in Somalia and needed support.  Salah Ahmed told Sharif he wasn't working, and got off the phone by telling Sharif he would call him back, but he never did.  It was Salah's desire to cut off everyone who had been involved in the trip to Somalia.  (Interview, 7/19/09, p. 8).

He only learned of the additional travelers to Somalia in 2008 when hearing it on the news.

It was also his purpose to put Somalia behind him when he lied to the FBI in 2008.  He was not terribly surprised by the first visit, but after that he didn't think the government would be that interested in him.  He was not trying to protect any of the men involved in the crime; he was simply hoping everyone would go away and leave him alone.

In Somalia he came to despise *al Shabaab*.  More than once during his FBI interviews he labeled them bloodthirsty, and as killers.  He and his family always wanted success for Somalia, and he never intended to oppose the government there, though he viewed it as weak, ineffective, and more or less irrelevant in 2007.  He and his family are happy with the new government and fully support it.


## VI.    POSITION WITH RESPECT TO SENTENCING FACTORS.

The defendant states and summarizes his position with respect to application of the United States Sentencing Guidelines for the record as follows:

Paragraph 99.  **Victim Related Adjustments.**

The defendant objects to the application of the so-called "terrorism" adjustment, which raises the offense level by 12.

The adjustment does not apply to Mr. Ahmed because it is meant to apply where a defendant's conduct was intended to affect an established and legitimate government by means of intimidation and/or coercion, and only where the conduct posed an actual threat.  Mr. Ahmed's conduct was intended to affect the invading Ethiopian army, not the Ethiopian government or the government, if any, that existed in Somalia.

Further, the TFG was not an established and/or legitimate government at any time Mr.

Ahmed was involved in relevant conduct.

Finally, Mr. Ahmed's intent was to support whatever government existed in Somalia at the times in question, or at the very least his only intent was directed against the Ethiopian army, and he had no intent to engage in conduct which intimidated or coerced the government, for lack of a better term, in Mogadishu at the time. There is no evidence to the contrary. In fact, it was when he learned that *al Shabaab*, which he'd reasonably understood to have been organized or maintained to repel the Ethiopian army, was in fact opposed to the government in Mogadishu, that he began to look for a way to leave the group. The evidence supports the conclusion that once he arrived in Somalia, his association with the group was not entirely voluntary. Not only did he have to use subterfuge to escape the training camp, but he'd been kept under the supervision of al Shabaab operatives and his travel documents, including passport, had been seized and kept from him. Other evidence shows that until the recruits had participated in "training" at the camp, they were not trusted by al Shabaab. Mr. Ahmed did not voluntarily share the anti-government goals of al Shabaab. He was always merely a trainee, not yet vested with true membership in the group.


Paragraph 100. **Role in the Offense**.

Mr. Ahmed was a minor participant in the offense conduct. He did not complete his training, never became a "trusted" member of al Shabaab, never participated in any operations or the preparations for any operation. He did not share the goals of the regular members of al Shabaab. He did not teach or recruit. His conduct was as passive as that of a student. His active participation was relatively short in duration and did not include any fighting, aggression, or act

of violance.  Particularly if the offense included all the conduct which might justify a 12 level

enhancement, Mr. Ahmed's contributing role was virtually insignificant.

Paragraph 103.  **Total Offense Level**.

The defendant objects to the total offense level as calculated by the Report.  The correct

total offense level would not include the 12 level enhancement, but it would include a reduction

for minor role, resulting in a level 26.

CRIMINAL HISTORY

Paragraph 108.

The appropriate criminal history category is I.  The provisions of U.S.S.G. § 3A1.4(b)

cannot be applied to Mr. Ahmed's offense conduct because he did not intend to promote a federal

crime of terrorism.

Paragraph 109.  **Other Criminal Conduct**.

The defendant wishes to advise the Court that on March 30, 2005, he was driving a

vehicle owned by one of his brothers when he was stopped by police.  He could not find the

certificate for proof of insurance and therefore received a citation.  The car was, however,

properly insured.  Pursuant to routine practice in Ramsey County, he was told to appear on his

court date with the proof of insurance and the charges would be dismissed.

SENTENCING OPTIONS

Paragraph 140.  **Guideline Provisions.**

The total offense level should be 26 and the criminal history category should be I,

resulting in an advisory guideline range of 63 to 78 months.

