```
                  UNITED STATES DISTRICT COURT
                    DISTRICT OF MINNESOTA

------------------------------------------------------------
                             )
                             )
  United States of America,  )   File No. CR-09-50
                             )           (MJD/FLN)
          Plaintiff,         )
                             )
  vs.                        )   Minneapolis, Minnesota
                             )   May 14, 2013
  Salah Osman Ahmed,         )   11:30 a.m.
                             )
          Defendant.         )
                             )
                             )
------------------------------------------------------------
```

BEFORE THE HONORABLE MICHAEL J. DAVIS
UNITED STATES DISTRICT COURT JUDGE

**(SENTENCING HEARING)**

Proceedings recorded by mechanical stenography;
transcript produced by computer.

1     APPEARANCES

2       For the Plaintiff:          U.S. Attorney's Office
                                     CHARLES J. KOVATS, JR., AUSA
3                                    600 U.S. Courthouse
                                     300 South Fourth Street
4                                    Minneapolis, Minnesota 55415

5                                    U.S. Attorney's Office
                                     JOHN DOCHERTY, AUSA
6                                    Suite 404
                                     316 North Robert Street
7                                    St. Paul, Minnesota 55101

8                                    U.S. Department of Justice
                                     WILLIAM M. NARUS, ESQ.
9                                    Room 1746
                                     950 Pennsylvania Avenue NW
10                                   Washington, D.C. 20530

11      For the Defendant:          Ostgard Law Office
                                     JAMES E. OSTGARD, II, ESQ.
12                                   P.O. Box 582536
                                     Minneapolis, Minnesota 55458

13
        Court Reporter:             LORI A. SIMPSON, RMR-CRR
14                                   1005 U.S. Courthouse
                                     300 South Fourth Street
15                                   Minneapolis, Minnesota 55415

16

17

18

19

20

21

22

23

24

25

1           **P R O C E E D I N G S**

2                 **IN OPEN COURT**

3           THE COURT:  Let's call this matter.

4           THE CLERK:  The United States of America vs. Salah

5     Osman Ahmed, Criminal Case No. 09-CR-50.  Counsel, will you

6     please state your appearances for the record.

7           MR. NARUS:  Good morning, Your Honor.  William

8     Narus from the Department of Justice.  I am joined by

9     Assistant U.S. Attorneys John Docherty, Charlie Kovats, as

10    well as FBI Special Agent Scott Zimmerman, on behalf of the

11    United States.

12          THE COURT:  Good morning.

13          MR. OSTGARD:  Good morning, Your Honor.  James

14    Ostgard representing Salah Ahmed.  He is present in the

15    courtroom as well.

16          THE COURT:  Good morning.  Step forward.  Counsel,

17    have you had an opportunity to read the presentence

18    investigation report in this matter?

19          MR. OSTGARD:  We have, Your Honor.

20          MR. NARUS:  Yes, Your Honor.

21          THE COURT:  Any objections to the factual

22    statements contained in the presentence investigation

23    report?

24          MR. OSTGARD:  No objection for the defense, Your

25    Honor.

1          MR. NARUS:  No objection for the government, Your

2     Honor.

3          THE COURT:  The Court will adopt the factual

4     statements contained in the presentence investigation report

5     as its own.

6          Regarding the guideline calculations, Mr. Ostgard.

7          MR. OSTGARD:  Your Honor, as Mr. Engh was pointing

8     out, we are aware of the Court's rulings concerning the

9     terrorism adjustment in the other cases and the law of the

10    case regarding that.  As Mr. Engh was doing, I want to -- I

11    need to make a record for purposes of preserving our

12    position concerning the terrorism adjustment.

13         We do object to the application of the terrorism

14    adjustment.  We have two comments concerning the -- well,

15    basically the core of our objection is the question of

16    whether there was a government to influence.

17         I understand the Court's previous rulings that

18    there was a government, that it is finding -- I'm not sure

19    whether the Court found that there was a government or

20    adopted the position that that determination is made by the

21    Department of State.

22         It's our position that the Court needs to make a

23    finding as to whether there was a government involved as a

24    starting point in determining whether that application is

25    going to apply.

1          The government's response to our position pleading

2     was that Mr. Ahmed intended to influence the government of

3     Ethiopia.  We certainly have no dispute with the fact that

4     Mr. Ahmed was there to fight with the Ethiopian army and to

5     move the Ethiopian army out of Somalia.

6          Because it's our position that the Court needs to

7     find that there was a government involved within the meaning

8     of the statute and within the meaning of the guideline, I

9     want to propose that we believe that relevant considerations

10    by the Court in determining whether there was a government

11    or not would be with respect to Ethiopia:

12         The fact that the soldiers were not in Ethiopia at

13    the time of the offense conduct, they were in Somalia.

14    There was -- there are questions about the legality of the

15    presence of the Ethiopian soldiers within the territory of

16    Somalia at the time.  We note that the United States

17    government, according to testimony at the trial, was itself

18    divided over whether it was appropriate for Ethiopia to be

19    on Somali soil at the time.  The evidence indicated that

20    there were -- that the presence of Ethiopian soldiers in

21    Somalia was a violation of the arms embargo at the time.

22    And it's also my understanding from the evidence that the

23    United Nations did not sanction the incursion by Ethiopian

24    troops into Somalia at the time.

25         I think that a definition of "government" as it's

1    used in the guideline and in the statute would be too broad

2    if it included the presence of the Ethiopian soldiers on

3    Somali soil.  And that's simply our position with respect to

4    the Ethiopian government and the government's position on

5    that.

6              With respect to the Transitional Federal

7    Government, again, our position was that the Court would

8    need to make findings that this was the government within

9    the meaning of the statute and the guidelines.

10             We would urge the Court to consider various

11   factors, including whether the Transitional Federal

12   Government met classic definitions of a legitimate

13   government, political legitimacy of that government; the

14   Court consider the nature of the recognition given to the

15   TFG by the U.S., what kind of recognition it was, and why it

16   was necessary for the United States to officially recognize

17   the TFG.

18             We would suggest that the evidence of the presence

19   of a government within the meaning of the statute and the

20   guideline was insufficient.  We believe the Court has the

21   power and the duty to make that determination and that it is

22   not bound to defer to the State Department determinations of

23   what is to be recognized or not.  I understand the Court's

24   ruling.  I just wanted to make my record.

25             The adjustment under the terrorism -- the

1    terrorism adjustment includes that reference to the criminal

2    history.  I was going to reserve comment about the criminal

3    history for later, my position on departures and variances.

4              THE COURT:  Please.

5              MR. OSTGARD:  With respect to the minor role, we

6    will submit that on the record.  I wanted to point out that

7    assuming that the terrorism adjustment is made, it seems to

8    me that the adjustment for minor role becomes more

9    sustainable because his role in the -- if he is being held

10   accountable for the efforts of al-Shabaab to influence a

11   government, his role with respect to that kind of conduct

12   was minor.

13             That's all I have concerning the guideline

14   calculations, Your Honor.  I have some comments about

15   departures and variances.

16             THE COURT:  All right.  Hold off on that.

17             The government's position dealing with the

18   guideline calculations?

19             MR. NARUS:  Yes, Your Honor.  The government

20   respectfully disagrees with the defense's position on the 3A

21   enhancement here.  The government that satisfies the

22   criteria is both the TFG and the Ethiopian government here.

23             Mr. Ahmed during his guilty plea colloquy and

24   again during the trial stated unequivocally, and defense

25   counsel has confirmed that today, that he did intend to go

1    to Somalia to force the withdrawal of the Ethiopian military

2    through the use of force, through the use of violence,

3    weapons, and that would involve killing.  That was the

4    offense to which he pled guilty.

5         The government submits that reading the case

6    law -- and we cited it in our papers; I won't recount it

7    here -- that that conduct qualifies under 3A.  Influencing a

8    government overseas satisfies the requirement of a

9    government and Ethiopia meets that threshold.