## VII.   GROUNDS FOR A NON-GUIDELINES SENTENCE

Practice under the Sentencing Guidelines since 1987 has tended to regiment our legal arguments into very categorical approaches.   What are really appeals to what we hope are shared intrinsic senses of justice about a given case, that may often be barely tangible, get pounded into holes of the wrong shape and size to satisfy our fantasy that what we are doing is somehow empirical and therefore capable of being self-evident and reviewable.   Undersigned counsel seriously doubts this is a case that lends itself to these boxes.   The applicable sentencing guidelines, as empirical guides, are worthless.   Obviously there are great differences among all these defendants, and yet the Guidelines for each results in identical recommended ranges at or near the highest possible, and in most cases well beyond the statutory maximums.   Because he must, undersigned counsel asserts the following grounds for a non-guidelines sentence, in no particular order.   Support for these grounds is based on the various factors and considerations set forth in 18 U.S.C. § 3553(a), and on the extensive recitation of the facts and circumstances of the offense conduct offered in the sections of this sentencing memorandum above.

But here is the real argument on behalf of Salah Ahmed:

Please don't over-identify him with the terrorists of *al Shabaab*.   All the evidence suggests that Salah Ahmed did not have a sophisticated understanding of everything he was getting himself into when he agreed to travel to Somalia in December, 2007.   All the evidence suggests that all he wanted to be was a soldier, and all he wanted to do was protect innocent people.   And even in his aspiration to be a soldier he was equivocal and naive.   No evidence exists that should convince us he for one moment thought there was any justification in Heaven or on Earth to kill innocent civilians for any purpose, or for the particular purpose of bringing

down a government, or imposing a government on others.  He ended up genuinely risking his

life, not by fighting for *al Shabaab*, but by rejecting it and having to escape.

   In the case of the original "American Taliban", defendant Lindh's sentence was based in

part on the fact that he remained with the Taliban after the attack on the World Trade Center and

after the United States invaded Afghanistan.  United States District Judge Ellis commented on

this circumstance in his sentencing order:

> Importantly, it is also true that defendant did not seek to walk away from the front
> line or the Taliban after learning that the United States was fighting in
> Afghanistan and might be threatened by Usama bin Laden and al Qaeda.
> According to defendant, he might have been killed had he attempted to leave. This
> rationalization reflects, as the Court stated in the course of sentencing, that it
> appears defendant was willing to give his life for the Taliban, but not for his
> country.

*United States v. Lindh*, 227 F. Supp. 2d 565, 574 (E.D. Va., 2002).  Salah Ahmed was not faced

with a choice between giving his life for *al Shabaab* or giving his life for his country, but he did

risk his life in order to abandon a group whose purposes he despised and whose goals he

opposed.

   This language of Judge Ellis's sentencing order reminds us of another significant

consideration in Salah Ahmed's case.  He did not go to Somalia in order to risk his life for *al*

*Shabaab* or any extremist group.  He went to risk his life in the defense of people.  This is one of

the likely distinctions between the 2007 travelers and the later ones.  When Salah Ahmed arrived

in Somalia, he was risking his life for what he thought was the good of the country, the good of

his countrymen.  What *al Shabaab*'s goals or purposes or creeds were was of no importance to

him, and he had not traveled to Somalia to risk his life for *them*.  He hadn't even heard their

name before he decided he had reason to go.  As we've shown though, in the end he was

prepared to risk his life to reject them.

The judge in the Lindh case made a related observation which is appropriate to quote here as well:

> To those who claim that defendant was merely fighting for something that he believed in, it is well to remember, as the Court advised defendant at sentencing, that there is no virtue in fighting for a belief unless that belief is itself virtuous. As defendant now recognizes, the Taliban and its animating ideas were far from virtuous.

*Lindh*, 227 F. Supp. 2d at 574.  Salah Ahmed traveled to Somalia in part because he believed the cause of driving the Ethiopians was religiously proper and virtuous.  Reasonable minds could agree there was virtue in this cause, given the evidence of atrocities.  On the other hand, it is clear that *al Shabaab* "and its animating ideas" were far from virtuous, but Salah Ahmed did not travel to Somalia for *al Shabaab*.