10        Second, with respect to the TFG, as Mr. Ahmed

11   candidly testified before Your Honor during the Mahamud Said

12   Omar trial, upon arriving in Somalia he learned more about

13   the true ideology of al-Shabaab and cited that, in fact, as

14   one of the reasons why he didn't agree with their position.

15   I believe he said he had relatives who were people -- or

16   friends who were affiliated with the TFG and when he

17   realized that that was their objective, he tended not to

18   agree with it.

19        Even so, the offense that he continued to commit

20   over those four or five months before he left the camp he

21   understood would have the effect or would be used to

22   influence a government, in this case the TFG.

23        So while his individual motive may not have been

24   to overthrow the TFG, he understood that the offense he was

25   committing, that is, conspiring to kill Ethiopians,

1    providing himself to that conspiracy, had the effect of --

2    or was calculated to influence the Transitional Federal

3    Government as well.

4            Finally, we've attached the testimony of Matthew

5    Bryden, who has testified before Your Honor on two

6    occasions, regarding the TFG's legitimacy in the eyes of the

7    international community.

8            With that, we would submit on our papers absent

9    further questions.

10           THE COURT:  Thank you.

11           The Court will deny the defense motion.  The

12    terrorism enhancement will be applied in this matter.

13    Section 3A1.4(a) provides for a 12-level enhancement for

14    felony offenses that involved or were intended to promote a

15    federal crime of terrorism.  Section 3A1.4(b) provides that

16    where subdivision (a) applies, the applicable criminal

17    history category is VI.

18           A federal crime of terrorism is defined as conduct

19    that is calculated to influence or affect the conduct of

20    government by intimidation or coercion or to retaliate

21    against government conduct and is a violation of crimes

22    listed in Title 18, United States Code, Section 2332b(g)(5).

23    The count of conviction in this case, Title 18, United

24    States Code, Section 2339A(a), is listed in 2332b(g)(5).

25           To determine whether the crime of conviction was

1   calculated to influence, affect, or retaliate against a

2   government, it is not necessary that the defendant was

3   motivated to retaliate, influence, or affect the conduct of

4   a government.

5          The enhancement will apply where there is evidence

6   that the defendant intended to promote a crime calculated to

7   have such an effect, that is, that his offenses were

8   intended to promote a federal crime of terrorism as defined

9   in Section 2332b(g)(5), whatever the defendant's reason for

10  committing them.

11         In addition, it is not necessary that the federal

12  crime of terrorism affected the conduct of the United States

13  or was meant to retaliate against the United States.  The

14  enhancement applies for foreign governments.

15         Further, it is not necessary that the Court make

16  findings as to the legitimacy of the government affected or

17  retaliated against.

18         Based on the evidence in the record, the Court

19  finds that the terrorism enhancement clearly applies in this

20  case.

21         The facts stipulated to by the defendant in his

22  plea agreement and his trial testimony in the Omar matter

23  demonstrates that the defendant's actions involved or were

24  intended to promote crimes that were calculated to influence

25  or affect the activities of the Ethiopian government and the

1    Transitional Federal Government, TFG, in Somalia.

2              Pursuant to facts stipulated to in his plea

3    agreement and his testimony at trial, the record

4    demonstrates that the defendant agreed to travel to Somalia

5    in December of 2007 to assist al-Shabaab in forcing the

6    Ethiopian military out of Somalia, which the defendant knew

7    would include fighting and killing.

8              Once he arrived in Somalia, he learned that

9    al-Shabaab had also intended to kill members of the Somali

10   TFG.  While the defendant may not have agreed with that

11   objective, he nonetheless participated in some initial

12   training on AK-47s, rocket-propelled grenades, machine guns

13   at the al-Shabaab safe house in Marka.

14             He also raised funds necessary to purchase his own

15   AK-47 and to assist in building the training camp for

16   approximately two weeks.

17             These facts demonstrate that the defendant joined

18   a criminal conspiracy whose objective was to kill, injure,

19   or maim Ethiopian soldiers and Somalis supporting the TFG.

20             All right.  Mr. Ostgard.

21             MR. OSTGARD:  Thank you, Your Honor.  With respect

22   to the departures or variances that the Court should

23   consider before we get to the cooperation and the

24   substantial assistance departure, I listed a few of those --

25   actually I listed the grounds that I would be relying upon

1    in my position pleading under the heading Imperfect

2    Necessity and I cited several traditional departure grounds

3    from the guidelines, one being under 5K2.10, victim conduct

4    which provokes the offense conduct.

5            It's respectfully suggested that the evidence we

6    have of the conduct of the Ethiopian Army and to some

7    extent, although it wasn't directly related to Mr. Ahmed's

8    motives, the conduct of the TFG with respect to the

9    population of Somalia is conduct that, as the testimony was,

10   motivated these 2007 travelers to go to Somalia in the first

11   place.

12           It is not a defense.  We don't claim that it is a

13   defense.  We claim that it is a mitigating circumstance that

14   the Court can take into consideration before determining

15   what the sentence should be before we reach the cooperation

16   departure.

17           I also mentioned the doctrine of lesser harms

18   under 5K2.11, which is a departure ground which aims at

19   conduct which violates a statute but does not necessarily

20   cause or threaten the harm or evil that's sanctioned or

21   anticipated by the law.  In this case the law that I'm

22   thinking of primarily would be the law of the guidelines

23   themselves, the 5K -- I'm sorry -- the terrorism adjustment.

24           It seems to me -- again, this kind of is in line

25   with my argument in my position pleading that the way I see

1    it, he was engaged in conduct that was closer to illegal

2    soldiering than to terrorism and because of that the

3    guideline, which is -- which seems pretty clearly aimed at

4    traditional terrorist activity, is directed at activity that

5    isn't in mesh exactly with the offense conduct of Mr. Ahmed

6    and that it seemed to me that there is a ground under 5K2.11

7    to adjust his sentence downward because of that.

8         Basically the statutes are so broad, the criminal

9    statutes are so broad and yet the sentencing guideline

10   affects everyone under that statute in the same fashion,

11   that our argument is that this is a situation where the

12   offense conduct itself falls somewhat outside of what the

13   guideline was directed at achieving.

14        Finally, I just wanted to mention that there is

15   the ground for departure under 5K2.12 for coercion or duress

16   not amounting to a defense.  Again, we don't claim that he

17   was under such duress or such threat of imminent harm that

18   he was forced to participate in this, but he was stuck to a

19   certain degree to continue with the concerted action,

20   particularly at Marka, in part because of the dangers of

21   running from al-Shabaab and the lack of an opportunity to do

22   so earlier than he did.

23        I borrow a phrase from the Court from the trial.

24   These young men were not at Valleyfair.  These were

25   dangerous people that they were with.  These dangerous

1      people had control of their passports and travel documents.

2      They had been shown films indicating what happens to

3      deserters and traitors, and they were being reminded of that

4      kind of thing on a daily basis.

5              The activity at Marka might have some hallmarks of

6      vacation or leisure or activity which is inconsistent with

7      being coerced into staying there, but we're still talking

8      about a very dangerous organization and a situation in

9      which, as the testimony established, al-Shabaab was

10     deliberately creating a situation where these young men

11     became dependent upon them and where they could be monitored

12     and where they were told, and al-Shabaab fostered the

13     reputation for killing people who ran away.

14             He could have tried earlier.  He could have risked

15     his life earlier to get away.  Because he didn't, he doesn't

16     have a coercion defense or because -- we're not claiming

17     that he has a defense of coercion, but there's an element of

18     coercion there that I think justifies consideration of a

19     sentence below the guidelines recommended by the terrorism

20     adjustment.

21             You know, I think about his situation there and I

22     think, you know, you have family, but you're still kind of

23     figuring out how to deal with al-Shabaab and how you get out

24     without endangering your family, without endangering

25     yourself, and it was a terrible position for him to be in

1    during that period of time.