Here are the formal grounds for a non-Guidelines sentence:

1.  Assuming Criminal History Category VI is applied by operation of the Guidelines, we urge that such an adjustment wildly overstates the seriousness and extent of that history, which, because it is actually zero, is essentially an infinite distortion.  The assessment of a Criminal History category of VI isn't even really an 'overstatement'; it is a distortion of the truth, a lie. The assignment of this category is triggered not by prior record but by the instant offense of conviction itself, a form of double counting.  It shares none of the rationales enjoyed by similar automatic category adjustments, as with the Career Offender provisions, which are rationally related to the defendant's actual criminal history.  Because of the degree of distortion introduced by the provisions of §3A1.4(b), a departure of only 1 criminal history category does nothing to

67

remedy the wrong.  The only rational remedy is to adopt the true category, which is I.  The application of the adjustment in question is fundamentally at odds with the design and goals of the Guidelines.

2.  While the defendant agrees the Sentencing Guidelines establish a base offense level of 33, a departure or variance founded upon a lower base offense level is fully justified by the lack of an empirical basis for the Sentencing Commission's establishment of such a high base level with respect to an offense which carries a maximum sentence of only 15 years.

3.  In addition to the arguments against the applicability of the 12 level 'terrorism' adjustment to Mr. Ahmed's conduct, the defendant asserts there is no empirical basis for the Guidelines Commission's adoption of this enhancement.  It is also an adjustment which operates in a way which is too general to be convincingly reliable in a given case; the enhancement, and the associated assignment of a fictional criminal history category VI, render the recommended guidelines unuseable and meaningless.  These provisions apply in a way that makes the resulting advisory range meaningless in every case that can be characterized as a "terrorism case".  Also, like the automatic assignment of Criminal History Category VI, the nearly automatic application of the 12 level adjustment is fundamentally at odds with the design and mission of the Guidelines, and also the statutory goals of sentencing, which emphasize the consideration of individual and unique characteristics of the defendant and the circumstances of the offense.  The application of this adjustment distorts and greatly exaggerates the seriousness of Mr. Ahmed's real offense conduct.

4.  Mr. Ahmed's conduct and behavior since returning from Somalia, and his progress since his arrest represent extraordinary rehabilitation and proof of a lack of need for punitive

consequences.

5. Mr. Ahmed's conduct was coerced by, among other circumstances, the use of the 'snuff film', the seizure of his passport and other needed documents, the constant presence of al Shabaab militants, the isolation and chaos of the environment, and the numerous communications from credible sources that he could be killed for disobedience or running away.

6. Mr. Ahmed's conduct, which was intended to protect civilian lives and preserve the integrity of the national boundaries of his country of birth, was motivated by a desire to avoid a perceived greater harm, i.e., the subjugation of his country and the rape and murder of his countrymen. See U.S.S.G. § 5K2.11, for example. Furthermore, his conduct, though still a violation of the statute, does not "cause or threaten the harm or evil sought to be prevented by the law proscribing the offense at issue." (Same Guideline section). In this case, the Guideline "terrorism" enhancement is the part of the law which addresses a harm or evil which Salah Ahmed's conduct did not truly involve. The Guideline is aimed at genuine terrorism; Salah Ahmed's conduct is closer to illegal enlistment in a foreign army.

7. It is entirely appropriate for the Court to consider the consequences and lack of consequences imposed in response to similar conduct by other Americans throughout history. The conduct condemned by this statute is broad enough to encompass the kind of conduct engaged in by other Americans who have gone overseas to fight in conflicts not sanctioned by the United States government, including the Americans who fought on behalf of the Republic in the Spanish Civil War, the Americans who flew combat missions for the British and French against the Axis powers, or against the Japanese in the Pacific before America entered the Second World War, and Americans who have fought on the side of Israel in more modern conflicts with its

neighbors.

8. A more appropriate sentence may be based on the consideration that Mr. Ahmed's conduct also falls within one or more other statutes which have traditionally prohibited American citizens from recruiting for or being recruited into foreign military units, or fighting in foreign wars, for which the consequences are far less punitive.

## VIII. CONCLUSION

The New York Times published an article recently about the latest frustrating developments in the Syrian rebellion. It began:

> CAIRO — In Syria's largest city, Aleppo, rebels aligned with Al Qaeda control the power plant, run the bakeries and head a court that applies Islamic law. Elsewhere, they have seized government oilfields, put employees back to work and now profit from the crude they produce. Across Syria, rebel-held areas are dotted with Islamic courts staffed by lawyers and clerics, and by fighting brigades led by extremists. Even the Supreme Military Council, the umbrella rebel organization whose formation the West had hoped would sideline radical groups, is stocked with commanders who want to infuse Islamic law into a future Syrian government.
>
> Nowhere in rebel-controlled Syria is there a secular fighting force to speak of.