2           There's one other area of departure that I wanted

3    to address, which had to do with the criminal history

4    generated by the terrorism adjustment.

5           I understand that the main rationale for adjusting

6    the criminal history category to VI for a person who has

7    nothing on their record is that in terrorism cases there's a

8    belief that terrorists are a greater risk for recidivism.

9           On its face that sounds like a reasonable

10   supposition, but there's no empirical data for it, of

11   course, because none of the people who have been sentenced

12   under the terrorism statute have gotten out in order to

13   re-offend.

14          And the other thing is that it does that thing

15   that I talk about in my position pleading.  It takes the

16   label of terrorist and it applies it to Salah Ahmed as if he

17   is a radicalized devotee of terrorism, of killing civilians

18   and of employing suicide bomb techniques and other kinds of

19   things.

20          In other cases where this adjustment has been

21   applied without problem where they have talked about the

22   recidivist justification, we're talking about people who

23   have demonstrated through blogs, through text messages,

24   through e-mails, through recorded telephone conversations,

25   through other writings that they have adopted the terrorist

1    point of view, that they advocate for terrorism.

2          There is nothing like that concerning Salah Ahmed.

3    There's no evidence that he was radicalized at any time or

4    that he adopted the terrorist point of view.  Because of

5    that, he is not in the category of people that the guideline

6    is concerned with being a recidivist.

7          I can understand the argument that someone who has

8    those crazy ideas will probably continue to have those crazy

9    ideas even if they get out of prison, but someone who is

10   still rational, someone who has thought about these things

11   and has refused to adopt them does not trigger that concern

12   with recidivism that this adjustment claims to address.

13         And therefore, I would ask that the Court do

14   depart on the criminal history for Salah Ahmed on the ground

15   that the recidivist argument doesn't apply to him.

16             THE COURT:  The government.

17             MR. NARUS:  Yes, Your Honor.  I imagine over the

18   next -- for the rest of this hearing I imagine at some point

19   Your Honor may ask Mr. Ahmed or his family many of the same

20   questions that have come up with respect to Mr. Hassan and

21   Mr. Isse, and that is how does someone who didn't appear to

22   be on this track, who didn't appear to have this history of

23   kind of fanaticism or extremism decide to make a vast right

24   turn in their life or wrong turn in their life toward this

25   path of going to Somalia and working at the direction of a

1     foreign terrorist organization.

2               And the government's position is that Mr. Ahmed is

3     in that category, along with Mr. Hassan and Mr. Isse to a

4     large extent, of people who didn't have indications of going

5     down this path, as we understand it, from our debriefs of

6     Mr. Ahmed.  Even so, in the fall of 2007, Ramadan of 2007,

7     Mr. Ahmed joined other men.  He learned of a trip overseas.

8     This conspiracy involved killing and would involve killing.

9               The energy for this trip was fanned both by

10    patriotism and a sense of duty toward the country where they

11    were born, but from which they had left many, many years

12    ago, and also a sense of there was a religious component to

13    this that was injected into it.

14              Now, Mr. Ahmed made the decision to join this and

15    it appealed to him, I think much like Mr. Hassan and

16    Mr. Isse.  It was an adventure.  It was a way to go in a

17    different direction and experience something that they

18    had -- that was vastly different from their ordinary life

19    here in the United States.

20              But the government's position needs to be

21    perfectly clear that they weren't pressured or coerced or

22    under some sort of duress when they made this decision.

23    They made the wrong decision and I think all three,

24    including Mr. Ahmed, will tell the Court that, but they did

25    make this decision of their own free will in the

1    government's position.

2         So once they arrived in Somalia, the government

3    takes the same position, that by the time they got to

4    Somalia and spent this time in the safe house -- as the

5    Court will recall from the testimony that Mr. Ahmed

6    testified to, they were visited by senior members of

7    al-Shabaab.  Amo visited them at the safe house in Marka,

8    Sheikh Fuad.  Fuad Shangole, a very senior figure in this

9    foreign terrorist organization, visited the men at the safe

10   house in Somalia.  So by the time they were in Marka their

11   eyes were wide open.

12         As Mr. Ahmed testified and has stated openly, you

13   know, that time in Marka was not unpleasant.  There weren't

14   harsh tactics.  It was once they arrived at the camp, once

15   he had been issued the gun that Mr. Ahmed made the very

16   commendable decision to leave.

17         And as he recounted at the trial, it was not an

18   easy process for him to escape from that camp and to return

19   to the United States.  When he returned, he went out to

20   Sacramento and spent time away from Minnesota to get away

21   from this behavior.

22         But the government respectfully disagrees with any

23   suggestion that he was under some sort of -- or that any

24   sort of duress or coercion mitigates his sentence for his

25   activities in Somalia.

1          I want to just briefly touch on one other point,

2     Your Honor, and that is the analogy to soldiering.  And the

3     government respectfully disagrees with that.  The departure

4     of these men was not in any way similar to the departure of

5     a soldier joining the U.S. military or any country's

6     military, for that matter.

7          This process was very secret.  It was done without

8     consulting family, without consulting older brothers,

9     without consulting elders in the community or elders at the

10    mosque.  This was a very secretive plan that was kept from

11    the people who would, as has been suggested, would be

12    celebrating this behavior as some sort of call to duty of

13    the Somali people.

14         Those people were not consulted and did not

15    encourage this behavior.  In fact, I think the testimony

16    would be that they discouraged it and would have discouraged

17    it had they found out that their sons and brothers were

18    considering a return trip to Somalia.

19         Indeed, once they arrived in Somalia I think the

20    analogy to soldiering fares no better.  Certainly they had

21    weapons and they were issued AK-47s, but one only needs to

22    look at the example of Shirwa Ahmed, a person that Mr. Ahmed

23    knew well and spent time with, to see how close this group

24    was to what the defense has characterized as terrorism in

25    its rawest form and that is killing innocent civilians,

1    killing Somali people in that country.

2              And so the government respectfully disagrees with

3    any analogy to this being consistent with soldiering or the

4    very honorable work of people who join the military, whether

5    here or in another country.

6              And with that, I would submit on those facts.

7              THE COURT:  All motions by defense are denied.

8              The government has filed a motion for downward

9    departure pursuant to 5K1.1 of the sentencing guidelines for

10   substantial assistance to the government.  The government

11   has filed an *in camera* submission to the Court.  Mr. Ostgard

12   has had an opportunity to read that.

13             The Court has been updated on any further

14   information dealing with substantial assistance from this

15   defendant and any other defendant that has given substantial

16   assistance.

17             Anything further on that issue that the defense

18   wishes to bring to the Court's attention?

19             MR. OSTGARD:  Not concerning the fact that they

20   are making the motion.  Like Mr. Engh, I thought I would

21   address cooperation issues and other 3553(a) issues

22   separately or together.

23             MR. NARUS:  Briefly, Your Honor.  Mr. Ahmed was

24   approached by the FBI twice before he was charged and

25   arrested.  During those times he disavowed any involvement

1    with this.

2            From the point of his arrest, however, in July of

3    2009 -- he was arrested on the 11th and within five days he

4    began to proffer with the United States -- Mr. Ahmed's

5    debriefs and proffers in consultation with Mr. Ostgard

6    contained none of the omissions that Your Honor has heard

7    about with respect to other defendants who are appearing

8    before the Court this week.  Mr. Ahmed candidly reviewed

9    photographs, identified people who were involved, made very

10   clear when he didn't know the answer.

11           His information from that point forward, the

12   government submits, has been consistent and reliable and

13   there's been no need to confront Mr. Ahmed, and certainly we

14   wouldn't hesitate to do so, but there's been nothing in

15   which we've needed to confront Mr. Ahmed about that.