*Islamist Rebels Create Dilemma on Syria Policy*, New York Times, Sunday, April 28, 2013.

Substitute "Mogadishu" for "Aleppo", "ports" for "oilfields", and "Somalia" for "Syria", and the rest of the article could have been written in 2009 about the status of things in Somalia.

Several months ago, when undersigned counsel learned that the United States had designated one of the rebel groups fighting Assad's government as a terrorist organization, he wondered just how that was going to work. From his knowledge of the history of Americans volunteering in foreign conflicts he knew there had to be Americans involved on the side of the

rebels, and sure enough, on March 13, 2013, National Public Radio broadcast a story about a Syrian-American supplying the rebels with arms and ammunition. The story opens talking about how for two years Syrian-Americans have been watching their home country fall apart, and how many of them have organized to support the rebels, forming non-profits, raising money, or making more life-changing decisions. The particular Syrian-American being profiled in the piece is described as a Californian "gun enthusiast" who is using the false name "Abu Ahmed". The interview is somewhere in Syria. There are 16 big duffel bags near him, full of what he coyly refers to as "tactical stuff." The bags are destined for the rebels.

The "Arab Spring" is still in everyone's hearts and minds. But now the Assad regime, suspected by the United States of using chemical weapons against its own people, is playing a new card: better the dictatorship you know than the revolutionary government that may consist of Islamic Militants controlled by *al Qaeda*.

Caught in the middle is Abu Ahmed. On the one hand, at least until the recent designation of the *Al Nusra* Front as a terrorist organization, he may well have been considered an American hero. There is also no question that from the beginning he has been violating 18 U.S.C. § 2339A, by supporting a conspiracy to kill under 18 U.S.C. § 956(a). With the designation of *Al Nusra*, he is almost certainly in violation of § 2339B as well. And because clearly he is specifically intending by his support to influence the current government of Syria (by overthrowing it), he gets the terrorism adjustment. But, at least at the moment, who wants to prosecute him, other than President Assad?

It is fair in sentencing to compare the 2007 travelers, like Salah Ahmed, with this Syrian-American *deja vu* character in 2013. There seem to have always been people who "provide

71

material support to terrorists" in ways we are not inclined to prosecute, and that may be largely because we look at the context and think, 'this guy is not really doing the kind of thing we're afraid of.' But this brings us back to one of the ambiguities of these cases this memorandum commented about at the beginning. Does Abu Ahmed seem less dangerous because we are on his side (unofficially)? In the realm of foreign policy we easily forgive the foibles of our friends. (We also easily forgive *ourselves*). Does the realm of law follow suit? Does Salah Ahmed seem more dangerous not because of what we know of him, but because of how we fear *al Shabaab*?

This memorandum has attempted to analyze the evidence we have in order to demonstrate that what may have appeared to be the concerted actions of *al Shabaab* and the 2007 travelers instead resolves into the separate courses of two groups which intersected for a time because of one shared objective – the driving of Ethiopian troops from Somali soil. To be able to disentangle Salah Ahmed's path from that of *al Shabaab*, to be able to momentarily suspend our close identification of him with that group, is to be able to see him and judge him fairly for what he did and what he intended.

We respectfully suggest that in a comparison with Abu Ahmed of today's Syria, Salah Ahmed of 2007 Somalia is merely the next rung up the ladder. He did something we're afraid of because we were afraid of what might have happened next. We are afraid of the potential for much worse. It turned out that Salah got down off the ladder on his own, and he never got to the second rung, or the rung after that. And the terrorists are still a lot of rungs higher.

Undersigned counsel respectfully submits there was virtue about what motivated Salah to fight, enough virtue at least to substantially distinguish him from people with a true relationship to terrorism. He ran an awful risk of getting swept up into a terrible, terrible enterprise. He

didn't though.  He escaped.  He rejected them.  He came home, in many senses.

We respectfully ask the Court to conclude that, in all the circumstances of his conduct and experience in this situation, in light of all he has achieved and built since his return to Minnesota in 2008, and in light of his years of full hearted, enthusiastic cooperation with the United States, he has received sufficient punishment already.  He should be allowed to remain free.

Date:  May 1, 2013

Respectfully submitted,

/s/ **James E. Ostgard**
_____
JAMES E. OSTGARD
Attorney at Law, Reg. #83124
P. O. Box 582536
Minneapolis, MN 55458
(612) 750-1455
Ostgardlawoffice@gmail.com