16           I would add that Mr. Ahmed came in at a point in

17   the investigation after, as Your Honor has heard, Mr. Hassan

18   and Mr. Isse pled guilty, but Mr. Ahmed's post arrest

19   candor, I think, was very important for the 5K analysis.

20           THE COURT:  The Court will grant the government's

21   motion for a downward departure pursuant to 5K1.1.

22           Mr. Ostgard, do you wish to be heard on

23   sentencing?

24           MR. OSTGARD:  Yes, Your Honor.  Thank you.

25           Other lawyers have remarked about the unusual

1   degree and intensity of the investigation by the government

2   that we participated in in terms of the meetings with

3   government lawyers and FBI agents for purposes of proffer

4   statements and interviews.

5           I was very impressed with the quality of the

6   investigation.  I was impressed by the fact that, more than

7   any other case I've been involved with, these individual

8   defendants were isolated from each other.  We didn't know

9   what other defendants were saying.  In fact, we didn't know

10  if they were actually talking to the government at all.  We

11  did not see reports of investigation concerning any of the

12  other defendants.

13          We were really kept in the dark about what was

14  going on and so the statements being made, the interviews

15  being given were untainted by any information that they

16  might be receiving from other defendants.

17          There were hours of interviews.  I think -- I

18  looked back on my records.  In the first year, year and a

19  half there are at least 80 hours of my time involved in

20  these kinds of meetings with the government in the first

21  couple of years I was representing Salah Ahmed.  I think

22  I've got probably 150 hours' worth of time in terms of just

23  interviews with either the defendant and his family or with

24  the government.

25          These are interviews that are taking place over

1    several days and several years, with the government having

2    the opportunity to come back after each interview with any

3    information that they think might contradict what my client

4    has said or anything that they think he might have been

5    hiding.

6             And as Mr. Narus was saying, I never experienced

7    any situation where the government came to us and said we

8    don't think he's being truthful about this or we think that

9    he is hiding that.

10            My role in sitting at these proffers is to be on

11   the edge of my seat waiting for any false chord that I hear

12   coming from my client's lips that I think might get us into

13   trouble.

14            And after a few days of the interviews I relaxed

15   considerably because I could see that he was being candid.

16   He was talking about friends.  He was talking about things

17   that were going on over there.  He was being truthful.  And

18   I believe what he's been telling the government completely.

19            I also believe that when he's being truthful with

20   the government about his involvement and with what he

21   learned, what he saw, that he was also telling them the

22   truth when he was talking about his reactions to what he was

23   learning there in Marka and his reactions to -- or his

24   feelings about wanting to leave, his feelings about wanting

25   to reject what people were telling him or training with him.

1    And I believe him when he talks about the

2    differences between what he thought he understood in

3    Minneapolis before he left and what he understood once he

4    got to Marka and they started telling him what he was really

5    there for.

6    I would -- I also wanted to note that within the

7    context of these interviews I saw and I nurtured, frankly, a

8    friendly relationship between Salah Ahmed and the case

9    agents and the prosecutors in the case.  And I think Salah

10   Ahmed genuinely likes the agents and the people he was

11   dealing with and that he developed kind of a friendly,

12   almost family-like relationship with these agents.

13   There were many times when the FBI agent, case

14   agent, would call me and say is it okay if I go see Salah

15   about this or that.  And most of the time, in fact, I think

16   every time that we had a conversation like that I said fine.

17   And Salah would have said come out and talk to me, that's

18   fine.  They had a friendly relationship.

19   And Salah I think -- he understood that he was

20   working to reduce his sentence, but he also understood that

21   he was engaged in a project that he supported, that he

22   enjoyed working with the agents on this investigation.

23   In my position pleading and my thoughts about what

24   I wanted to say here today, I don't know exactly what the

25   Court is thinking about a lot of things here, but I want the

1    Court to try to see things in a different light or at least

2    the light that I'm seeing them.  And Mr. Narus was just

3    talking about the disagreements that we have over whether

4    this is soldiering or terrorism or where it falls.

5           But, you know, like anybody else, like somebody

6    with a client to represent, I was trying to figure out why

7    he went to Somalia as well.  And in addition to talking with

8    him and learning about the details about what was being said

9    to him at these meetings in Minneapolis, it started me

10   thinking about other examples from history and that's why I

11   went into all that business in my position pleading about

12   past instances in which American citizens went to serve in

13   foreign wars even though America was neutral.

14          I became particularly intrigued with the Abraham

15   Lincoln Brigade and the war in Spain because as I read the

16   book that I cited, the remarkable parallels between the

17   decisions of 3,000 Americans in 1937 and these young men

18   from the Somali community in Minneapolis began to develop.

19          So many of those Americans who went to Spain in

20   1937 had never picked up a gun.  They were not rowdy,

21   dangerous people.  They were -- a lot of them were

22   intellectuals.  A lot of them had good jobs.  They had

23   families and no military training.  That was one of the

24   problems with the brigade, is that they didn't have -- they

25   had very few people who had any military training at all.

1          They had to sneak into Spain.  They had to make up

2     false reasons for traveling to Europe and then sneak across

3     the mountains into Spain because it was illegal for

4     Americans to enter Spain at the time.

5          But they went to Spain to risk their lives because

6     of an idea, because of their idealism.  Many of them had no

7     connection with Spain either, but they could be persuaded to

8     go and fight and risk their lives and kill for an idea, to

9     fight fascism, and they did that.

10          Same with the pilots that flew with the RAF and

11     with the French Escadrille and with the White Guards in

12     Finland, and we were talking the other day more and more

13     examples come up of situations in which American citizens,

14     often naturalized citizens, feel a kinship with some

15     activity going on in another part of the world and they are

16     moved by passion to go and do something about it.

17          And I just saw the parallels between what I was

18     seeing in the reports and what I was hearing from Salah

19     Ahmed and what was happening in Somalia, the history of what

20     was happening in Somalia at the time, I saw the parallels

21     between that and the motivations of these other people in

22     history.  And as I pointed out, you know, this practice of

23     intervening, of citizens intervening, overseas continues to

24     this day in Syria.

25          I've heard the Court engage in colloquy with

1    defendants and with defense lawyers also about the business

2    of the secrecy surrounding the decision to go.  And I

3    understand that there's some unusual facets to that, that we

4    wouldn't necessarily expect that, but, you know, the people

5    who were going overseas in the past in American history

6    engaged in some secrecy to do that because it's against the

7    law to fight under American law, it has been traditionally

8    since almost the beginning.

9          But there are other reasons to keep these things

10   from your family, and all this talk about recruiters and

11   about motivations to go and all of these things begin to

12   draw me back 40 years to 1970 and '71 when I was turning 18

13   and there was a police action in Vietnam going on.

14         And I came from a family where my oldest brother

15   was a career Air Force officer.  He had served a tour in

16   Korea and two tours in Vietnam.  I had another brother who

17   was a Marine and my father was a decorated World War II

18   veteran from the Pacific.

19         I was the only man in my family who was not in

20   service.  I had no interest in Vietnam.  Even as a high

21   school student I didn't really buy into the domino theory,

22   but I had family and I had this tradition of service and my

23   friends were going there and it was a very difficult

24   decision to make.

25         And my mother was, having had two sons already

1    serve and feeling lucky that they weren't killed, was not

2    going to have her third son die in Vietnam, so she was

3    already preparing -- and the statute of limitations has

4    passed so I could say this, but she was preparing with

5    relatives in Canada to spirit me away in case there was

6    going to be a draft.  My father, on the other hand, and

7    myself did not see that as an option.

8         But if I had decided to join the service, I would

9    have lied to my mother, I would not have told her that.  The

10   first she would have known about it is a letter from Camp

11   Pendleton or someplace saying, Dear mom, I'm sorry, but I

12   had to do this.

13        And it was actually talking to my father that

14   talked me out of enlisting.  He said, If you're drafted, you

15   go, but you're not going to volunteer to go to Vietnam.  And

16   I could talk to my father about it because my motivation was

17   my family, was the honor of my family and the tradition of

18   my family in service.

19        Salah Ahmed could not talk to his family about

20   this because he knew that they would oppose his decision to

21   go and yet he felt from what he was learning not only from

22   the men who were recruiting him, but from the larger

23   community that there was a duty here, that there were things

24   happening in Somalia that he wanted to do something about.

25        And I can understand the secrecy.  I can

1    understand the decision over about a four- to six-week

2    period to allow himself to be recruited into this

3    enterprise.  It happens often.

4         We depend on young men in their 20s to be willing

5    to make that decision maybe without a lot of thought because

6    those are the people we need to fight our wars and defend

7    our country for us.  And unfortunately those young men are

8    the ones who are most susceptible to the romance, the

9    thrill, the feeling of adventure that accompanies that kind

10   of thing.

11        So I do see it as soldiering.  I don't see the

12   secrecy as inconsistent with soldiering.  And I see the

13   motivation as something that -- he had far more motivation

14   to go there than I had to go to Vietnam for sure.

15        I also wanted to talk about the problem of his not

16   leaving sooner.  I addressed that a bit earlier with respect

17   to the departure.  But, again, these were dangerous people.

18   I don't believe, from what I have seen and from what I

19   learned in being with him during these interviews and

20   talking with him separately, I don't believe that he just

21   got tired of the camp, tired of the work, and decided it was

22   time to leave.  I believe that he did want to leave earlier

23   and that he was looking for opportunities to leave and that

24   his motivation for leaving was his disagreement with the

25   tactics and with the goals of al-Shabaab.

1            Part of the reason that I believe that is that a

2    man who is going to just get tired of the camp environment

3    and want to go home to Minnesota and play video games and

4    that sort of thing is not the kind of man who would have

5    given up all of those things and gone to the trouble and the

6    risk and everything to travel to Somalia in the first place

7    and engage in a desire to participate in this enterprise.

8    He was motivated and he was dismayed by what he saw and he

9    came back not because he was tired of the camp, but because

10   he didn't want to be part of al-Shabaab.

11           He does have family here in court today, brothers

12   and sisters.  His mother, who doesn't speak any English, is

13   here.  We are aware that the Court has inquired of family

14   members.  There is a brother who would like to speak on his

15   behalf.

16           But I wanted to close my remarks by saying that,

17   you know, in more than 30 years of representing people I

18   have always found something about my clients that I like as

19   a person, some reason to empathize with them, some reason to

20   understand what they have done.  But I have never been in a

21   position where I admire the offense conduct.  I've never

22   admired the bank robbery, never admired the drug deal or any

23   of those kinds of things.

24           I want the Court to know, I want the record to

25   reflect that I admire what Salah Ahmed intended to do.  I

1    believe there was virtue in what he intended to do.  He

2    couldn't carry it out.  He should have used better judgment

3    in terms of trying to find other people to talk to before he

4    made a decision to go.  He was guilty of youthful exuberance

5    in some ways.

6           But I admire the fact that he wanted to go to

7    Somalia and defend people who were there, people that he

8    didn't know, but people he cared about, people he had a

9    relationship with.

10          And I found myself wondering oftentimes, as I

11   listened to him describe what they were doing and what was

12   happening, I often wondered myself if I would have had the

13   courage to do what he did.

14          And so it makes it kind of a difficult case.  I

15   know you are probably not supposed to say things like that

16   at a sentencing where somebody has pled guilty and admitted

17   the conduct was wrong.  I think there was virtue in what he

18   did.  It wasn't consistent with American policy, it violated

19   the law, but there was a measure of virtue there and I

20   admire him for that.

21          THE COURT:  What brother is going to speak for

22   him?

23          MR. OSTGARD:  Saed.

24          THE COURT:  Good afternoon.

25          SAED DALMAR:  Good afternoon, Your Honor.

1              THE COURT:  Would you state your name for the

2    record, please.

3              SAED DALMAR:  Saed, S-a-e-d.  Dalmar, D-a-l-m-a-r.

4              THE COURT:  Please talk to me.

5              SAED DALMAR:  Your Honor, I was just getting

6    emotional just listening to what Jim was just saying, but I

7    don't want to be emotional any longer, so I am just going to

8    get to the point.

9              I know my brother real well.  He come from a big

10   family, very respected family in the community.

11             THE COURT:  Who is here?

12             SAED DALMAR:  My mother right there.  My sister

13   right next to her and my other younger sister.  His wife.

14   The little baby on the cart is his newborn.  His name is

15   Kariya [phonetic].  We have my younger brother and my other

16   younger brother is there as well.  We also have additional

17   brothers that unfortunately was not able to make it here

18   this afternoon.

19             Say a few things about my brother.  He is genuine.

20   I have never seen him lie about anything.  He's always to

21   the fact.  He tells the truth as it is.  He's very loving.

22             I will tell you one story.  One time I was having

23   my first child and I told him, hey, I'm having a baby.  He

24   didn't wait for a moment.  He run to the store, get set of

25   different clothes, one for boys and one for girls.  I'm like

1    you didn't ask me which one are you buying for.  He had that

2    kind of heart.

3           Also, when this happen -- if I go to the situation

4    that went into Somalia, as family we completely do not

5    support any terrorism whatsoever.  We always -- never have.

6    We never will.  And when we realized that Salah went to

7    Somalia, we were shocked.  Actually, my mother was

8    extremely -- very sick.  She was sick to her stomach.  She

9    was sick.  She was not able to communicate with anybody.  So

10   what we decided was to contact any contact that we have in

11   Somalia to make sure we get him out as soon as possible.

12          And if I go back to the reason why a lot of kids

13   went to Somalia, the main reason was that we have been

14   invaded by Ethiopians and we have long history with

15   Ethiopian wars between Somalia and Ethiopia.  Salah was too

16   little to know those things.

17          At the time I was -- I will tell you one story.

18   In 1977 I think I was three or four years old.  My father

19   was police officer.  My mother was sick, so she went to

20   Mogadishu, but we were staying in a small town called --

21   what was the name?

22          UNIDENTIFIED SPEAKER:  Dhusamareb.

23          SAED DALMAR:  Yeah, Dhusamareb, the town was

24   called Dhusamareb.  I was a little kid.  I was about three

25   or four years old and my mother went to Somalia [sic].  My

1    father was police officer in the town.  He used to transfer

2    to different cities.

3            So in that town one of the mornings we heard a

4    sound in the city.  Didn't know what this sound was about.

5    That's the first time I ever seen an aircraft.  That

6    aircraft was Ethiopian war plane.  It was making all kind of

7    noises.

8            So everybody in the town came outside, including

9    us and then the lady that was taking care of us.  She was

10   our neighbor.  And they started massacring all the people

11   that came out to see where the sound come from because none

12   of them ever seen what aircraft looks like.  After that we

13   went to the -- my sister could be witness as well on that

14   one.

15           We went to the jungle for a few days.  A few days

16   turn to be a few weeks.  And at that time we separated from

17   our father, who was custodian to us at the time, because he

18   was in the police officer -- police department at the time.

19   So that was the first time when we realize this war -- what

20   war is all about.

21           And then that followed 2007 when the Ethiopian

22   troops invaded Somalia again.  That brings emotional [sic]

23   to me and so many other Somalis.  It was all over the news.

24   It was all over the mosques.  Everybody was objecting to

25   that.

1           And those other kids went to Somalia in 2007,

2     including my younger brother.  I didn't know that he was

3     going there.  If we knew that as a family, we would never

4     let him go.

5           So I commend him as well for thinking about it,

6     but we never -- the intention was never to be in a terrorist

7     camp whatsoever.  And I don't think he went out there to

8     even fight.  Maybe he went out there to facilitate, as he

9     told me in the later days, to help the people or anyone in

10    need.

11          When he left Somalia, he was a little child.  He

12    have no idea what Somalia looks like.  So did I.  I left

13    Somalia in 1990 when the war started.  So I have no idea.  I

14    have never went back.  I have no idea what Somalia looks

15    like at the time.  I've been here almost 22 years now.

16          So he's a very gentle man, again.  He never lied.

17    I never see him lying.  He is loving husband and great uncle

18    to my kids, as the other kids that we have in the family.

19    And as family, he's one of -- the smartest child my mother

20    ever had.  He was very good at school.  He was an honor roll

21    student and he's very kind.

22          THE COURT:  Thank you.

23          SAED DALMAR:  Thank you.

24          THE COURT:  Come back up.  Anything for the

25    government dealing with the departures or variances?

1                    MR. NARUS:  Yes, Your Honor.

2                    THE COURT:  I should state the advisory guideline

3      range I have found to be a total offense level of 42,

4      criminal history category of VI, custody of 180 months,

5      supervised release of two years to life, fine range of

6      25,000 to 250,000 dollars, and a mandatory special

7      assessment of $100.

8                    The government may be heard.

9                    MR. NARUS:  Your Honor, would this be an

10     appropriate time for the government's summation or would you

11     like that --

12                   THE COURT:  Yes.

13                   MR. NARUS:  Your Honor, I've been working on this

14     case since 2009.  I met Mr. Ostgard at that time.  I think

15     Mr. Ahmed is very fortunate to have been appointed

16     Mr. Ostgard.

17                   And I believe it's his brother who just spoke

18     that -- I think Mr. Ahmed is also very lucky to have his

19     brother because, as I recall, during these plea negotiations

20     very early on I believe Mr. Ahmed's family encouraged him to

21     cooperate, and it's not to suggest he wouldn't have already,

22     but encouraged him to work with the United States.

23                   And I believe Mr. Ostgard, while I certainly don't

24     know what he discussed with Mr. Ahmed, he allowed his client

25     to begin being debriefed within five days.  So I think

1       Mr. Ahmed is very lucky to have Mr. Ostgard as an attorney.

2              There are certain things that I can agree with

3       Mr. Ostgard on and that is that Mr. Ahmed's disposition

4       during debriefs and proffers is pleasant.  Certainly isn't

5       to suggest he's agreeable when he doesn't know the answer to

6       something, but it's not a tense deliberation.  Mr. Ahmed

7       speaks with ease and good humor when he recounts these

8       details.  And when he doesn't know the answer to something,

9       he certainly says that he doesn't know the answer.  So we

10      don't suggest that he is fabricating or just going along

11      with our suggestion.

12              I must respectfully disagree just briefly, if I

13      may, with the suggestion of nobility.  And I think it's

14      important to point out, and I think Mr. Ostgard would agree,

15      that Mr. Ahmed during his debriefs with us hasn't defended

16      this conduct as noble.  He's explained it to us certainly in

17      very factual detail, but the suggestion of nobility does not

18      come from Mr. Ahmed at least as far as the government is

19      concerned.  That has not been his -- those are not his

20      words, I don't believe.

21              And I think in some ways it's a red herring to go

22      down this road and I think for several reasons.  I think the

23      first is Mr. Ahmed's conduct included -- while certainly the

24      principle of coming to one's defense is a noble principle,

25      the conduct here even before they left for Somalia included

1    lying to Kamal Hassan's family; and Mr. Ahmed was present

2    for that, he participated in that.

3           I don't need to recount for Your Honor -- I

4    believe Mr. Ostgard was here and wouldn't disagree with this

5    characterization -- that ruined the Hassan family's life.  I

6    believe they testified, and it's in the record in that

7    hearing, it broke up their family.  Their family is still

8    separated.  They've lost their house.  That was a

9    devastating, devastating event in their life.

10          We don't need to advance much further than the

11   trial of Mahamud Said Omar.  The conduct here, whatever

12   noble purpose it may have been inspired by, certainly ruined

13   the life of Jamal Sheikh Bana's family and we heard his

14   mother testify to that.  It certainly had a profound impact

15   on Hibo Ahmed when Shirwa Ahmed detonated a suicide bomb and

16   killed himself and many innocent Somalis.

17          So the suggestion of nobility, I think, is -- it

18   detracts from Mr. Ahmed's remorse about making a terrible

19   mistake.

20          And we would back up just slightly by saying that

21   at the time that Mr. Ahmed left, had he done the appropriate

22   research, there are statements by Osama bin Laden, there are

23   statements by Zawahiri, major figures in al-Qaeda,

24   supporting the activities in Somalia and encouraging people

25   to go support those activities.

1           Mere weeks after he departed an al-Qaeda and East

2     African senior figure, Saleh Nabhan, wanted by the United

3     States for his participation in the embassy bombings and

4     other terrorist activity in Kenya, is training these men in

5     Somalia.  So very quickly whatever preconceived notions

6     about how they would be received had evaporated.

7           THE COURT:  Well, the government knows that I've

8     had these cases for a long time and whenever I have had the

9     opportunity to question defendants or any other witnesses,

10    I've always talked -- asked the question about dealing with

11    hostility, hatred with Ethiopia because the Court knows the

12    history and we've had an expert come in and testify several

13    times dealing with the conflict between the Ethiopians and

14    Somalia and up to this time we have not had anyone say they

15    had lost family members, land directly to any conflicts with

16    Ethiopia.

17          And, yes, Ethiopia is a Christian country and

18    Somalia is Muslim and for 300 or 400 years they've been in

19    conflict dealing with land, but if it comes out of a

20    defendant's mouth that they think it's noble, it's going to

21    add time to their sentence.  So I think we should move on.

22          MR. NARUS:  May I make two quick points, Your

23    Honor, and then I'll be complete here?

24          THE COURT:  (Indicating.)

25          MR. NARUS:  The first is that Mr. Ahmed, more than

1    the other defendants who returned from the United States,

2    made in the government's view the cleanest break.  Your

3    Honor is well aware of that.

4          Second, the United States has treated Mr. Ahmed

5    very similarly to Mr. Isse both in his plea agreement, his

6    statutory maximum, and in the sentencing recommendations.

7    So I would just reiterate that point to Your Honor.

8          And with that, we recommend a 10-level departure

9    and a guideline range of 70 to 87 months.

10          THE COURT:  All right.

11          MR. OSTGARD:  Your Honor, if I might comment just

12    briefly?

13          THE COURT:  No.

14          MR. OSTGARD:  I want to --

15          THE COURT:  No, no, no.  You said your piece.  I

16    need to hear from Mr. Ahmed.

17          THE DEFENDANT:  Thank you, Your Honor.  My name is

18    Salah Ahmed.  What should I talk about?

19          THE COURT:  You have a right to -- you have an

20    absolute right to talk to me, sir.  You have an absolute

21    right to tell me anything that you want to tell me about

22    yourself, about this offense, or anything else that you

23    think I should know before I sentence you.  This is your

24    time and opportunity to speak to me.  Take your time, gather

25    your thoughts, and talk to me.

1          THE DEFENDANT:  Thank you, Your Honor.  First when

2     I left -- I met these guys and they were talking about going

3     to Somalia and saying Somali people are dying, people are

4     getting killed, kidnapped, raped, something like that, and

5     the whole community was going on.

6          So they were saying if you guys go to Somalia, you

7     have the right to do whatever.  You are American citizen.

8     You are on top of the war.  You have a passport.  You can do

9     whatever, you know.  So if you don't like what's going on,

10    you know, what you see in Somalia, you have the freedom to

11    go wherever and just leave.

12         Then I was thinking, okay, I'm helping my people,

13    not only just war and, you know, being soldier, also like,

14    for example, if you go to Somalia you can be an inspiration

15    for people who don't have education, who have never been to

16    America or never had chance like we --

17         THE COURT:  But why did you hide it?

18         THE DEFENDANT:  Huh?

19         THE COURT:  Why would this be hidden if it's all

20    this inspirational thing to help?  Why would you hide it

21    from your family?  Why would you hide it from the community,

22    hide it from the mosque, hide it from the imams, hide it

23    from everyone and make this such a secret conspiracy?

24         THE DEFENDANT:  Okay.  They said do not tell

25    nobody, your family, your friends, not even --

1          THE COURT:  Didn't that register in your mind

2     what's going on here, what do you mean I can't tell -- if

3     I'm doing something that's going to be helpful, why wouldn't

4     I be able to discuss this with my family members?

5          THE DEFENDANT:  I still -- every time I think

6     about those days I still remember -- I still don't know

7     exactly why I agreed, and I always regret.  But they said if

8     you talk to anyone --

9          THE COURT:  But I need to know.  The reason why is

10    it's just not for you.  We have to figure out what's going

11    on and to try to make sure this doesn't happen again and

12    educating people to what is making someone turn on or turn

13    off the switch.

14          Everything I've read, everything that has been

15    told to me about Somalia and Somali people, you're clans and

16    that's family.  And when it's family, you do anything for

17    family.

18          And here we have a number of individuals, young

19    people, that have turned away from their family to allegedly

20    go back to do great things for Somalia, which they have

21    never been to or they were there when they were babies and

22    wouldn't recognize it if they had to.

23          So the papers that have been given to me have not

24    been as helpful as I've wanted them to be in trying to

25    understand this instead of just saying that you're a young

1    kid running off for adventure.

2              It's not like you were running off to New York

3    City or going to Las Vegas, you know, what happens in

4    Las Vegas stays in Las Vegas and you are coming back in

5    three days.

6              You're going and you're talking about killing

7    people.  And I'm assuming that you have never killed anyone

8    before, so that's a leap.  That's a huge leap for me and I

9    think it's a leap for anyone.  And so that's why I need you

10   to talk to me about those things.

11             THE DEFENDANT:  Thank you, Your Honor.  As an

12   individual I took it as if I go to Somalia, I have the right

13   to choose if I want to be a soldier and defend Somali

14   country or if I can just leave.  Because I have my, you

15   know, passport and documents and everything, I have the

16   right to do whatever I like to do or however I want to help

17   Somalia.

18             That in the back of my head and at the same time

19   those guys, they had an agenda for not telling anybody and

20   they forced not to tell anyone, including family member,

21   friends, and anyone else.

22             So I was thinking if I go to Somalia or help my

23   people, it will be a crowd of Somali people protesting, you

24   know, saying Ethiopia, get out of our country, we don't want

25   you here, like united Somali people in Mogadishu, like, you

1    know, waving the flag, thinking that, oh, Ethiopia, we don't

2    need you, please leave us alone, something like that.

3            Then I was thinking -- at the same time we said,

4    in our mind, it will be like chance for us to see our

5    motherland that we never remember and, you know, come back

6    and travel to different cities and, you know, learn your

7    history and how it looks like in Somalia and Africa, how

8    people live.  It is kind of in our mind we -- I took that

9    I'm going to experience out of this traveling and I felt

10   like I am in control of my life.

11           Then when I get there things was the opposite way.

12   As soon as we landed in Mogadishu we went to the house and

13   this guy said, Everybody, I want your documents.  Lay down

14   on the floor.  I want you to change your name.  I don't want

15   you to talk to no one.  That's it.  You act local.  Don't

16   tell your identity.  Then we stayed overnight.

17           Next morning we went to Marka.  Then we came to

18   Marka and somehow in our mind reality hit us.  What is going

19   on here?  Where is the people?  Where is the unity?  Where

20   is the people that are against the Ethiopians?  Why

21   people -- why are we hiding?  Why do we have to change our

22   name?  Why we even don't have our package that we have

23   clothes?  We just came up with normal clothes, only one

24   shirt, one pants.

25           Then we sit in Marka thinking, okay, things might

1    change.  You have our documents.  You have, you know,

2    ability to do whatever you want.  I come back and all of a

3    sudden things changing.

4         And I missed one thing.  When we went to -- huh?

5    Oh, that's me.  When we went to Mogadishu, as soon as we

6    came to the house we lay down our documents.  Then these

7    guys show video, two videos.

8         And my family -- everybody in my family knows, all

9    my friends, I have a fear of blood or anything like that.

10   All of a sudden they show this video of a guy getting shot

11   and they show this video of a guy cut his neck.  I remember

12   I turn away and I said I'm not going to watch it.

13        So we were terrified at all these bullets that we

14   hear in Mogadishu.  And we don't see any people.  I never

15   seen Ethiopians even when I went to Mogadishu, no army of

16   Ethiopia or anything.

17        Then when we came to Marka, then I learn these

18   guys' motive.  All they talk about was we are against the

19   government because they're with the Ethiopians.  We are

20   against Ethiopians.  And then I said, okay, you guys are

21   against even your own people.

22        Then I notice some members coming and talking

23   about how they fight with Ethiopians, the government, and

24   how they ambush and how, you know, Ethiopians fight back.

25   When they fire them, they fire back the whole village.

1           You know, in our mind -- and at the same time,

2      Your Honor, you can't express your opinion and say, okay,

3      hold up.  What do you mean you attack Ethiopians and

4      Ethiopians kill?  What is that going to do for you?  You

5      kill one soldier and they kill the whole village.  What's

6      that going to do for you?  You know, you can't -- so in my

7      mind this is not right.  This is not why we came here.  This

8      is not the experience.  This is dangerous.

9           We then realized that we cannot, you know, have

10     travel agents that we can go to.  There's no airport in that

11     town.  Even there's no police that you can say, hey, can you

12     help me if I want to leave.  There's nothing.  You don't

13     know if even the people that are local, are they al-Shabaab.

14          I used to -- I smoke.  You can't even smoke.  I

15     have to hide in the mountains.  And I said, You can't even

16     smoke?  What kind of -- how you can't even smoke if you're

17     here, you know?  Even if you guys religious, how -- why?

18     What's the big deal about smoking?  It's not criminal.  It's

19     not in the Quran that says you can't smoke.  It's bad thing,

20     but it's not in there.  Why?

21          Everything was the opposite that we were thinking.

22     We don't have no choice just sitting over there.  Then I

23     start thinking about myself.  How can I leave these guys?

24     What can I do?  Who should I trust?  Where is that stuff

25     from, you know?  Then you can't do nothing about it.

1    There's no airport.  There's no security.  There's no police

2    that you can --

3            MR. OSTGARD:  Could I get him back to the Court's

4    point?

5            THE COURT:  (Indicating.)

6        (Discussion off the record between

7         the defendant and defense counsel.)

8            THE DEFENDANT:  Then --

9        (Discussion off the record between

10        the defendant and defense counsel.)

11           THE DEFENDANT:  When I get the chance to run away,

12   I run away and never came back and I never call them.

13           And the reason -- when I come back to your

14   question, I regret the decision I made to even go to

15   Somalia.  I still ask myself where -- what I was thinking.

16   I sit down sometimes and I say at that time what you were

17   thinking, why did you believe.

18           And one of the reasons, when I think about it, it

19   was short time.  These guys like peer pressuring, like

20   somebody is already leaving, we don't have no time.  If we

21   had, for example, long time, you know, somehow one day I

22   would talk to family or friend and they will stop me or I

23   have time to think about not even go there.

24           All of a sudden reality hit us when we get to

25   Somalia and since then all I'm doing is to put all these bad

1     things and al-Shabaab and everything in my past.

2          In America my family.  My mom, she has diabetes,

3     asthma, she has blood pressure, she has her bladder removed.

4     Since we came to the United States -- even I remember when

5     we were in Kenya I used to think America is like paradise.

6     When you go there you rich, you have money, everybody happy,

7     everybody have five different cars.  It was my dream to come

8     here.  I came here.  I never had anything against America.

9     I always love this country.  My mom, she been getting

10    treatment, all the expenses every day.  She goes to hospital

11    every month.  Once all those bills, 30,000, 40,000, all

12    this -- America provided that to my family.  I never had

13    anything against America.  And my family, always we

14    appreciate being here.

15          I went to school -- it's like when I was in Marka

16    I was thinking, okay, you had chance that nobody had and now

17    are you going to waste it and let these guys make you

18    soldier or kill somebody and force you and to use you.

19          That's one of the things that made me run away, is

20    that I don't want to be a terrorist.  I didn't sign up and I

21    will never be -- that's one of the reasons why I left.  I am

22    young.  I don't want to endanger myself without ever having

23    family of my own, without finishing school, without being a

24    man.

25          Your Honor, I am grateful and happy that you

1    talking to me today face-to-face.  I was not -- I thought

2    that if I stayed over there those guys will, like, make me

3    kill somebody or get killed and never have a chance to see

4    my mom.

5          When I see my mom, who I remember came to New

6    York, I was crying with my family.  I couldn't even stay in

7    California to stay away from my job or anything.  I run back

8    to Minnesota because of my mom because she was really ill.

9          I'm so grateful that I am here today.  I'm so

10   grateful that I am speaking and have life to be in the

11   United States.  I'm so grateful and I will never want to

12   lose that.

13         No matter what happens today, all I'm doing in my

14   life is to put all this bad experience in my past and move

15   forward in my life and be a better man and have a future of

16   my own.

17         Thank you, Your Honor.

18         THE COURT:  Thank you.

19         The government is moving for Sentencing Exhibits 1

20   through 9 to be admitted?

21         MR. NARUS:  Yes, that's correct, Your Honor.

22         THE COURT:  Any objection?

23         MR. OSTGARD:  No objection, Your Honor.

24         THE COURT:  They are admitted.

25         On July 28, 2009 the defendant pled guilty to

1    Count 1 of a four-count indictment charging him with

2    providing material support to terrorists, in violation of

3    Title 18, United States Code, Section 2339A(a), a Class C

4    felony.  It is considered and adjudged that the defendant is

5    guilty of that offense.

6        The government has filed its 5K1.1 motion.  The

7    Court has granted that.  The Court has outlined the advisory

8    guideline calculations that have been adopted by the Court

9    and has denied all motions by the defense.

10       I heard -- the Court has read the presentence

11   investigation report.  The Court has reviewed all the

12   submissions of counsel.  The Court has reviewed all the

13   United States Supreme Court decisions and Eighth Circuit

14   court decisions dealing with this type of case and also all

15   the other circuit cases that deal with terrorism violations.

16   And the Court has heard from counsel in court and the

17   defendant in court, along with the defendant's brother.

18       The Court will sentence the defendant as follows:

19   The Court will, of course, and has to follow Title 18,

20   3553(a) factors in sentencing the defendant and will do so

21   now.  The defendant is hereby sentenced to the care and

22   custody of the Bureau of Prisons for a term of 36 months.

23       There is no fine.  There is no restitution.

24       The defendant is sentenced to a term of 20 years

25   of supervised release.  The following mandatory conditions

1     are applicable:

2             The defendant must report to the United States

3     Probation and Pretrial Services Office in the district to

4     which the defendant is released within 72 hours of release

5     from the custody of the Bureau of Prisons.

6             Next, the defendant shall not commit any crimes,

7     federal, state, or local.

8             Next, the mandatory drug testing is suspended

9     based on the Court's determination that the defendant poses

10    a low risk of future substance abuse.

11            Next, the defendant shall not possess a firearm,

12    ammunition, destructive device, or other dangerous weapon.

13            Next, the defendant shall cooperate in the

14    collection of DNA as directed by the probation officer.

15            Next, the defendant shall abide by the standard

16    conditions of supervised release that have been adopted by

17    this Court, including the following special conditions:

18            One, if not employed by a -- at a regular lawful

19    occupation as deemed appropriate by the probation officer,

20    the defendant may be required to perform up to 20 hours of

21    community service per week until employed.  The defendant

22    may also participate in training, counseling, daily job

23    search, or other employment-related activities as directed

24    by the probation officer.

25            Next, the defendant shall submit his person, his

1      residence, office, vehicle, or other area under the

2      defendant's control to a search conducted by a United States

3      probation officer or supervised designee at a reasonable

4      time and in a reasonable manner based on reasonable

5      suspicion of contraband or evidence of a supervision

6      violation.  The defendant shall warn any other residents or

7      third parties that the premises and areas under the

8      defendant's control may be subject to searches pursuant to

9      this condition.

10             Finally, there's a $100 special assessment which

11     is due and payable immediately to the Crime Victims Fund.

12             Sir, if you feel the Court has not followed the

13     law in the imposition of your sentence, you have a right to

14     appeal your sentence to the Eighth Circuit Court of Appeals,

15     which sits in St. Louis, Missouri.  You have 14 days to file

16     that notice of appeal.

17             Mr. Ostgard will be your attorney.  If you do not

18     wish to have Mr. Ostgard, you can represent yourself or hire

19     your own attorney.  However, I will not appoint anyone else

20     but Mr. Ostgard to represent you in this matter.

21             Now, before I end up here, I want to say that this

22     investigation and cases have been going on for some time and

23     the Court has been intimately involved in all the cases

24     except one that has come through dealing with the young

25     Somali men that have left the Minneapolis community to go to

1   Somalia.

2          The community at large and the Somali community

3   should know that the United States, through the United

4   States Attorney's Office, has done an admirable job at

5   investigating and prosecuting all the individuals that were

6   involved in these terrorism activities.  That goes to the

7   FBI and any other agency that was involved.

8          The community should know and knows and the Court

9   knows that the family members of these young people came to

10  the government, came to the FBI to find their sons.  And the

11  community knows that they could never do that in Somalia,

12  that the government would be corrupt, would not help.  But

13  they know that in this community, the outreach of the United

14  States government has been outstanding in trying to bridge

15  any gaps dealing with not understanding the laws of the

16  United States.

17         And the community at large and the Somali

18  community should know that the United States District Court

19  and all its judges and I being the chief judge has made sure

20  that all the Somali defendants have been represented by

21  outstanding and qualified attorneys that would represent

22  their interests to the maximum.

23         I am proud to be a United States judge and I am

24  proud to have the attorneys in front of me representing

25  their respective interests to make sure that justice is

1    being done in these cases.

2                Anything further for the defense?

3                MR. OSTGARD:  No, Your Honor, except with respect

4    to a request that --

5                THE COURT:  June 14th, 12:00 noon, the

6    defendant -- where are you living, sir?

7                THE DEFENDANT:  I live in New Brighton.

8                THE COURT:  You turn yourself in on June 14th at

9    12:00 noon of 2013.  You are to turn yourself in to the

10   designated place of your confinement by the Bureau of

11   Prisons.

12               I will recommend that you be housed in the state

13   of Minnesota.  If they do not house you there, you will be

14   housed wherever the Bureau of Prisons decides that you will

15   be housed.

16               If the Bureau of Prisons has not designated a

17   place for your confinement, you are to turn yourself in to

18   the United States Marshals Office, whose office is located

19   in this building, on June 14th, at 12:00 noon, 2013.

20               Anything further for the government?

21               MR. NARUS:  No.  Thank you, Your Honor.

22               MR. OSTGARD:  Thank you, Your Honor.

23               THE COURT:  We will recess until this afternoon at

24   2:00.

25               THE DEFENDANT:  Thank you.

1          (Court adjourned at 12:56 p.m.)

2                              *        *        *

3

4

5

6

7          I, Lori A. Simpson, certify that the foregoing is a

8     correct transcript from the record of proceedings in the

9     above-entitled matter.

10

11                    Certified by:   *s/ Lori A. Simpson*

12                                   Lori A. Simpson, RMR-CRR

13

14

15

16

17

18

19

20

21

22

23

24

25